FILED

DEC 1 2 2017

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

UNITED STATED DISTRICT COURT
WESTERN DISTRICT OF TEXAS
MIDLAND DIVISION

CASE NO. 7:17-CV-250

| | | |
|---|---|---|
| BRADLEY MCDANIEL | § | IN UNITED STATES DISTRICT COURT |
|     *Plaintiff,* | § | |
| | § | |
| v. | § | WESTERN DISTRICT OF TEXAS |
| | § | |
| RONALD J. MILLER, | § | |
| SIR MARK ALLEN, | § | MIDLAND COUNTY, TEXAS |
| MARK EDWARD COBB, | § | |
| CHARLES R. POWELL, | § | |
| MARY STREETT, | § | |
| BP AMERICA, INC., BP P.L.C., AND | § | |
| BP AMERICA PRODUCTION CO. | § | |
| | § | |
|     *Defendants.* | § | |

## COMPLAINT

### I.

Plaintiff, BRADLEY MCDANIEL ["Plaintiff"], 3803 Saint Andrews Court, Midland County, Midland, TEXAS 79707, files this complaint against the below defendants.

### II.

Defendant Ronald J Miller, former BP America *"Drilling Advisor"*, *"Wellsite Leader of the Future Coach"*, *"Security Advisor,"* is a resident of South Jordan, Salt Lake County, Utah, and may be served with process at his residence located at 9732 Skye Park Road, South Jordan, Utah 84009.

Defendant Sir Mark Allen, BP P.L.C. "*Security Consultant*", is a citizen of the UK and may be served with process at his employer's residence located at: BP, 1 St James's Square, London, SW1Y 4PD, UK.

Defendant Charles R Powell, former BP America "*Wellsite Leader Excellence Program Manager,*" is a resident of Jayess, Lawrence County, Mississippi, and may be served with process at his residence located at 718 Topeka Jayess Road, Jayess, MS 39641.

Defendant Mark Edward Cobb, former BP America "*General Manager of In Amenas*", is a resident of Corpus Christi, Nueces County, Texas, and may be served with process at his residence located at 13970 Man 0 War Court, Corpus Christi, Texas 78418.

Defendant Mary Streett, BP's "*Vice President US Government Affairs*" and sister of Clinton Foundation Executive Director, Stephanie S Street, is a resident of Washington D.C., and may be served at her place of business at 1101 New York Ave NW #700, Washington DC 20005.

Defendant BP America, Inc. ("BP America") is a Delaware corporation with its principal place of business at 501 Westlake Park Blvd., Houston, Texas 77079. BP America is registered to do business, and does business, in Texas. BP America may be served with process by serving its registered agent, CT Corporation System, 350 St. Paul Street, Suite 2900, Dallas, TX 75201.

Defendant BP America Production Company, ("BP America Production"), is a Delaware company with its principal place of business at 501 Westlake Park Blvd., Houston, Texas 77079.

BP America Production Company was the entity BP plc chose as the entity that provided direct compensation during the time Plaintiff was working at In Amenas.  BP America Production may be served with process by serving its registered agent, CT Corporation System, 350 St. Paul Street, Suite 2900, Dallas, TX  75201.

Defendant BP plc ("BP plc") is the head of a multi-national group of related business entities.  BP plc is the global parent company of the world-wide businesses operating under the "BP" logo.  Defendant BP America is a wholly owned subsidiary of BP plc and is sufficiently controlled by BP plc as to be BP plc's agent in Texas.  BP plc is a UK company that does business in Texas, does more business in the United States than in any other country in the world, maintains its North American headquarters at 501 Westlake Park Blvd., Houston, Texas 77079, and is subject to jurisdiction in the United States. BP plc maintains a principal place of business in Houston, Texas.  BP plc maybe served with process by serving its registered agent, CT Corporation System, 350 St. Paul Street, Suite 2900, Dallas, Texas  75201

Defendants BP plc, BP America, and BP America Production Company shall be referred to herein collectively as "BP."  BP plc  is the global parent company of the world-wide businesses operating under the "BP" logo.  BP plc actively and sufficiently controls its subsidiaries to a degree that the subsidiaries are the parent's agents, both in Texas and worldwide [hereinafter sometimes collectively "Defendants"].

### III.

The basis of jurisdiction is established through diversity in citizenship of Defendants. Also, the Federal Question is met under violations of US Federal Laws by the Defendants including

but not limited to: U.S. 30 CFR 250 1501-1510, U.S. Patriot Act 18 U.S. Code 2339B - which prohibits providing material support or resources to designated foreign terrorist organizations, Section 806 of the SOX, 18 U.S. Code 1514A, and 18 U.S. Code 1961-1968 – Racketeering Influence and Corrupt Organizations Act.

## IV.

### INTRODUCTION

Evidence recently recovered, including but not limited to evidence recovered in cases consolidated with a related case with Cause Number 2014-54027, in the District Court of Harris County, 152nd District, has made necessary this complaint be filed in this jurisdiction in United States Federal Court against multiple, additional Defendants as detailed above with additional, more severe causes of action. All referenced depositions, exhibits, and bate numbers were discovered in Cause Number 2014-54027 or cases consolidated with it for the purpose of discovery dealing solely with the January 2013 In Amenas Hostage Crisis which the Plaintiff survived. While much of the evidence contained against the Defendants arise from this crisis, it is not the sole nor most recent overt act the Defendants took against the Plaintiff.

BP[1] has a checkered history of unsafe operations that create the risk of serious injury or death. BP fails to provide operational safety, safety, and personal safety for those working with BP. BP makes representations about safety, which demonstrate a clear understanding of its duties

---

[1]BP is an integrated oil and gas company that does business worldwide. BP's presence in the US is greater than in any other nation in which it operates. BP's United States headquarters and principal place of business is located in Houston. BP does business by and through a variety of subsidiaries, all of which are under the direct control of BP p.l.c. BP operates under the trade name, or a common name, of "BP," which includes the parent company as well as all of its subsidiaries and affiliates. Specifically as to the BP subsidiaries, BP P.L.C., the parent company, actively and sufficiently control the subsidiaries such as to make the subsidiaries the parent's agencies, both in Texas and worldwide.

and obligations, then deliberately engages in actions and allows omissions that are directly contrary to safety. The tragedy outlined in this Petition is another in a history of tragedies in which BP fails to disclose known risks, while deliberately engaging in actions that place people at greater risk than necessary. Relevant to this case, BP has a well-known history among federal investigators, regulators, and oversight committees of retaliating against employees for bringing health, safety, and environmental concerns to BP management and/or employees when BP learns these employees plan on going outside the company to federal investigators, regulators, or oversight committees.  These retaliations follow and include the Defendant's internal security function's discrete monitoring of flagged employees' emails, computers, and other "company property." A well-known, well-documented, and widely publicized example of this occurred, even within the United States, in BP's Alyeska Pipeline operations in the 1990s (U.S. House of Representative's Report on Alyeska Covert Operation dated July 1992; Charles Hamel v. Alyeska Pipeline Service Co.).  Going into the January 2013 In Amenas siege, the BP Defendants knew the Plaintiff was a huge problem for their false-narrative defense in criminal and civil litigation surrounding the April 2010 Deepwater Horizon Disaster/Gulf Oil spill which to date has cost BP shareholders over $64 billion and counting. The Plaintiff is possibly the biggest corporate whistleblower in U.S. history given the detailed insider evidence and statements he delivered to federal investigators in Case Number IRU-14-0026-GOM regarding the BP Defendant's blatant violations of Federal Law 30 CFR 250 1501-1510 both before and after the April 2010 Deepwater Horizon Disaster/Gulf Oil Spill as well as the BP Defendants blatant violations of the terms of their felony probation for the 11 counts of felony manslaughter which the BP Defendants pled guilty to for killing the 11 men on the Deepwater Horizon as spelled out in Federal Court Document 49 Case 2:12-cr-00292-SSV-DEK filed 16 January 2013 – the same day the In Amenas

5

Hostage Crisis and the four-day siege of the Plaintiff's drilling rig began. The Plaintiff worked as a Wellsite Leader for the BP Defendants from January 2008 through his resignation from the company in July 2014. As laid out in the petition below, the Plaintiff witnessed extremely disturbing things going on inside the BP Defendants' Wellsite Leader program dating back to his first year with the company in 2008. Among them was a "Highly Confidential" BP email he obtained in which the BP Defendants Charles Powell and Ronald Miller were cheating a family-connected BP Wellsite Leader through the most critical competency test of his career. Among other things, inside of BP, the Plaintiff warned in an emailed safety observation card (STOP) that a disaster like the Deepwater Horizon Disaster would happen the BP Defendants continued placing dangerously incompetent family members into these safety-critical roles. Despite his warnings, the BP Defendants continued the practice and 16 months later the Deepwater Horizon blew out killing 11 men and becoming the worst oil spill in U.S. history. A product of the BP Defendant's fraudulent Wellsite Leader program was on board the rig at the time of the disaster, took part in many of the key decisions that led up to the disaster, and was one of the BP Wellsite Leaders who *"fatally misinterpreted the negative pressure test aboard the Deepwater Horizon."* As the Plaintiff detailed to federal investigators in June 2014 and most disturbing, even after the horrendous aftermath of the disaster, the BP Defendants still continued their shameful, self-serving practice of "hooking up" dangerously incompetent family members with these high-paying positions in violation of their felony probation (McDaniel Deposition 18 February 2016, Exhibit 854). Four months after the Plaintiff delivered this devastating insider evidence to federal investigators, the Judge presiding over the Deepwater Horizon case shocked legal experts when he found the BP Defendants guilty of "gross negligence" for the disaster in September 2014. Also shocked were the BP Defendants' two non-operating partners in the well the Deepwater Horizon was drilling at

6

the time of the blowout – Mitsui and Anadarko – who years prior, agreed to pay a combined $4 billion dollars for their share of the cleanup costs under their incorrect assumption that it would be impossible for BP to be found guilty of "*gross negligence*" in operating the well. After fighting liability for the disaster for over four years, BP ultimately settled with the U.S. Department of Justice in July 2015 for a record $20.8 billion under the condition of "*strict confidentiality*" under Judge Barbier's order in Document 14801 in Case 2:10-md-02179-CJB-SS filed on 07/02/15. Since the Plaintiff's deposition in February 2016, the facts and evidence surrounding the criminal conduct BP Defendants attempted to contain has been well established after obtaining the results of a Freedom of Information Act Request (control number BSEE-2015-0042). Despite the Plaintiff's terrible experience working for the BP Defendants from 2008 through 2014, as spelled out in the Petition below, the Plaintiff has become the highest-paid, U.S.-based product of the BP Defendants' Wellsite Leader of the Future program working as a Senior Drilling Engineer for a different U.S. based oil company. In his current role, the Plaintiff makes nearly twice as much a year as his peers from BP's Wellsite Leader of the Future program who are currently in charge of BP's drilling operations in Deepwater Gulf of Mexico.

Relevant to this case, BP is also well-known for partnering and protecting some of the most brutal regimes in the world in order to secure and maintain lucrative oil concessions. BP shamelessly coddles these regimes -- many of whom are known state sponsors of terrorism -- with examples in recent history being Iran, Ghaddafi's Libya, and most relevant to this case, Algeria. BP utilizes people like BP Defendant Sir Mark Allen to cultivate relationships within the darkest corners of these regimes. Widely publicized and relevant to this case, BP Defendant Sir Mark Allen built, in his own written words in 2004, a "*remarkable relationship*" with Ghaddafi's

notoriously brutal Libyan Intelligence Chief Moussa Muhamad Koussa. BP Defendant Sir Mark Allen had an even stronger and longer relationship with the Algerian government's notoriously brutal intelligence agency, the Algerian DRS. In turn, as neighbors and staunch allies, Ghaddafi's Libyan Intelligence Agency and the Algerian DRS had an extremely close working relationship. As detailed in the December 2010 Senate Report *Justice Undone*, using the "remarkable relationship" Sir Mark Allen had formed with Ghaddafi's Libya, BP arranged for the release of the Lockerbie Bomber -- who was sentenced to life in prison in the UK for killing 270 people, including 189 Americans, in the bombing of Pan Am 103 -- in return for a $900 million oil exploration deal with Ghaddafi's Libya in 2007. Also relevant to this case, while BP Defendant Sir Mark Allen was a high-ranking officer atop MI6, a MI5 whistleblower named David Shayler blew the whistle on his knowledge of MI6's utilization of well-known members of Al Qaeda in an assassination attempt in North Africa that went terribly wrong and killed innocent civilians -- while missing their intended target. The plot was detailed by former MI5 officer David Shayler reportedly targeting Ghaddafi in retaliation for his nationalizing BP's billions of dollars of oil fields in Libya in the 1970s. Key to this case as laid out in this petition, BP Defendant Ronald Miller himself has detailed his history working with BP's "Security" function dating back to his time working for BP in Colombia in the 1990s when BP was implicated in the murders of tens of thousands of innocent civilians, including women and children, who opposed their $25 billion oil interests there. BP's "Security" chief was ultimately sacked in the scandal, which was highly publicized in articles like "*BP's Secret Soldiers*." BP had a similar security arrangement in place at In Amenas – with considerable relationships, resources, capabilities, and influence in place. We lay out these facts further in this petition below in part to counter the BP Defendants' defense behind closed doors that they were innocent victims of an Algerian DRS false flag attack at In

8

Amenas 16-19 January 2013 and in response to the BP Defendants' attempts to deflect liability in this case by designating bad actors in the Algerian government as *"responsible third parties."* – while asserting that if they were in fact merely *"responsible third parties"*, why did the BP Defendants go to such great lengths to cover up their guilt?

After recently obtaining "Highly Confidential" and "Confidential" BP internal documents (discovery cases consolidated with Cause No. 2014-54027 in Harris County Civil Court, 152nd District), which BP has successfully hid from the public until now, BP's dishonest narrative about what happened at In Amenas 16-19 January 2013 has been exposed--while the Plaintiff's account of what really happened on the ground during those four days has been substantiated (Summarized starting on Page 69 in this petition under *"V. FACTS"*). Tellingly, BP has refused to perform a public investigation into the crisis while shamelessly lying, denying, and hiding this key evidence from the public in any investigations held into the crisis to date. In stark contrast to BP's false narrative, the Plaintiff witnessed first-hand the Algerian government's complicity in the attack and the fact that it was the Algerian government, not the terrorists (who, by the way, were known by BP to be secretly sponsored by BP Defendant Sir Mark Allen's friends in the Algerian DRS), that actually killed the majority of the 39 expatriates who ultimately lost their lives. BP not only placed the Plaintiff and his men in an extremely vulnerable and unsafe position, but also "hung them out to dry" there for four long days during the January 2013 In Amenas Hostage Crisis. While "hung out to dry" during those four days, the Plaintiff worked relentlessly under terrifying conditions doing whatever he could to not only ensure the safety of his men, but also to do everything he could to save the lives of his expatriate coworkers who were being held hostage or were in hiding at the main facility – 39 of whom were ultimately murdered. During the four-day siege, the Plaintiff

worked relentlessly with U.S. government contacts passing on all the on-the-ground intelligence he could to them – including working to gather intel answering specific questions they had. Confirming this, the Plaintiff's phone bill shows he logged 313 minutes of phone calls with U.S. contacts while on the ground at In Amenas, as well as dozens of texts with some examples shown below under "*V. FACTS, 5.19.*" While all this was going on during these four days, BP took part in multiple lies to the United States government claiming the Plaintiff and the eight other expatriate workers on his drilling rig had been evacuated to safety; when, in fact, they were not. In one such occurrence on the afternoon of the third day of the siege, a "dummy run" of vehicles faking the evacuation of the Plaintiff and his men from the drilling rig was even utilized to attempt to pull away U.S. aircraft with eyes on the situation – the Plaintiff's account of this occurrence has been substantiated after recovering BP's own "Confidential" Incident Management Team time log that documents what occurred. In contrast to the Plaintiff's "evacuations" and "fake evacuation," BP promptly evacuated expatriates working at a nearby wellsite in Bourahet up through Route National 3 which ran through the In Amenas field without issue the morning of the first day. BP also evacuated nearly 100 expatriates from In Amenas as they became free – including BP Defendant Mark Cobb after he fled the main facility, abandoning his men in the first hours of the attack. Also, BP evacuated hundreds of expatriate workers from fields in Algeria hundreds of miles away from In Amenas in the first three days of the attack (*V. Facts 5.23-5.29*). Worth noting Once the Plaintiff and his men were finally "evacuated" from the drilling rig on the fourth day of the siege, they were strangely brought to the main facility within close proximity of the last six or seven hostages who were still being held by terrorists within the gas plant at that time (*V. Facts 5.23, b*). At this point, BP had dishonestly notified some of these hostages' families that they had perished on the previous day. As seen in his text messages, the Plaintiff was working with his

U.S. contacts at this time to gather all the information he could about their status with the goal of getting them out. Most disturbing to the Plaintiff, these last six or seven hostages were in fact freed from the terrorists that afternoon – only to be murdered by the Algerian DRS shortly thereafter. BP's own "Confidential" evidence recovered in this case confirms the Plaintiff's account of this, while exposing the BP Defendants dishonest false narrative, which attempted to cover up these particular murders by the Algerian DRS. For example, the BP Defendants' Intelligence Analysis Unit's internal reports were clearly modified over several versions, with the help of BP Defendant Sir Mark Allen, to ultimately dishonestly claim that these last hostages were killed by terrorists' explosions on the afternoon of the third day (Bate Numbers BPALGERIA_0364176, BPALGERIA_0365100, BPALGERIA_0366535).

Substantiating the Plaintiff's account of what actually happened on the ground at In Amenas 16-19 January 2013, BP's own former Social Programmes / Security Expert for the In Amenas area, Dr. Jeremy Keenan, put out a report in November 2016 titled "REPORT ON IN AMENAS: INQUEST COVER UP AND WESTERN INVOLVEMENT IN ALGERIAN STATE CRIMES" which is a 283-Page, 14.5 MB, Peer Reviewed Report compiled after three years of studying the facts surrounding the January 2013 In Amenas attack. In the Executive Summary of this report, Dr. Keenan further substantiates the Plaintiff's first-hand account stating "...*the Algerian authorities, in the form of the DRS, were almost certainly complicit in the In Amenas attack. **Evidence in this report strongly suggests that the attack was a false-flag operation organized by the DRS that went drastically wrong**...*" Also substantiating the Plaintiff's account, on the first day of the attack, BP's own high-ranking security analysts and advisors working with BP's Intelligence Analysis Unit came to similar conclusions. BP Security Consultant Geoff Porter

"*Apparently, MBM's new katiba (Signatories in Blood) is claiming it. **I smell a rat. Something doesn't add up here**... If it was Belmohktar, why would he shift from a very profitable and sustainable kidnap for ransom method outside Algeria to one in Algeria that is surely going to end in his death or capture?...*" (BP email between Geoff Porter and BP Senior Security Analyst William Skidmore, dated 16 January 2013, BPALGERIA_0364184) and also an email chain between BP's William Skidmore and BP's former Director of International Security Affairs, Greg Saunders "*You're probably also familiar with Schindler's Article, "The Ugly Truth about Algeria," (10 July 2012) in the National Interest...* where the author, who is a former counterintelligence officer with the NSA, details with multiple, specific references that "... **Some of the most notorious massacres of civilians, were perpetrated by military special units masquerading as mujahidin, or by GIA squads under DRS control**..." To this, BP's Greg Saunders replies "***Picky, picky, picky. In my humble view, Algeria would look like Libya or Pakistan without the DRS, etc. Still does not make it right, but at least there was sufficient stability***..." (BP's Director of International Security Affairs, Greg Saunders in BP Email to Paul Kolbe dated 23 January 2013, BPALGERIA_0362953). And BP's Intelligence Analysis Unit report on Day 1 of the Siege, 16 January 2013 "*Mali, the In Amenas Connections and Regional Threat... **Belmokhtar is alleged to have had links to the Algerian secret service (the DRS). The Algerians are thought to have maintained both links and a high level of penetration within the Sahel militant movements** and may have felt they had control over the situation, which until recently had led them to resist foreign intervention in neighboring Mali...*" (Derek Porter Deposition, Exhibit 167, 28 January 2015, BPALGERIA_0016403). These BP security experts, based in offices in complete safety thousands of miles away, came to these conclusions based on their experience and expertise and networks gained from their previous careers working with

government intelligence agencies. At the same time the BP Defendants' security experts were coming to these conclusions, the Plaintiff came to this conclusion abruptly on the ground at In Amenas when he and his fellow American BP Wellsite Leader were forced into their rooms at gunpoint by the Gendarme Captain with an AK-47 and was subsequently told that the Gendarme Captain "…*wanted to know the exact location of the American company men on the rig because the terrorists were going to want to talk to them*…" The agreed plan had changed abruptly when, seven hours after the attack began, around noon local time, terrorists with RPGs and machine guns were reported moving within one mile of their drilling rig in broad daylight, unchallenged by Algerian security forces. Fortunately for the Plaintiff and dozens of other expatriate workers, with the help of his U.S. contacts, the Plaintiff reached the same conclusion BP's security experts did on the first day of the attack, early enough to take appropriate actions. The Plaintiff correctly assessed the situation and came to the conclusion that soliciting U.S. military intervention into their situation was the only chance he and his men had to survive. Some of the Plaintiff's U.S. contacts had previously worked in Libya and knew some of the Americans killed at Benghazi four months prior to this in September 2012. It was known that some of the same terrorists who took part in the attack on Benghazi were taking part in the January 2013 attack on In Amenas. Also, the two attacks were masterminded by the same terrorists – Mohktar Belmohktar – who in turn, was widely known to be an operative of the Algerian DRS. Considering this, the Plaintiff's U.S. contacts were quick to take action against these adversaries and come to the aid of the Plaintiff by deploying a U.S. Predator drone on the afternoon of the first day of the siege, followed by other U.S. aircraft – including Intelligence Surveillance & Reconnaissance (ISR) surveillance jets, C-130s, C-17s, and surveillance jets (*V. Facts 5.21-5.22*).  At the start of the 16 January 2013 In Amenas attack, the U.S. was already utilizing overflight permission from the Algerian government

13

to aid French forces in Operation Serval in Northern Mali.  These assets and support groups were already active in that operation, as well as in special operations ongoing in nearby Libya.

Early on that morning as the attack began, the Plaintiff had been gathering all the intelligence he could about the attack and had been relaying it on to his U.S. contacts, including intercepted radio transmissions from the terrorists who had taken over the main facility and gas plant. The Plaintiff's U.S. Contacts asked him very specific questions and asked him to gather specific information for them. In just one example, this fact can be clearly seen in a text message between the Plaintiff and a U.S. contact on the fourth day of the siege "Plaintiff: … *So it's possible Mr. Rowan could be in there if he's unaccounted for...* (**U.S. Contact replied**: *K thanks. Pls focus on latest info*) **Plaintiff's response:** *Yes, sir.*"  Upon the Plaintiff's reports of terrorists moving unopposed in broad daylight armed with RPGs and machine guns around noon local time on the first day and the Gendarme Captain's disturbing action and reasoning, the Plaintiff's U.S. contacts also correctly assessed the situation based on all the intelligence they had available and deployed a Predator drone above the Plaintiff's drilling rig to deal with the immediate threat the armed terrorists posed -- followed by other necessary actions warranted by the situation later. Looking at all the evidence available in the case, the actions the Plaintiff took were in fact necessary and saved lives during the four-day siege. In covering up what really happened at In Amenas, the BP Defendants have attempted to hide key evidence, have lied, and have denied that the Plaintiff's actions were necessary and dishonestly claim that the Algerian government – including the Gendarmes on the Plaintiff's location who turned on them -- actually had the Plaintiff's and his men's best interests in mind. The Plaintiff's actions during the four-day siege were in fact, necessary, and have resulted in injury and damage to his future earnings potential.

14

Upon studying the evidence substantiating the Plaintiff's experience working in the greater In Amenas area before the four-day In Amenas siege, which included at least two near-miss attacks similar to what ultimately happened at In Amenas, and then looking at what the Plaintiff endured during the four-day siege, the obvious question becomes – why was the Plaintiff such a high-value target? Not only of the terrorists, but also of the Algerian Government? And why was BP standing staunchly on the side of the Algeria government during the entire four-day siege despite everything that was going on? To begin to answer that question, BP has a well-known history among federal investigators, regulators, and oversight committees of retaliating against employees for bringing health, safety, and environmental concerns to BP management and/or employees BP learns plan on going outside the company to federal investigators or regulators. A well-known, well-documented, and widely publicized example of this, even within the United States, occurred in BP's Alyeska Pipeline operations in the 1990s (U.S. House of Representative's Report on Alyeska Covert Operation dated July 1992; Charles Hamel v. Alyeska Pipeline Service Co.). Congressional hearings and court proceedings exposed BP "Security" function for spying on employees and targeting whistleblowers and regulators in their Alyeska Pipeline operations in the 1990s. In these hearings, former FBI agent Gus Castillo testified that, while working for Wackenhut, he was instructed to follow whistleblowers in cars, to park in white vans outside of people's houses to spy on them, to steal mail, to steal phone records taken, and even to run whistleblowers off the road. Another former FBI agent, William Hinshaw, stated that "*it is known throughout the industry, that if you want a dirty job done, call Wackenhut.*" BP continues to utilize the same notoriously dirty security company, G4S Wackenhut, today. At the hands of the BP Defendants in London on 20-21 January 2013, the Plaintiff was terrified that "*BP was trying to kill him*" after they insisted he be "evacuated" there

to meet with them after the January 2013 In Amenas siege (*V. Facts 5.52 (a) through (g)*). Once

returning home to the U.S. from the January 2013 In Amenas siege, the Plaintiff has reported

multiple security incidents in writing, in detail to the FBI and local law enforcement. The

Plaintiff was warned by the FBI he could be targeted by terrorist networks even at home. Expert

witness on radical Islamic networks, Dr. Shaul Gabbay, confirmed this possibility (*V. Facts,*

*5.55*). To complicate things, the Plaintiff was also warned by Dr. Jeremy Keenan that it is

possible he could be targeted by the Algerian DRS – even within the U.S. – "... *If they (Algerian*

*DRS) deemed it necessary to protect themselves from the sort of exposure you describe, I think*

*they would do it, probably by **devising an "accident" (car crash**, or something along those lines,*

*or even a "false flag" terrorist killing)...*" (*V. Facts 5.56*). **Some of the most concerning**

**incidents being suspicious cars following within feet of the Plaintiff's vehicle for an**

**extended period of time – despite the Plaintiff greatly varying his speed (*V. Facts 5.59 b*).**

**Upon studying the possibilities, the Plaintiff felt the suspicious cars were attempting to gain**

**control of his vehicle and crash his vehicle at the opportune time. This means of**

**assassination, which they refer to as the "*Boston Brakes*", has been publicly detailed by**

**former SAS members -claiming they used such tactic dating back to at least the 1990's.**

**Upon studying the facts of this case as laid out in this petition and given the timeline of the**

**incidents, it will be obvious to any reasonable person will agree that BP "Security" /**

**Wackenhut was behind the incidents, probably more so looking to intimidate the Plaintiff**

**from going outside of BP with the insider evidence regarding the $18+ billion at stake in**

**the Deepwater Horizon Disaster / Gulf Oil Spill trial more than anything else.**

Tellingly, seeking to conceal their blatant dishonesty and cover up of what actually happened

at In Amenas, the BP Defendants have refused to compensate the Plaintiff for even the most basic

and obvious of these damages unless he agrees to sign an iron clad 9 page non-disclosure agreement that includes full confidentiality, a waiver of any and all liability – including future liability, and his agreement to cease all criminal accusations against them (*V. Facts 5.59 a –c*) and (*IX. Damages 7.04 g*). By signing such an agreement, the Plaintiff feels it would leave him wide open to the further defamed by the BP Defendants in the future – putting at risk his personal and professional reputation, which is critical to being successful in the 30+ years remaining in his career. The idea that the BP Defendants' protection of their reputation takes precedence over the Plaintiff's defense of his reputation is ludicrous – especially considering the BP Defendants have issued public filings effectively defaming the Plaintiff - while the Plaintiff can substantiate the accuracy of his account with hard evidence that the BP Defendants wish to seal. If the Plaintiff only continues to earn what he is currently earning now, working as a Senior Drilling Engineer for a Texas-based oil company, he will earn over $12 million over the next 30+ years that remain in his career. Considering this, the Plaintiff believes seeking fair compensation in a trial by jury as the only acceptable way to resolve this matter -- leaving his First Amendment right intact to further defend his reputation in the future if needed. Additionally, years after returning home from the In Amenas Hostage Crisis and as litigation against BP in both the In Amenas hostage crisis and the Gulf Oil spill continued to drag on, the Plaintiff has reported several suspicious security incidents in detail, writing to the FBI and local law enforcement stating his fear that the BP Defendants were seeking to "take him out" in order to contain non-public evidence he had against them. The incidents reported by the Plaintiff match well-known, shady tactics utilized by BP "Security"/Wackenhut in the recent past to address problem individuals for BP with much less at stake. In response to these incidents, the Plaintiff launched a Facebook Public Figure page with the aim of making public this evidence and laying out his case against BP in order to take away

the majority of the incentive the BP Defendants would have if he were to suffer a sudden death. It was, in fact, the BP Defendants who brought this Facebook page before the Texas Civil Court in Cause Number 2014-54027, by mentioning it in their motions for summary judgement (www.facebook.com/BradMcDanielBP). Given the overall situation and the seriousness of the evidence he holds against BP, the Plaintiff feels his and his young family's lives would be at greater risk than they are today if he agreed to "seal" this evidence and remove it from public domain. Additionally, the BP Defendants legal teams have issued documents in the public domain, including documents in this case, which are dishonest and out of line with the facts of the case as laid out in this petition. Shortly after issuing the most incendiary filings under this cause number, the BP Defendants served the Plaintiff's current employer, former employer, alumna matter and others court documents requesting evidence with said cause number. There appears to be no public record in this cause number addressing these ridiculously dishonest and incendiary filings. The Plaintiff will continue to vigorously defend his reputation and justified cause for bringing this legal action against the BP Defendants as laid out in this petition.

The Plaintiff has submitted detailed reports to federal investigators and contacts in the relevant Oversight Committees asking that criminal charges be brought against the BP Defendants for attempted murder and conspiracy to murder (for the deaths of the 39 expatriates killed at In Amenas in the hit gone wrong). Whether or not criminal charges are ultimately brought against the BP Defendants is out of the Plaintiff's hands. The Plaintiff's assertion of BP's guilt as a criminal matter should not prevent him from seeking justice in Texas Civil court against the BP Defendants under any and all possible means including application of Texas' Civil Conspiracy Law. Considering new evidence the BP Defendants have refused to produce in the Plaintiff's case,

which we have just recently been able to obtain, we now assert additional, more severe causations in this petition – including naming additional BP employees as defendants as individuals - with the most obvious being the BP Defendants' "Civil Conspiracy to Commit Fraud", in addition to the "Fraud" we asserted as an independent causation in our original petition - as laid out in the Petition below. This can easily be established with the evidence and facts in this case even without adequately establishing the BP Defendants' working relationship with Al Qaeda at In Amenas, who they viewed as more interested in "*organized criminal activity,*" than radical Islamic terrorism (*V. Facts, 5.1-5.3*).  Also, perhaps the Plaintiff cannot convince the jury the BP Defendants sought to have him murdered – with their reasoning that if BP wanted him dead, he would be dead – but instead believe that the BP Defendants only conspired to intentionally inflict emotional distress, not only with what happened at In Amenas, but also in the aftermath and in their dishonest cover-up of what he actually went through, in order to accomplish his objective as laid out below in this petition. If the truth were told about what actually happened at In Amenas and the BP Defendants celebrated the Plaintiff acts as "*heroic*" (V. Facts 5.54), how would it then look when he turned around and testified against them as laid out below?

### The BP Defendants' $18+ Billion Motive and Objective to be Accomplished:

In a civil conspiracy, the BP Defendants had a meeting of the minds and took part in one or more unlawful, overt acts attempting to prevent (and/or intimidate, threaten, harass, discredit, defame, and impede) the Plaintiff from doing what he ultimately did in May 2014 when he presented devastating insider evidence against BP and the BP America Defendants to a Senior Advisor on a U.S. Congressional Committee followed by federal investigators regarding BP's April 2010 Deepwater Horizon Disaster / Gulf Oil (McDaniel Deposition 18 February 2016, Exhibit 854). At the time the Plaintiff delivered this evidence in May 2014, $18 billion was still at

stake in one court ruling alone under the Clean Air and Water Act if BP were found guilty of "gross negligence" for the incident versus merely "negligent." As it turned out, the evidence the Plaintiff ultimately delivered showed that against written warnings he issued to BP managers dating back to 2008, not only were the BP America Defendants blatantly violating federal law U.S. CFR 250 1501-1510 both before and after the April 2010 Deepwater Horizon Disaster, but also that the **BP Defendants were blatantly violating the terms of their felony probation for the 11 counts of felony manslaughter which BP pled guilty to for killing the 11 men on the Deepwater Horizon as spelled out in Federal Court Document 49 Case 2:12-cr-00292-SSV-DEK filed 16 January 2013 – the same day the In Amenas Hostage Crisis and the four-day siege of the Plaintiff's drilling rig began.** In this plea agreement, on page 29, BP clearly agrees to specific terms of their felony probation. However, the Plaintiff's statements and evidence he delivered showed that the BP America Defendants Ronald Miller and Charlie Powell had no intention of actually following through with these terms in their positions atop of BP's fraudulent Wellsite Leader program - ***"The Plea Agreement requires BP to submit operational oversight in several key areas that contributed or may have contributed to the blowout and spill in this case … The defendant must develop and implement a plan to assess the competency of personnel responsible for overseeing deepwater drilling operations on its rigs (such as the Well Site Leaders who fatally misinterpreted the negative pressure test aboard the Deepwater Horizon)…"*** (Federal Court Document 49 Case 2:12-cr-00292-SSV-DEK, Page 29, filed 01/16/2013). Working halfway around the world at this time, the Plaintiff was not aware of what was going on in the closed door negotiations between the BP Defendants and the U.S. Department of Justice regarding the plea agreements or the terms of the felony probation that would come with it.   However, it is unimaginable that the BP America Defendants Ronald Miller and Charles Powell would not have

20

knowledge of them, given their positions atop of BP's fraudulent Wellsite Leader program and considering that their responsibilities in those positions included them administering the Wellsite Leader competency assessments that were spelled out in the terms of BP's felony probation – especially considering that they knew that the majority of the dangerously incompetent family-connected BP Wellsite Leaders, who they had previously cheated through the competency assessments in their program, could not pass an honest test.

The facts and evidence surrounding the criminal conduct BP Defendants attempted to contain has been well established after obtaining the results of a Freedom of Information Act Request (control number BSEE-2015-0042) from the United States Department of the Interior, Bureau of Safety and Environmental Enforcement, Investigations, and Review Unit that investigated BP's Wellsite Leader Program in Case Number IRU-14-0026-GOM. This evidence has been obtained as well as relevant U.S. Federal Court Documents and other evidence from the case. The evidence, presentation, and statements the Plaintiff ultimately delivered to Federal Authorities couldn't have come at a worse time for BP. On 31 August 2012, BP was called out in a **Federal Court Document 7229-2 by U.S. Department of Justice Lawyers for attempting to dodge liability for the disaster as a corporation by blaming "*blue collar rig workers*" (specifically BP Wellsite Leaders), as acting grossly negligent as individuals. In this filing, U.S. Department of Justice Lawyers charged, "*This was a decision designed to ensure that the public and legal lines of accountability would be focused exclusively on blue collar rig workers and other contractor/defendants - but at all costs, not upon BP management and the inexplicable behaviors that coursed through the pages...*" BP's legal strategy attempting to dodge $18+ Billion in liability as a corporation by scapegoating the Wellsite Leaders as individuals, blew up in BP's face when the Plaintiff delivered insider evidence detailing that**

**the BP Defendants had, against his warnings, been blatantly cheating dangerously incompetent family members into these positions for years. The detailed PowerPoint presentation the Plaintiff originally put on for a high-ranking BP Human Resources Vice-President and BP Lawyers in August 2013 and then to federal investigators in June 2014, was titled "The Root Cause of the Deepwater Horizon Disaster Was Incompetent BP Well Site Leaders" (McDaniel Deposition 18 February 2016, Exhibit 854, Pages 1-88).**

In his presentation, the Plaintiff was seeking to correct safety concerns he knew still existed within BP, even after the disaster. This presentation specifically detailed the relevant roles of all three of the BP America Defendants in Ronald Miller, Charles Powell, and Mark Cobb. The Plaintiff detailed that "incompetence" was a key issue in the Deepwater Horizon Disaster along with the serious lack of honesty and integrity within the BP Wellsite Leaders in which the BP America Defendants hired, trained, fraudulently competency-tested, and then fielded these "leaders" into these safety-critical positions. The Plaintiff detailed that, in fact, the BP Defendants' "secret sauce" in running these drilling operations were Wellsite Leaders who could be commanded, controlled, and manipulated to play outside the rules when needed. The Plaintiff detailed that while, yes, the Wellsite Leaders in charge of the Deepwater Horizon were incompetent, he also detailed that they also acted dishonestly in calling the multiple negative pressure tests which they knew were bad, "good," attempting to save rig time. Based on the Plaintiff's experience working as a Wellsite Leader for BP from 2008-2014, he detailed that the Wellsite Leaders in question errantly judged the source of flow and pressure to be the heavier cement on the back side of the production casing u-tubing through the failed float equipment. If correct, their dishonest acceptance of the negative pressure test would have come at no significant consequence and would have saved BP a significant amount of rig time and money – allowing

them to rush the drill ship over to the next location to meet the spud deadline for an expiring lease. However, unfortunately, their assumption was wrong -- the actual source of flow and pressure was an influx of oil and gas from a very permeable and porous formation. The Plaintiff detailed that the root cause of the disaster had not been addressed by BP, leaving the door wide open for such a horrendous disaster to happen again.

In this presentation, the Plaintiff detailed his experience working as a Wellsite Leader for BP and the need to create legislation requiring certain requirements along with foolproof competency testing of Wellsite Leaders in charge of Deepwater Drilling Operations in U.S. waters. The Plaintiff detailed that many of the family members of BP managers who were then working in deepwater Gulf of Mexico were not qualified to obtain a work visa to work on relatively simple land rigs in countries like Algeria. Algeria required ten years certifiable experience as a Wellsite Leader or an engineering degree. Also, Algeria required International Well Control Forum (IWCF) well control certification, which was much tougher to pass than the International Association of Drilling (IADC) certification that was then required to work in the U.S. Also, IWCF was nearly impossible to cheat on, which was very relevant as the Plaintiff detailed he witnessed multiple BP Wellsite Leaders in his class, including Pork Chop, cheat their way through their IADC well control exams. What the Plaintiff ultimately proposed would have put members of the Defendants' families out of high-paying jobs in Deepwater Gulf of Mexico, which they had been cheated into including Defendant Mark Cobb's son, Defendant Charles Powell's nephew-in-law and other family members, and Defendant Ronald Miller's then son-in-law to be. Upon his first discussions with the House Natural Resources Committee Senior Advisor Dr. Steve Feldgus and after forwarding on the damning BP "Highly Confidential" November 2008 cheating email to Dr. Feldgus (McDaniel Deposition 18 February 2016, Exhibit 854, Page 90-91), the Plaintiff quickly

learned there was much more at stake concerning what he was prepared to deliver to authorities than he had originally realized. Dr. Feldgus explained to the Plaintiff that there was no need for additional legislation because what the Plaintiff was detailing was still going on within BP and was not only against U.S. Federal Law 30 CFR 250 1501-1510, it was also against the terms of BP's felony probation, which BP had agreed to on 16 January 2013 – the same day In Amenas was attacked and the four-day siege of the Plaintiff's drilling rig began. After the Plaintiff emailed just some of the evidence he had to the Congressional Advisor substantiating his statements, federal investigators were notified and quickly contacted the Plaintiff.

To start the conversation with lead federal investigator Ross Laidig, the Plaintiff forwarded on the 2008 "Highly Confidential" BP email sent by BP American Defendant Ronald Miller to BP America Defendant Charles Powell's nephew-in-law who went by the nickname "Pork Chop" (McDaniel Deposition 18 February 2016, Exhibit 854, Page 88 and Page 97). As the Plaintiff detailed, Pork Chop was the nephew-in-law of BP's Wellsite Leader Excellence Program Manager, Charles R. Powell. The Plaintiff explained that Pork Chop, who was his classmate in the BP Defendant's Wellsite Leader of the Future Class #3, had been cheated through every competency test he had ever seen him take, including his IADC well control certification and lacked adequate competency, attitude, leadership skills, and work ethic to lead even basic drilling operations on land. Among other concerning details surrounding Pork Chops's on-the-job performance, the Plaintiff detailed that Pork Chop's first post Deepwater Horizon competency assessment showed him not even competent enough to lead a relatively simple drilling operation on land – much less in Deepwater Gulf of Mexico - where Pork Chop was then "...*currently working nights on BP's Development Driller 3 in Deepwater Gulf of Mexico*" (McDaniel Deposition 18 February 2016, Exhibit 854, Page 103). The federal investigators were very

impressed with the Plaintiff's detailed presentation. They were floored to learn that the Plaintiff had originally put on this presentation for a BP Vice President of Human Resources and BP Lawyers along with answering any questions they had in August 2013, and before that meeting had actually emailed the presentation to them along with BP's CEO on 16 July 2013, but despite the undeniable evidence it contained substantiating the Plaintiff's genuine safety concerns and warnings, nothing was done to correct the situation and Wellsite Leaders like Pork Chop were still working in deepwater Gulf of Mexico (McDaniel Deposition 18 February 2016, Exhibit 854, Page 123). All this was with the understanding that BP agreed to test Wellsite Leader's competency as a condition of their felony probation -- *"The Plea Agreement requires BP to submit operational oversight in several key areas that contributed or may have contributed to the blowout and spill in this case ... **The defendant must develop and implement a plan to assess the competency of personnel responsible for overseeing deepwater drilling operations on its rigs (such as the Well Site Leaders who fatally misinterpreted the negative pressure test aboard the Deepwater Horizon)...** "* (Federal Court Document 49 Case 2:12-cr-00292-SSV-DEK, Page 29, filed 01/16/2013).

To start the conversation with investigators, the Plaintiff forwarded the November 2008 BP email to Pork Chop marked *"Confidential"* and *"Importance: High"* with a subject line titled *"Potential DAP #2 Questions – Highly Confidential (Do Not Share with Anyone)"*.  This e-mail, which was sent by BP Defendant Ronald Miller, contained a "copy and paste" of the questions that were ultimately on the final exam. Pork Chop had received this email over a month prior to this and had once again been "coached" on how to correctly answer the questions on the final exam. At the bottom of the email in oversized all-capital red lettering, Ronald Miller emphasized *"REMEMBER!   KEEP THIS DOCUMENT STRICTLY CONFIDENTIAL BETWEEN YOU & I*

*ONLY!"* Upon receipt of the e-mail, the Plaintiff was shocked and ultimately forwarded on the email in the form of an anonymous safety observation card, known as a "STOP Card", via e-mail to Ricky Lott and other relevant BP managers, including Charles Powell from a Hotmail account he had created named WellsiteLeaderofFuture@hotmail.com (McDaniel Deposition 18 February 2016, Exhibit 854, Page 141). **In this safety observation card, the Plaintiff warned BP managers that a disaster like what ultimately happened on the Deepwater Horizon would happen if BP continued to cheat dangerously incompetent family-connected Wellsite Leaders through BP's program and continued to place them in charge of drilling operations where they would be making safety-critical decisions on a routine basis.** The Plaintiff detailed specifically his concern that these Wellsite Leaders would not be capable of correctly handling high pressure well control situations, which the Plaintiff had witnessed occur while working previously for Baker Hughes. Upon receipt of the Plaintiff's safety observation card (STOP) in January 2009, BP still gave the oral competency test to all BP Wellsite Leaders, including Pork Chop, word- for-word as in the "Highly Confidential" email dated 28 November 2008. BP conducted an internal investigation at a high level into the Stop Card looking into the disturbing way the program was being conducted by the BP America Defendants. However, after a high level investigation into the scandal, the powers that be within BP ultimately decided to do nothing about it. BP did not re-competency test it's Wellsite Leaders who were cheated through the program and continued placing them in charge of drilling operations – including rigs in Deepwater Gulf of Mexico.

Sixteen months after the Plaintiff forwarded the "Highly Confidential" BP cheating email in the form of a safety observation card to BP managers in charge of BP's Well Site Leader of the Future Program, the Plaintiff's warning became a reality. On 21 April 2010, the Deepwater

Horizon blew out, killing 11 men and causing the worst oil spill in U.S. history with a product of the BP America Defendant's fraudulent Wellsite Leader of the Future program working on the rig. At the time of the disaster, the Plaintiff had progressed into being the lead Wellsite Leader in charge of a BP drilling rig in Wyoming. The Plaintiff's night Wellsite Leader on this BP drilling rig, at the time, had been a driller for Transocean on the Deepwater Horizon prior to joining BP's Wellsite Leader of the Future Program in 2009. BP had recruited this ex-Deepwater Horizon Driller into the Wellsite Leader program with the promise of him returning to deepwater as a Wellsite Leader for BP soon. The Plaintiff and the ex-Deepwater Horizon driller watched the Deepwater Horizon burn live on CNN from their rig in Wyoming, while the ex-Deepwater Horizon driller got phone calls confirming which of his former co-workers had perished. The raw emotion shown by this ex-Deepwater Horizon driller when he was notified which of his former co-workers and friends had perished in the disaster greatly impacted the Plaintiff (McDaniel Deposition Transcript, 18 February 2016, Pages 60-67 and Page 114). At the time of the disaster, one of the Well Site Leaders assigned to the rig had family ties to a high-ranking BP manager and had been involved in a "cheating" scandal in BP's Well Site Leader of the Future Program (McDaniel Deposition Transcript, 18 February 2016, Pages 108). Telling, the primary cause of the disaster on the rig involved a well control situation where the Wellsite Leaders had failed to properly interpret a negative pressure test on the well.  Such a well control situation was similar to a scenario asked on the final exam administered in the Well Site Leader of the Future Program and in which family-connected students had been given answers by BP senior managers in the "Highly Confidential" November 2008 cheating email.  Subsequently, in August 2010, during the Deep Water Horizon investigation and congressional hearings, the BP executives and drilling engineers invoked their Fifth Amendment privilege and attempted to blame the disaster on BP Wellsite Leaders from the

program. One of the three BP Wellsite Leaders who was on the Deepwater Horizon at the time of the blowout was named Lee Lambert. Lambert was hired on and trained beside Mark Cobb's son in BP's fraudulent Wellsite Leader of the Future Program in Class #1 by Charles Powell and Ronald Miller. Mark Cobb knew Charles Powell and Ronald Miller very well as he had multiple people who were products of their program work in his operations in In Amenas, Algeria. Lambert had briefly worked at In Amenas under Mark Cobb around 2008 before transferring into BP's Deepwater Gulf of Mexico drilling operations before the Deepwater Horizon blew out in April 2010. Mark Cobb stated voluntarily at the UK Coroner's Inquest into In Amenas that he "…*knew who Brad* (Plaintiff) *was because Brad had gone through the development programme with (his) own son in BP…*" (UK Coroner's In Amenas Inquest, Day 3, 17 September 2014, Page 55), understandably so considering the Plaintiff's objections of what was going on in said program as laid out in this Petition. As detailed in an interview with 60 Minutes, at the time of the attack Mark Cobb's son was working as a Wellsite Leader for BP on a deepwater drilling rig in Deepwater Gulf of Mexico.

In the aftermath of the Deepwater Horizon blowout, the Plaintiff and the ex-Deepwater Horizon Driller turned BP Wellsite Leader were understandably deeply disturbed to witness that, even after the horrendous aftermath of the Deepwater Horizon Disaster, BP Defendants Charles Powell and Ronald Miller continued to cheat dangerously incompetent family-connected Well Site Leaders through post-Deepwater Horizon well control competency tests, including Pork Chop, who failed his first test but was cheated through a second test and promoted to a BP deepwater drilling rig in the Gulf of Mexico weeks later. Beyond that, weeks later, in November 2010, a family-connected BP Well Site Leader had a serious, nearly fatal well control incident on the Plaintiff's drilling rig while the Plaintiff was on days off. The Plaintiff took part in the BP

administered investigation of the incident that nearly killed men he had worked with for over a year. The family-connected BP Well Site Leader who was responsible for the rig at the time of the incident exhibited a dangerous combination of incompetence, arrogance, and laziness in his leadership of drilling operations on the rig. After the near-miss well control incident, Wyoming BP drilling managers had wanted this Well Site Leader fired but were only allowed to demote him to night shift. Weeks later, BP managers in Houston ignored the incident and the family-connected Wellsite Leader's lack of on-the-job performance and promoted him to a BP deepwater rig in the Gulf of Mexico. The Plaintiff was disturbed that BP was ignoring the lessons that should have been learned from the Deepwater Horizon and that BP was continuing to "hook up" dangerously incompetent family members with higher-paying deepwater jobs. The Plaintiff was an outspoken critic inside of BP regarding BP's Well Site Leader program as it was being run by Charles Powell and Ronald Miller. The Plaintiff was well-known within BP, and most definitely among each of the Defendants, for raising his safety concern surrounding the November 2008 "Highly Confidential" cheating email scandal as well as the Plaintiff's outspoken objection to BP's continued systematic promotions of dangerously incompetent and poor-performing family-connected Wellsite Leaders to Deepwater Gulf of Mexico. In contrast to his peers within BP's Wellsite Leader Program, the Plaintiff's experience and qualifications made him very marketable to go to work for other oil and gas companies. The Plaintiff let his low-level BP supervisors in Wyoming know he saw little reason to continue investing his career in a company like BP, considering promotions obviously had nothing to do with performance and qualifications – only nepotism. It was known among the Defendants that the Plaintiff was actively searching for employment outside of BP. The Plaintiff did not realize the gravity of what was at stake and never

fathomed that the BP Defendants would go to the lengths they went to at In Amenas attempting to ensure what he knew never left the company.

In September 2014, four months after the Plaintiff divulged this shocking and devastating evidence against BP, the Judge presiding over the Deepwater Horizon case shocked legal experts when he found BP guilty of "gross negligence" for the disaster. In February 2015, the Bureau of Safety and Environmental Enforcement (BSEE) administered a surprise well control competency test to BP's Wellsite Leaders on Transocean's Development Driller III, including Pork Chop. **Considering the shocking results of these tests that confirmed the Plaintiff's assessment of Pork Chop, in July 2015 BSEE began implementing a new and more demanding Federal Law 30 CFR 250 1501-1510 dealing with requirements and government competency testing of all Wellsite Leaders responsible for deepwater drilling operations in the United States – stating, among other things, under 250.1503 (b) that BP Wellsite Leaders like Pork Chop must "*... have a comprehensive knowledge of deepwater well control equipment, practices, and theory...*" and under 250.1507 that "*... BSEE or its authorized representative may conduct testing at either onshore or offshore locations for the purpose of evaluating an individual's knowledge and skills in perfecting well control, deepwater well control, and production safety duties...*" and under 250.1508 that "*...BSEE or its authorized representatives may test your employees or contract personnel at your work site or at an onshore location. You and your contractors must: (a) Allow BSEE or its authorized representatives to administer written or oral tests; and (b) Identify personnel by current position, years of experience in present position, years of total oilfield experience...*". Shortly after this, in July 2015, after fighting liability for the disaster for over four years, BP ultimately settled with the U.S. Department of Justice**

**for a record $20.8 billion under the condition of "strict confidentiality"** under Judge Barbier's order in Document 14801 in Case 2:10-md-02179-CJB-SS filed on 07/02/15.

Beyond the huge fines BP had to pay, the BP Defendants wanted to contain their shameful conduct for a multitude of other reasons. For one, the two non-operating partners in the Macondo well the Deepwater Horizon was drilling at the time of the blowout – Mitsui and Anadarko – both agreed to pay billions of dollars for their share of the cleanup costs based on BP's false narrative and denial of their "gross negligence" as the operator. Once operators like these learned the details of who the BP Defendants were actually putting in charge of these risky operations, would they continue to trust BP to operate these wells in which they were potentially liable for billions? BP had partners like these not only in deepwater drilling but in many of their operations onshore as well. Anyone in the drilling industry will tell one that not only was what BP and the BP America Defendants doing illegal and unethical, it was also incredibly stupid from a business standpoint considering the Deepwater Horizon Disaster has cost BP's own shareholders over $64 billion and counting – on top of the over $4 billion it cost BP's two non-operating partners in the Deepwater Horizon Disaster. BP and the BP America Defendants faced a great embarrassment when their shameful conduct was ultimately exposed by the Defendant. For example, in the drilling industry, it is both unbelievable and appalling that BP hired candidates into their program with zero qualifications and zero oilfield experience to become Wellsite Leaders after only a one-year training program. When asked for names in his deposition in February 2016, the Plaintiff had plenty of examples of this – including Oprah Winfrey's nephew, who was hired on in Class #1 beside Lee Lambert, who took part in the "fatal" decision aboard the Deepwater Horizon the night of the disaster and BP Defendant Mark Cobb's son. ***"Q. All right. Any others, folks who had either no engineering degree or no experience working in oil? A. Oprah Winfrey's nephew hired***

31

*on in Class 1. Q. All right. What was his name? A. Joel Winfrey.... Q. All right. And, again, no engineering degree, no experience in the oil and gas industry? A. No, sir. Last I heard, he's working for Target in Arizona."* (McDaniel Deposition Transcript, 18 February 2016, Page 23).

Not only did the Plaintiff detail to federal investigators that the BP Defendants had been cheating dangerously incompetent family members through these competency tests even after the Deepwater Horizon Disaster, they were also ignoring lack of on-the-job performance once these Wellsite Leaders took on the responsibility of being in charge of drilling operations on a drilling rig on a day-to-day basis. The most notable example of this was in November 2010, just six months after the Deepwater Horizon blowout, when a family-connected BP Wellsite Leader had a serious, nearly fatal well control incident on the Plaintiff's drilling rig while the Plaintiff was on days off. The Plaintiff took part in the BP administered investigation of the incident that nearly killed men he had worked with for over a year. The family-connected BP Wellsite Leader who was responsible for the rig at the time of the incident exhibited a dangerous combination of incompetence, arrogance, and laziness in his leadership of drilling operations on the rig. After the near-miss well control incident, Wyoming BP drilling managers had wanted this Wellsite Leader fired, but were only allowed to demote him to night shift. Weeks later, the BP America Defendants in Houston ignored the incident and the family-connected Wellsite Leader's lack of on-the-job-performance and promoted him to a BP deepwater rig in the Gulf of Mexico. The Plaintiff was able to deliver internal BP emails and documentation to federal investigators substantiating that this actually occurred. With total disregard for the implications on others, the BP America Defendants shamelessly sought to continue their self-serving racket of 'hooking up' family members into these relatively high-paying, cushy positions. In May 2014 the Defendant approached a U.S. Congressional Committee wanting to create legislation requiring certain

requirements along with foolproof competency testing of Wellsite Leaders in charge of Deepwater Drilling Operations in U.S. waters. The Plaintiff detailed that many of the family members of BP managers who were then working in deepwater Gulf of Mexico were not qualified to obtain a work visa to work on relatively simple land rigs in countries like Algeria. Algeria required ten- years certifiable experience as a Wellsite Leader or an engineering degree. Also, Algeria required IWCF well control certification, which was much tougher to pass than the IADC certification that was then required to work in the U.S. Also, IWCF was near impossible to cheat on which was very relevant as the Plaintiff detailed he witnessed multiple BP Wellsite Leaders in his class, including Pork Chop, cheat their way through their IADC well control exams. What the Plaintiff ultimately proposed would have put members of the BP Defendants' families out of a high- paying jobs in Deepwater Gulf of Mexico. Some specific examples of this include Defendant Mark Cobb's son, Defendant Charles Powell's nephew-in-law, Pork Chop, and other family members, and Defendant Ronald Miller's then son-in-law to be. Mark Cobb stated voluntarily at the UK Coroner's Inquest in to In Amenas that he "*..knew who Brad* (Plaintiff) *was because Brad had gone through the development programme with (his) own son in BP...*" (UK Coroner's In Amenas Inquest, Day 3, 17 September 2014, Page 55). As detailed in an interview with 60 Minutes and other pieces of evidence discovered in this case, at the time of the January 2013 attack, Mark Cobb's son was working as a Wellsite Leader for BP on a deepwater drilling rig in Deepwater Gulf of Mexico at only 29 years of age – with zero qualifications or experience by industry standards to be in such a position (McDaniel Deposition 18 February 2016, Exhibit 854, Page 54-56). Among other reasons for placing these relatively unqualified, relatively inexperienced "Wellsite Leaders" in these positions, the BP Defendants sought to save money as they paid these people much less than relatively much more qualified and experienced people working these positions for other oil

33

companies. For example, the Plaintiff is currently making nearly twice as much per year as a Senior Drilling Engineer for a different Texas-based oil company than BP Wellsite Leaders currently working Deepwater Gulf of Mexico from BP's Wellsite Leader of the Future Program are.

### The BP Defendants "Meeting of the Minds"

Dating back four years before BP's $20.8 billion record settlement with the United States Department of Justice and as BP's false narrative defense attempting to dodge this liability began taking shape, the BP Defendants sought to contain the evidence the Plaintiff had against them with the desire to continue their self-serving conduct. Five months after the Deepwater Horizon blew out and as BP Wellsite leaders, engineers, and executives began asserting their Fifth Amendment rights, the BP America Defendants "promoted" the Plaintiff to the greater In Amenas, Algeria, area. The Plaintiff looked forward to distancing himself from the BP America Defendants and was certain that if he raised his concerns high enough within BP, the ridiculous things he had witnessed going on within BP's Wellsite Leader program would be corrected. Unfortunately, as it turned out, the louder the Plaintiff got within BP, the bigger the target got that was painted on his back within BP by the BP Defendants. Going into the January 2013 In Amenas siege, the BP Defendants knew the Plaintiff was planning on leaving BP for a job comparable to what he has now and when he did, nothing would prevent him from doing what he ultimately did in May 2014 when he approached a Congressional Committee seeking to right the wrongs he knew were still going on within BP. In the summer of 2012, it was known within BP and among the BP Defendants that the Plaintiff had received a job offer from BP's competitor, Chevron, but the Plaintiff was holding out for a different position with a different oil company.

Among other things, and in the very least, the evidence and facts of this case will prove beyond a reasonable doubt that BP and the BP America Defendants took part in a civil conspiracy to commit fraud against the defendant by blatantly misrepresenting the security situation at In Amenas in order to keep him working in the extremely dangerous situation that they knew had developed there between 2010 up to the January 2013 In Amenas Hostage Crisis/four-day day siege of the Plaintiff's drilling rig. Studying the facts of the case, it is obvious that the conditions that presented themselves during this siege would have no doubt resulted in the loss of the Plaintiff's life without intense U.S. intervention into the crisis. Beyond placing him repeatedly in the dangerous situation they quietly knew to exist at In Amenas and fraudulently misrepresenting the security situation to him to keep him there, BP's strange pattern of actions and inactions once the four-day siege began can only be explained by reaching the conclusion that BP didn't want the Plaintiff to make it out of In Amenas alive. The Plaintiff clearly made this assertion with key facts supporting his assertion to Federal Investigators in an email dated 2 November 2015 *"See the below email chain. Nobody in the U.S. government has ever questioned the fact that BP had a working relationship with Al Qaeda in the Islamic Maghreb at In Amenas. It sure was a convenient place for BP to keep assigning me considering that I was outspoken inside the company against their Wellsite Leader (WSL) program and was known to be holding the damning internal BP confidential email from 14 months before the Deepwater Horizon blew out. It's pretty obvious I was seen as a "problem" for BP's twisted way of conducting business as well as BP managers as individuals. If they would have listened to my safety concern and done what was right, the company would have saved themselves the cost of the disaster – over $54 billion. Unfortunately for the victims of the Deepwater Horizon disaster, BP had no interest in doing what was right. I passed the below information on BP's history with Mokhtar*

*Belmokhtar and Abou Zeid along to the FBI as soon as I learned of it. If you want to find someone like MBM, there is no better way than to make his people think that BP wants to make the multi-million dollar arrangement with him going forward since Abou Zeid had been killed* ... http://www.cnn.com/2015/06/14/world/mokhtar-belmokhtar/ ..."  (McDaniel Deposition 18 February 2016, Exhibit 854, Page 158-160). The CNN article and video in that hyperlink reported that MBM had been targeted in an American airstrike in Libya months after the Plaintiff passed on the details of BP's negotiations with MBM at In Amenas in 2003 to his appropriate In Amenas attack contact in the FBI. In this email the Plaintiff initially laid out significant and detailed evidence supporting his assertion that among other things, BP was guilty of conspiracy to murder and attempted murder in an email to federal investigators, including the FBI, on 31 August 2015 after he felt he had enough evidence to do so after listening to BP's Algeria Business Security manager (2006 – Present), Barry Shaw's first deposition in Aberdeen on 24 July 2015. BP Security's function has a well-known history and well-established modus operandi of identifying and targeting whistle blowing employees and regulators for a lot less. Some undeniable examples of this were publicly exposed in Congressional hearings and court proceedings regarding BP Security's targeting of whistle blowers and regulators in their Alyeska Pipeline operations in the 1990s (U.S. House of Representative's Report on Alyeska Covert Operation dated July 1992; Charles Hamel v. Alyeska Pipeline Service Co.). In these hearings, former FBI Gus Castillo testified that, while working for Wackenhut, he was instructed to follow whistleblowers in cars, to park in white vans outside of people's houses to spy on them, to steal mail, to steal phone records taken, and even to run whistleblowers off the road." Another former FBI agent, William Hinshaw stated that "*it is known throughout the industry, that if you want a dirty job done, call Wackenhut.*" BP continues to utilize the same notoriously dirty security company, Wackenhut G4S, today.

Matching these tactics exposed in the Alyeska Case, BP sought to destroy evidence against them by utilizing BP's well-funded and capable IT Security group in the months after the Deepwater Horizon blew out. Months after the Deepwater Horizon blew out, the Plaintiff's personal business Hotmail email address, which he had used for all of his interviews with BP and to back up any important work emails (such as the "Highly Confidential" November 2008 BP cheating email), was completely wiped out. Also completely wiped out was the WellsiteLeaderofFuture@hotmail.com email address he used to forward on the Highly Confidential email and safety observation card. Additionally, upon coming home from the In Amenas hostage crisis, the Plaintiff's highly secured BP email was hacked by a simple spammer and key emails were deleted from the Plaintiff's email account. The Plaintiff notified BP's IT Security Department of the incident. Tellingly, BP IT Security declined to restore the Plaintiff's email account but requested he send his company laptops in for "inspection." The Plaintiff realized that many of the emails BP sought to permanently delete – which he eventually delivered to federal investigators -- including the near-miss well control incident on his drilling rig in November 2010 and the emails regarding the Al Qaeda linked SARL BAAT labor strikers' threats against expatriates at In Amenas in the weeks before the January 2013 In Amenas attack – were still contained in the Outlook of his laptop and would not be deleted unless he logged into BP's network updating his Outlook account. Over the next year and a half, BP tried several different tricks attempting to get the Plaintiff to return his laptops to them – not for the value of the laptops but seeking to contain the damning evidence that still existed on them.


**The BP Defendants' Unlawful Overt Acts and/or Acts to Accomplish an Unlawful Purpose Before the January 2013 In Amenas Siege:**

37

As BP America's "Wellsite Leader Excellence Program Manager" and later as BP's "People Person," Charles Powell decided which BP Wellsite Leaders were promoted where. In other words, who was promoted to cushy, high-paying positions in Deepwater Gulf of Mexico and who was transferred to less desirable places like Algeria. BP America's Ronald Miller and BP America's Mark Cobb also played key roles in this decision process within BP from 2008 through 2013. Five months after the Deepwater Horizon blew out and as BP's onshore managers began applying their Fifth Amendment Rights in hearings starting to investigate the disaster, the BP America defendants "promoted" the Plaintiff to work on drilling rigs in the greater In Amenas, Algeria area, effectively doubling the Plaintiff's take-home pay. The evidence will show that from 2011 through January 2013, the BP Defendants, especially BP's Mark Cobb, secretly knew the security situation at In Amenas had deteriorated substantially. BP and the BP Defendants kept the Plaintiff in the dark about the dangerous situation they knew to have developed at In Amenas while giving the Plaintiff false assurances that BP had the security situation was well under control. BP Defendant Mark Cobb later volunteered under oath at the UK Coroner's Inquest he and BP "... *always felt that if there was going to be an attack on an installation, it would be a ... drilling rig because they have a tendency to be much more remote... so I mean that was always, you know, what we believed and the intelligence led us to believe that the rigs were a more vulnerable target and more likely to be attacked than the static facility itself* (where Cobb was located)... *When you think about the numbers, and again I have quoted I think there were roughly 160 Gendarmes on the site, on a drilling rig there was 30 Gendarmes...*" (Mark Cobb's transcript UK Coroner's In Amenas Inquest, Day 3, 17 September 2014, Pages 127-128). Evidence discovered in this case will show that BP and the BP Defendants knew as time progressed, the security situation at In Amenas had deteriorated to the point where it could be equated to a death trap. However, evidence

will also show that the BP Defendants deceived relatively low-level expatriate workers like the Plaintiff about the security situation in order to quietly keep them working there. If told the truth as contained in these "Confidential" BP emails which BP Defendant Mark Cobb was included on, there is no way the Plaintiff or many other expatriates would have continued to work there.

Upon recruitment and as time progressed, the BP Defendants misrepresented the security situation at In Amenas in great detail to the Plaintiff -- including manipulating BP's own written threat-level system. When the Plaintiff was first assigned to the greater In Amenas area in September 2010, there were five different drilling rigs working for BP within a 200-mile radius of In Amenas. By January 2013, BP had released all those drilling rigs except for one. BP and the BP Defendants transferred the Plaintiff from drilling rig to drilling rig at least four times. Thus, BP and the BP America Defendants gravitated the Plaintiff to an area that was secretly know by the BP Defendants to have become more and more dangerous for expatriates – especially those working on drilling rigs. The final time the Plaintiff was transferred by the BP Defendants into situations they knew to be incredibly dangerous was when they notified him that BP's plans for him had changed and he was being transferred to the only drilling rig left working at In Amenas less than two weeks before the January 2013 attack and four-day siege of that drilling rig began.

Among other things, going into the January 2013 attack, BP and Mark Cobb communicated to all expatriates working at In Amenas that the threat level was "low" while quietly operating at "medium." This allowed BP and Mark Cobb to skirt around their assurances given in writing to expatriate workers like the Plaintiff. The Plaintiff was assured that BP's very capable security function was constantly monitoring the security situation in places like In Amenas. The Plaintiff was assured that if BP raised the threat level from "Low" to "Medium," BP was required to inform all expatriate workers the details as to why and give them the option to immediately transfer to BP

39

operations elsewhere without negative consequences to their careers within BP. BP and Mark Cobb did in fact raise the threat level at In Amenas which they operated on from "Low" to "Medium" but kept the official threat level which they communicated to the Plaintiff at "Low". If the threat level was raised from "Medium" to "High," BP was required to remove all expatriate workers from the situation immediately, without question, and not return them to work until it was gauged at "Medium" (V. Facts 5.08).

Among other things, unknown to the plaintiff prior to the attack, BP had specific knowledge that the threat of a high-impact terrorist attack on BP's In Amenas, Algeria, facility had significantly increased. Going from 2011 into 2013, dozens of BP's own confidential documents warned relatively high-ranking managers, including BP America's Mark Cobb, that In Amenas was at greater and greater risk of a terrorist attack – with the drilling rigs being the "*more vulnerable and more likely to be attacked*" than the relatively much better guarded and fortified compound that housed Cobb himself. According to BP America's "Senior Director of International Security Affairs," BP's In Amenas field was in the middle of the "*Trans-Algerian (desert) highway*" used to smuggle illegal weapons and drugs and in which "*security services worked an informal arrangement with the bad guys: we let you pass and leave us alone.*" Other BP Security documents detail that the "*bad guys*" were in fact "*Al Qaeda in the Islamic Maghreb*" (AQIM) and were more interested in pursuing "*organized criminal activity*" than terrorism. A former BP Advisor specific to the In Amenas field has detailed in sworn statements that as far back as 2003, BP was exploring utilizing him as an intermediary to approach senior members of "Al Qaeda" to arrange a safe payment arrangement protecting In Amenas – specifically naming BP's desire to negotiate with the mastermind of the January 2013 In Amenas Hostage Crisis, Mokhtar Belmokhtar (MBM). This BP advisor noted that the specifics of such arrangement would be

40

complicated and BP ultimately ceased utilizing him to approach MBM. Unknown to the plaintiff, at the time of the January 2013 In Amenas Hostage Crisis, BP was using a transport company at in Amenas that was owned by the brother of the commander of AQIM, Abou Zeid aka Mohamed Ghedier. The name of this company at In Amenas was SARL BAAT. SARL BAAT provided hundreds of local workers to BP's In Amenas field including drivers who BP chose to "guard" their expatriate workers working there. According to BP's own "IA Post Incident Security Report," BP had terminated contracts with the "same company" in some of their other Algerian operations after they "became aware that one of the owners (named Ghedier) had been arrested on arms smuggling charges." In June 2012, SARL BAAT workers, including the drivers who guarded expatriate workers at In Amenas, started a bitter labor strike that shut down all three drilling rigs working for BP in the In Amenas field. After threats of violence were made by the SARL BAAT labor strikers in September 2012, BP decided to evacuate all non-essential expatriate workers from In Amenas including all expatriate Wellsite Leaders working on drilling rigs. This took the total number of expatriate workers working at In Amenas from around 130 to fewer than 25. BP's own "Confidential" and "Highly Confidential" emails substantiate the fact that BP knew the labor strike made In Amenas and, especially, the drilling rigs at In Amenas a very dangerous environment. However, BP and Mark Cobb assigned the Plaintiff to go into the In Amenas field as the lone Wellsite Leader during the tense labor strike in November 2012 to release a drilling rig that had remained idle since the beginning of the strike and that was accumulating significant standby costs. BP's own emails from this time frame clearly state that the two drilling rigs standing by idle at In Amenas were costing the company $200,000 a day or $73 million a year in non-productive standby costs. While performing his assigned duty of releasing the drilling rig in November 2012, the Plaintiff reported serious security concerns to BP managers, including threats made by the SARL

BAAT labor strikers who were assigned as the "A" shift of "guards/drivers" on his drilling rig, stating that if any of their "hunger strikers were to die, 25 expatriate workers would be killed in retaliation." The SARL BAAT "A" shift of "guards/drivers" worked 28 days on/28 days off; upon going on days off, the "B" shift rotates in. The Plaintiff successfully released the drilling rig as assigned in early December 2012 and was told he was assigned to commission a different drilling rig in central Algeria far away from In Amenas. Additionally, in early 2012, a massive weapons cache was discovered near In Amenas close to where the Plaintiff's drilling rig was working. This fact, along with other facts provided through its affiliation with its joint venture partner, informed BP that the region was experiencing more than "routine and manageable threats." By September 2012, BP was specifically advised that "foreign workers such as employees at BP's In Amenas facilities would be at risk..." BP was also specifically advised of the risks "while traveling by road" as well as "risks within compounds," although the risks while traveling were judged to be higher. In response to this specific information, as well as other related information, BP neither disclosed the increased risks to its employees and contractors, nor did it increase the security at its facilities at In Amenas. To the contrary, as volatility increased from the workers' strike, the BP security environment actually deteriorated. BP and Mark Cobb declared the SARL BAAT labor strike over on 15 December 2012 after negotiating with the "B" shift of SARL BAAT "guards/drivers." In late December 2012, the Plaintiff was informed that the SARL BAAT labor strike was over and was notified that the Wellsite Leaders who had been assigned to work on the only drilling rig left at In Amenas, KCAD T-212, were being reassigned, and he was being assigned in their place. Given assurances the security situation was under control by BP and Mark Cobb, the defendant returned to work at In Amenas and physically arrived at KCAD T-212 on 3 January 2013. On 13 January 2013, the "A" shift of SARL BAAT "guards/drivers" returned to

work from their days off and resumed the labor strike. BP's own emails recovered from this date detail that 12 "A" Team drivers were on strike while at least four were "sick" or on "unauthorized absence". BP's Mark Cobb downplayed the labor strike's flaring back up and declined to reevacuate the 130 expatriates who had recently returned to work at In Amenas. Mark Cobb temporarily pacified the SARL BAAT labor strikers by setting up a meeting between them and himself along with the other senior managers in charge of the In Amenas field on the night of 15 January 2013. In this meeting, Mark Cobb and Lotfi Benadoula, the JV General Manager, met with over 100 labor strikers and their representatives. Witness testimony at the Coroner's Inquest hearings in the UK confirmed that the meeting ended badly and one of the strikers' representatives was heard stating "you've made your law, but tomorrow when you wake up, you will have a surprise and blood will be shed." In his deposition, Cobb denied ever hearing this statement from a striker, but admitted to having a meeting with them the night before the terrorist attack. Despite the labor strike flaring back up, neither Mark Cobb nor BP evacuated the Plaintiff and the other ex-pats on the Rig as they perceived the main facility was safe and secure. Neither Mark Cobb nor BP warned the Plaintiff or anyone else on the Rig that the labor strikers were once again angry and furious. Given Mark Cobb's admission that he and BP "... *believed and the intelligence led us to believe that the rigs were a more vulnerable target and more likely to be attacked than the static facility itself* (where Mark Cobb was located)...", it is inexcusable that the Plaintiff and his men were not immediately evacuated to the relative safety of the much-better-protected main facility or in the very least, given a warning of the very dangerous situation that had developed. Given the facts and the evidence that has been discovered in this case, to sum it up, the situation BP and the BP Defendants continuously placed the Plaintiff in might best be described as a "Death Trap."

While the BP Defendants hid the increased security risks from the Plaintiff, they misrepresented BP's willingness and ability to step in and protect and/or extract them if needed. The BP Defendants boasted a robust "Security" apparatus that included an "Intelligence Analysis Unit" consisting of former CIA analysts who were constantly monitoring the security situation. In constantly monitoring all developments and threats, BP emphasized that they would pull expatriate workers, like the Plaintiff, out of harm's way if the conditions changed (BPALGERIA_0054913). BP's Intelligence Analysis Unit correctly analyzed the situation leading up to the In Amenas attack (*V. Facts 5.40*); however, BP chose not to evacuate the Plaintiff and his men from the only drilling rig working at In Amenas which, as Defendant Mark Cobb voluntarily detailed under oath at the UK Coroner's Inquest into In Amenas that he and BP "*... always felt that if there was going to be an attack on an installation, it would be a ... drilling rig because they have a tendency to be much more remote... so I mean that was always, you know, what we believed and the intelligence led us to believe that the rigs were a more vulnerable target and more likely to be attacked than the static facility itself* (where Cobb was located)*... When you think about the numbers, and again I have quoted I think there were roughly 160 Gendarmes on the site, on a drilling rig there was 30 Gendarmes...*"

Additionally, the Plaintiff has released a detailed report to U.S. Authorities and Oversight Committees asserting that, beyond BP 'hanging him out to dry' at In Amenas, BP was trying to murder him through their shady connections in North Africa in the greater In Amenas area. The fact that this criminal case has been presented and whether or not the BP individuals accused are charged or not should not prevent the Plaintiff from seeking justice in Texas Civil court for the BP Defendants civil conspiracy to commit fraud, at a very minimum, in order to place him in an unbelievably dangerous situation. The Plaintiff's criminal complaint details Defendant Ronald

Miller's connections within BP's "Security" function who maintains these connections. Given BP Security's well established modus operandi and the extreme $18+ billion motive they had to eliminate the Plaintiff, the case the Plaintiff built asserting BP's attempt to murder him should not be taken lightly. On two separate occasions before the January 2013 In Amenas hostage crisis, it has been well-documented in proceedings and discovery surrounding this case that the Plaintiff's work locations were narrowly missed by heavily armed bands of terrorists outfitted much like the one that ultimately hit In Amenas. The first time was when six truckloads of heavily armed terrorists attacked a BP rig nearby 200 miles northeast of In Amenas in February 2011 asking "Where are the Americans???" This attack came two weeks after the Plaintiff left the drilling rig, much earlier than planned, due to his work visa being processed much sooner than expected during his first hitch on the rig and only ten months after the Deepwater Horizon blew out. Evidence in this case has established in great detail that BP's Director of Security, North Africa, had long established very good relationships with well-armed local bandit and smuggling organizations like the Zintan tribe, who operated unchallenged by authorities in the immediate area. The evidence will also show that BP "Security" scrubbed this near-missed attack from their reporting, while reporting relatively minor occurrences that happened nearby. The second time was when a heavily armed group of terrorists confronted an ENI (Italian Oil Company) drilling rig working nearby the Plaintiff's rig in the summer of 2012. The terrorist convoy, armed with a belt-fed-truck mounted 12.7mm, confronted the rig and were allowed to leave without shots being fired by either side after it was determined, they "weren't where they thought they were." The Plaintiff has put together the facts supporting his charges against BP. BP America Defendant Ronald J Miller has a long history working with BP's "Security" function dating back to his assignments working for BP in Colombia in the 1990s where BP was implicated in the murders of tens of thousands of innocent civilians,

including women and children, who opposed their $25 billion oil interests there.  BP's "Security" chief was ultimately 'sacked' in the scandal which was highly publicized in articles like "BP's Secret Soldiers."  In a similar security situation in North Africa, it has been well established that BP's Security Advisor Sir Mark Allen and other ex-MI6 BP security advisors had "remarkable" relationships with senior officers in the Algerian DRS and their close allies in Gaddafi's Libyan Intelligence. With the most public example being Sir Mark Allen's "remarkable" relationship with Libyan Intelligence Chief Moussa Muhammed Koussa.  It has also been noted, including in BP's own internal emails, that Algerian DRS officers were known to have infiltrated terrorist networks like Al Qaeda and had carried out attacks under the direction of the Algerian DRS. It's also well-known that MI6 officers maintain contacts directly with high-ranking members of terrorist factions in North Africa, like Al Qaeda in the Islamic Maghreb. For example, while BP's Sir Mark Allen was still a high-ranking officer with MI6, an MI5 officer David Shayler, blew the whistle and detailed MI6's utilization of well-known members of Al Qaeda in an assassination attempt in North Africa that went terribly wrong and killed innocent civilians while missing their intended target.  Five months after the Deepwater Horizon blew out and as BP's onshore managers began applying their Fifth Amendment Rights in hearings starting to investigate the disaster, the BP America defendants "promoted" the Plaintiff to work on drilling rigs in the greater In Amenas area where BP security had these connections. If you look at the facts of what transpired once the four-day In Amenas Hostage Crisis and four-day siege of the Plaintiff's drilling rig began, it is impossible to acknowledge the strong case the Plaintiff has built asserting that the powers in BP did not want the Plaintiff to make it out of In Amenas alive.

**BP's Cover Up of What Actually Happened at In Amenas on 16-19 January 2013:**

First and foremost, the evidence in this case will prove that BP has shamefully attempted to cover up the truth about what actually happened at In Amenas on 16 – 19 January 2013. BP's self-serving, false narrative starkly contradicts the Plaintiff's experience on the ground at In Amenas during those four days. Not only has the Plaintiff told the truth in all proceedings he has been called to testify in, the evidence will show that his account has also, in fact, been quite accurate when compared to the evidence BP has attempted to hide from the public by deeming it "Confidential" or "Highly Confidential."  This evidence obtained in Texas civil proceedings and other undeniable evidence obtained confirms the Plaintiff's account and exposes BP's dishonest cover up. In the UK Coroner's Inquest and other proceedings, BP has lied, denied, and withheld this "Confidential" evidence from the public attempting to cover up the truth – including their knowledge of their partners in the Algerian government's long-time support of the terrorist organization that attacked In Amenas, as well as the Algerian government's murder of the majority of the 39 expatriates who were ultimately killed at In Amenas. As the Plaintiff has testified at the UK Coroner's Inquest into In Amenas, he was "certain" the last hostages were not killed until after noon local time on the fourth day of the siege – including at least one of his BP America co-workers. Due to his refusal to go along with BP's false narrative, BP and people working on behalf of BP attempted to keep the Plaintiff from testifying at the UK Coroner's Inquest into In Amenas. Once there, the transcript showed the Coroner and BP lawyers attempted to discredit the Plaintiff, including his knowledge of how and when the last hostages were killed on the fourth day of the siege. In the transcript, one can see the Coroner cut in multiple times attempting to discredit the Plaintiff, while not allowing him to tell his story. When the Coroner issued his dishonest "Findings of Fact" in the In Amenas Hostage Crisis months later, among other things, he falsified key parts of BP's "Confidential" Incident Management Team time log while hiding the document from the

47

public in its entirety. He also falsified the statement of the only witness, Lotfi Benadoula, who claimed he saw the dead bodies of the last six or seven expats in the CPF (gas plant) on the afternoon of the third day of the siege. Once obtained in Texas civil proceedings, in fact, Lotfi's statement and BP's Incident Management Team time log clearly state his witnessing the dead bodies occurred late on the afternoon of the fourth day (19 January). While testifying at the Inquest, once the Plaintiff brought up that he was in the "*midst of (Algerian) DRS agents*" and "*being secretive for obvious reasons*", he was removed from the stand and not allowed to testify any longer. However, Billy Whitted, who is still working for BP, was brought in and allowed to ramble on for hours at the lead of the Coroner's and BP's lawyers attempting to discredit the Plaintiff's experience. Here is what little the Plaintiff was allowed to testify to regarding the last of his coworkers being killed on the fourth day of the siege, contrary to BP's now exposed false narrative -- "MS. GOLLOP: ... *Q: So I am really interested in whilst the terrorists were actually terrorizing people rather than after they had stopped terrorizing people. A: Sure. Just to be clear on this, the last group of hostages were not killed until Saturday afternoon. I am not sure what's been going around but I can say with certainty the last group of hostages, six or seven of them were not killed until Saturday afternoon.*" (UK In Amenas Inquest, Page 210, Day 14, 8 October 2014). "(BP's Barrister) *MR. POPAT: ... Q. So far as your giving any evidence about what actually happened at the BdV and the CPF during the attack your evidence is based either on, I think you have some photographs in the papers you provided, either on what you saw from the rig site, what you had translated to you from the radio chatter that you have described or what you have heard and I think you heard during the course of the attack by some unnamed U.S. sources? A. I was using every means available to me to gather intelligence, anything and everything. This includes conversations between guys I trusted on location who were Algerian nationals, with the lower-*

*level Gendarmes, what they were hearing on the radio. Just anything and everything imaginable plus I was in contact with the U.S. and we shared information, that's correct. Q. The contact you were having with the U.S. was not with anyone within the BdV and the CPF but from outside sources? A. I was in contact with people who were controlling the Predator drone, the surveillance – (jets) the C130s..."* (UK In Amenas Inquest, Page 214, Day 14, 8 October 2014)   and *"MR. FLINN: Mr. McDaniel, you did mention at one earlier point in your evidence that you were of the understanding that a group of hostages had died on Saturday, which I think was 19 January. Can I just clarify where that understanding comes from? A. Gathering intelligence on the ground for four days before these men were killed. Q. Who did you hear it from? A. Not one source. It was all the information I had. During this attack the Algerian government was lying to the western governments, specifically the United States... CORONER: Q. Mr. McDaniel, can I just cut in there. On 19 January did you have any direct information that there were hostages still alive? A. Yes sir, I did. As Tom Martin detailed we went up past VCP2...we parked at the Gendarme base, the entrance to the Gendarme base for about 30 minutes. At that point, it was confirmed that it was still an active hostage situation. Six or seven hostages still inside, explosives in place. Q. You were told they were still inside where? A. Inside the gas plant. Q. The coroner, it is entirely a matter for the coroner to come to his own conclusions with regard to the whole of the evidence which might tend to suggest there was an explosion at the gas plant on the evening of the 18 January. And there has been other evidence which might suggest that a number of hostages were killed in that explosion. Do you have any direct knowledge that would contradict that? A. Yes, I do. It takes an extremely long amount of time to present. I did present it to BP in August 2013. Q. Could you give us the executive summary? A. Well, I had been in contact with the U.S. authorities and my goal was to expose the truth, get these guys help. The U.S. had pulled their surveillance*

*planes out as the sun was setting on Thursday after the helicopter attack. They were under the impression that this thing was over. I made three different phone calls insisting this thing was not over. The planes came back. See, I'm in contact with the U.S. government and giving them all the information I can give. So before we even went up to the falaise, up to the Gendarme base, I had significant reason to believe it was still active. We got up there, we parked our vehicle and special forces, one with a holographic sight on his sub-machine gun, came by our vehicles. There was a high-ranking Algerian commander there with a wood grip pistol on his hip. All these guys were talking. They held us there for 30 minutes. All these guys were talking who were coming by, talking to the Gendarme driving us out of that position. So we asked the Gendarme what is the status on the gas plant? And that's when he gave us the information, that six or seven hostages still in place with explosives, four or five terrorists. It was still at a standoff. THE CORONER: Sorry, who was with you when you had this conversation? A. Billy Whitted was in the back seat. A Portuguese French tool pusher, Antonio, he was in the back seat. He translated. MR. FLINN: Just a few final questions from me on this. You didn't overhear any radio communication in respect of the terrorists on 19 January, did you? A. I did. Q. You did? A. Like I said, it's a long story, a lot of details. So they were killing time. This thing was still active. They didn't want the world to know. They took us the long way up there. They held us at the Gendarme base. They killed 30 minutes there and then they took us to VCP1. THE CORONER: I am sorry, they are having all these conversations in your presence or with you, are you saying telling the world one thing but prepared to tell you another or to let you hear another being said? Is that what you are saying? Why would they do that? A. I'm saying the Algerian government was lying. THE CORONER: Yes, but why would they then let you hear what the truth was? A. They're not loyal to the Algerian government. THE CORONER: Sorry, I don't understand, but anyway, you carry*

*on... MR FLINN: Could you give us the name of the person in the U.S. government you were in contact with. A. I have his name but I'm not going to give it.... I do have texts with his name blocked out, with the cell phone number blocked out... these texts, just one thing to note, these texts were when I couldn't talk. I was in the midst of DRS agents. I was being secretive for obvious reasons. So, yes, I only texted when I couldn't talk on the phone, just to be clear about that.*" (The Plaintiff is then removed from witness stand.) (UK In Amenas Inquest, Page 209-241, Day 14, 8 October 2014). Given a chance to tell his of his full experience and most disturbing, it was reported to the Plaintiff that the last group of hostages were initially "rescued" from the terrorists in the gas plant only to be executed by Algerian forces at a later time. Multiple pieces of evidence recovered in Texas civil proceedings confirms this while further exposing BP's cover up of what really happened at In Amenas. For example, from BP Defendant Mark Cobb's "sent" text message log from what he knew hundreds of miles away and from total safety beside BP's Incident Management Team on the fourth day of the siege (19 January) "*More initial information. All expats in CPF alive including Gordon. Two injured but rest ok. Will give more information as available. 19/01/2013 14:00:03 UTC* sent to BP America's George Griesedieck and 27 minutes later Cobb sent "*Gordon is alive!!!!!!!!!!!! 19/01/2013 14:27:55 UTC* to BP's Ken Bonzo (Page 19, BPALGERIA_0011565). Gordon Rowan was the Plaintiff's BP America coworker who the Plaintiff worked relentlessly to save while on the ground at In Amenas during the entire four-day siege. Mark Cobb was allowed to testify without interruption multiple days at the Inquest and was present taking notes on his tablet during all other testimony, including that of the Plaintiff, but did not speak of what he knew occurred on the fourth day of the siege nor was asked any questions about it. BP Defendant Sir Mark Allen was clearly involved in the orchestration of the cover up. For example, he was seen involved early on in the process with BP's Intelligence Analysis Unit

drafting their "In Amenas – Implications for security in the region 19 Jan 13. Docx" on 19 January

2013 (BP email dated 1/19/2013 5:23:03 PM, BPALGERIA_0364176). BP emails discovered in

this case from the same circle with BP's Intelligence Analysis Unit show that BP's drafts of their

"In Amenas: Course of Events" initially confirm the Plaintiff's testimony of his experience on the

ground at In Amenas (BP email dated 2/4/2013 1:15:54 PM, attachment In Amenas.pptx,

BPALGERIA_0365100). Tellingly, this PowerPoint document that included a timeline of events,

was modified in multiple versions over the following week to follow BP's desired false narrative

(BP email dated 2/14/2013 7:51:25 PM, attachment *"Algeria – Chronology of Tiguentourine*

*Attack (7 February 2013).docx",* BPALGERIA_0366535). The first version, attachment In

Amenas.pptx, confirms the Plaintiff's experience of the last hostages being killed on the fourth

day stating, on page 7, *"Timeline of events: Saturday 19 January. Algerian snipers move in as*

*reports suggest hostages-takers plan to execute final seven hostages. By end of 19 January, it was*

*reported that Algerian forces had killed all of the hostage-takers and had secured the facility…"*

However, after several versions the truth had been modified to fit BP's desired false narrative. In

the final version, the original presentation was attached to the 14 February email, now named

*""Algeria – Chronology of Tiguentourine Attack (7 February 2013).docx."* On page 7, the

modified presentation dishonestly states, *"Timeline of events: Friday 18 January. Algerian Forces*

*launch final assault on CPF. Algerian snipers are deployed to minimise the chances of heavy*

*weaponry blowing up plant. During the assault, the terrorists execute a number of hostages and*

*detonate rigged explosives…"*

However, most disturbing, on the fourth day of the siege, the Plaintiff and the eight other expats

on his drilling rig were finally "evacuated" up an illogical route and parked within several hundred

yards of the gas plant where the last hostages were being held. Due to U.S. signals' intelligence

having eyes on the situation, communication between the likes of BP's Sir Mark Allen and the bad actors with the Algerian DRS at In Amenas was limited to couriers. It is believed that BP and BP's Sir Mark Allen's friends in the Algerian DRS who were on the ground at In Amenas, killed the wrong group of expats while letting the group containing the $18+ billion insider witness against BP go free. Beyond this and among other things, one other obvious reason BP has attempted to cover up the Algerian government's guilt in the crisis is to preserve their billions of dollars in oil and gas interests within Algeria – while keeping members of the Algerian DRS from further incriminating BP in the matter. The In Amenas (Tiguentourine) field alone produces over $4.4 billion dollars a year in natural gas and condensate. The evidence in this case will show that for four long days, the Plaintiff worked relentlessly with U.S. government contacts to not only protect his men on the drilling rig, but also to gather all the intelligence he could at the request of U.S. government contacts in efforts to save the lives of his coworkers who were in hiding or being held hostage at the main facility. As seen on time-stamped text messages from the crisis, the Plaintiff was asked by U.S. contacts to gather specific information which he in fact did. During the four-day siege while on the ground at In Amenas, the Plaintiff logged 313 minutes of phone calls and traded dozens of text messages with U.S. authorities. During the four-day siege, while evacuating dozens of expatriates without issue from the In Amenas main facility and evacuating hundreds of expatriates without issue who were working hundreds of miles away from In Amenas, BP did not evacuate the Plaintiff or his men from the drilling rig. BP also took part in numerous lies issued by the Algerian government to the U.S. government asserting that the Plaintiff and his men had safely been evacuated from the drilling rig; when, in fact, they had not. Most telling and disturbing, BP's own "Confidential" time log from the crisis confirms that BP took part in a "fake" evacuation of the Plaintiff and his men on the third day of the siege, along with lies that the

evacuation took place, attempting to draw away U.S. aircraft with eyes on the situation from the Plaintiff's drilling rig.   BP's Director of Security, North Africa, is shown in the time log notes as having been involved in BP's "evacuation" of the drilling rig both before and after this fake evacuation. The Plaintiff and his men were only evacuated from the drilling rig after the U.S. government laid down an ultimatum on the morning of the fourth day of the siege giving BP and the Algerian government until 9:00 a.m. local time to evacuate the Plaintiff and his men. Once the Plaintiff reached the airport, BP insisted the Plaintiff be "evacuated" to London so BP could process him before he returned home to the U.S.  Well-documented occurrences in London made the Plaintiff certain that BP was trying to steal his digital evidence and kill him there.  Beyond that, once the Plaintiff returned home to the United States, he reported multiple security incidents in writing to the FBI and local law enforcement matching tactics BP's "Security" function has employed within the U.S. in the recent past to intimidate, harass, threaten, and/or eliminate insiders in cases where much less was at stake (U.S. House of Representative's Report on Alyeska Covert Operation dated July 1992; Charles Hamel v. Alyeska Pipeline Service Co.).  Looking at all the facts of this case, BP's well-known modus operandi, and considering BP's and BP Defendant Sir Mark Allen's "remarkable" relationship with the Algerian DRS, BP's enormous influence within Algeria, BP's substantial assets and resources, it is hard to not recognize that the only valid explanation for the Plaintiff's experience is that BP didn't want him to make it out of Algeria alive due to his plans to leave the company and deliver $18+ billion worth of damning insider evidence against BP in the Deepwater Horizon/Gulf Oil Spill proceedings. Or, at a minimum, BP and the BP Defendants acted in a civil conspiracy to commit fraud against the Plaintiff gravitating him to an area they knew as extremely dangerous while keeping him working there by intentionally misleading him about the overall security situation there that, at the time of the 16 January 2013

In Amenas crisis could best be described as a "death trap." Further and at a minimum, BP and the BP Defendants were acting in civil conspiracy to inflict emotional distress on the Plaintiff with the aim of preventing, discrediting, defaming, intimidating, threatening, harassing, and/or impeding the Plaintiff from testifying against them – not only by 'hanging him out to dry' during the four-day In Amenas Hostage Crisis but also by conspiring in a well-orchestrated but now exposed cover up with the aim of discrediting his experience at In Amenas, which would further be used to also discredit his statements against BP's Wellsite Leader program and the Deepwater Horizon Disaster.

## The BP Defendants' Unlawful Overt Acts and/or Lawful Acts for an Unlawful Purpose during the January 2013 In Amenas Siege:

In the early morning of January 16, 2013, the Plaintiff was on night duty at the Rig. At approximately 2:00 a.m., the Plaintiff observed approximately 12-15 SARL BAAT "guards/drivers" mustered in the guard shack, which was highly unusual. The Plaintiff believed something was wrong as the men appeared suspicious in demeanor and would not make eye contact with him. If the Plaintiff would have been warned about the meeting ending with the labor strikers being furious hours before that or that the labor strikers were in fact Al Qaeda linked, there is no doubt he would have made multiple phone calls to his superiors. Shortly after the attack began at 5:45a.m., BP's OLC Tom Martin and McDaniel realized two of the three escort vehicles within the Rig site were missing. Again, McDaniel was suspicious as usually only one escort vehicle is used to transport workers to and from the Rig site. The "whiteboard" at the Rig site confirmed both escort vehicles went missing at approximately 4:30 a.m. Investigations after the attack have reported that the terrorist convoy had a fatal vehicle accident on the way to attack In Amenas that morning, making the attack much later than planned. Investigations also detailed that

55

one of the vehicles that was stolen by the Al Qaeda linked "guards/drivers" on the Plaintiff's drilling rig that morning, took small arms fire and the other one still has not be accounted for by BP. Multiple reports about the January 2013 In Amenas Hostage Crisis state that the terrorist's initial intended target was, in fact, not the gas plant and main facility. Frozen at this point in time, BP and the BP Defendants had placed the Plaintiff in the most dangerous position imaginable and had withheld from him even the slightest warning that the Al Qaeda linked SARL BAAT labor strikers were again furious. As Defendant Mark Cobb voluntarily detailed under oath at the UK Coroner's Inquest into In Amenas that he and BP "... *always felt that if there was going to be an attack on an installation, it would be a ... drilling rig because they have a tendency to be much more remote... so I mean that was always, you know, what we believed and the intelligence led us to believe that the rigs were a more vulnerable target and more likely to be attacked than the static facility itself* (where Cobb was located)... *When you think about the numbers, and again I have quoted I think there were roughly 160 Gendarmes on the site, on a drilling rig there was 30 Gendarmes...*"

At 5:45 a.m. on January 16, 2013, McDaniel and other personnel on the Rig were notified that they were being placed on high alert via radio communication because the bus taking expatriates to the airport had been ambushed at Vehicle Check Point One. Soon after, the terrorists had taken control of the facility, including, without limitation, the living facilities (or "Base de Vie"). At the time of the attack, Plaintiff was assigned to Rig T-212 ("Rig") as a Wellsite Leader also known as a Drilling Supervisor. The Rig was located approximately 7.5 miles from the Gas Plant and base de vie.

BdV and gas plant were under attack by terrorist militants. The Gendarmes, who were hired to provide security to the Rig, began taking up positions. McDaniel immediately sent the HSE man on location to wake up Tom Martin, the Security Liaison at the Rig, to inform him of the attack and that they were on high alert. McDaniel then began monitoring the radio through his preferred translators and began looking for anybody approaching the Rig site from an elevated but exposed position on the drilling rig floor. The Gendarme Captain quickly confiscated a satellite phone from the BP expatriate leadership on the drilling location. The Plaintiff used his cell phone to contact his immediate supervisor in Hassi Messauod, Van Flaherty, who was BP's Drilling Superintendent. Van Flaherty knew the details surrounding the SARL BAAT guards and drivers, including threats they had made on the Plaintiff's previous hitch. The Plaintiff detailed that he had found the SARL BAAT guards and drivers in the guard shack hours before this and that he was certain that they were "in on the attack." At 8:00 a.m., the Plaintiff began intercepting radio traffic and overheard various people talking in Tuareg, French, and Arabic dialect. The Plaintiff had one of his mud engineers, an Algerian National, listen to the radio communications and help translate what was being said. Through the translator, the Plaintiff confirmed the terrorists had infiltrated the BdV and gas plant and had control over certain areas with 35 to 40 ex-pat hostages. Additional translated communications revealed the terrorists had the hostages held with primer cord around their necks with grenades and the terrorists were demanding release of 100 prisoners held by the Algerian government. The terrorists also made clear they wanted to negotiate directly with U.S. and British authorities, as they were holding Westerners hostage. At approximately 10:00 a.m., one of the terrorists was demanding the cell phone number for Lotfi. This was the last terrorist communication overheard via radio after the attack had begun. The Plaintiff attempted to

communicate the intercepted radio communications to Drilling Superintendent Van Flaherty, but Van was busy on the "other line."

Realizing the importance of the radio communications and the situation at the BdV and gas plant, the Plaintiff contacted the U.S. Consulate in Algeria and reported there was an emergency situation at the BdV and gas plant. From the moment the Plaintiff made contact with the U.S. Consulate, he became the eyes and ears for U.S. authorities and relayed information about the attack and continued to stay in contact with U.S. authorities to pass along important intelligence information of the attack and the ensuing hostage situation. As seen on time stamped text messages from the crisis, the Plaintiff was asked by U.S. contacts to gather specific information which he in fact did. Indeed, the Plaintiff logged 313 minutes of phone calls and text messages to U.S. authorities, including the U.S. Consulate, CIA and other military personnel.

The Plaintiff again detailed to BP managers early in the morning of the first day his experience finding the labor strikers mustered at the entrance to location hours before the attack and that they were in on it – it was imperative that they were evacuated from the Rig as soon as possible. Throughout the remainder of the morning after the initial attack on the BdV and gas plant, the Plaintiff and other ex-pat workers on the Rig were preparing for an attack and evacuation of the Rig. Given the content of the intercepted terrorist radio transmissions, all BP ex-pat leaders on location, including the Plaintiff, agreed to not be taken alive to avoid being tortured and the reality of being the next target began to set in among the ex-pats. The Plaintiff began fortifying the perimeter of the Rig, repositioning perimeter lights, and advising personnel of where to position themselves should the terrorists attempt to take the Rig. The Plaintiff also began gathering any tools that could be used as weapons from around the rig (axes, knives, hammers, etc.) and distributed them among the ex-pats. Given BP's capabilities, resources, influence, and

connections in North Africa, the Plaintiff was puzzled why BP had not already evacuated them from the Rig at this point and had not provided them with a detailed a plan for evacuation or communication when they would be evacuated.

At approximately 12:45 p.m., an unidentified man was seen walking towards the Rig, prompting the security alarm to trigger. It was then reported by the man that terrorists with Rocket Propelled Grenades and machine guns were positioned at a nearby FRAC site approximately one mile from the Rig. Based on this information, the Gendarme Captain and Tom Martin began ordering all personnel on the Rig, including McDaniel, to go into their rooms and lock their doors. Such an order, however, would essentially trap them in their rooms with no escape – no windows or cell phone reception. When McDaniel and other ex-pats refused to go to their rooms, the Gendarme Captain, who was armed with an AK-47, forced them into their rooms. An argument then ensued between BP ex-pat leaders on location, including McDaniel, Billy Whitted, and Tom Martin. When McDaniel asked why the plan had changed, Martin informed McDaniel that the Gendarme Captain wanted to know the exact location of the American BP company men on the Rig because the terrorists were going to want to "talk to them."

At this point, Billy Whitted, the other Drilling Supervisor at the Rig, fell apart and began to lose all composure due to fear. Whitted wanted to physically attack the Gendarme Captain to which the Plaintiff agreed with the understanding they needed to wait until they had the element of surprise. Tom Martin, the security liaison on the Rig, and Billy Whitted had a heated screaming match in front of the majority of the men on the drilling rig. Billy Whitted berated Tom Martin nastily stating that basically Tom had fallen subservient to the Gendarme Captain in a pathetic attempt at self-preservation at the expense of the other expatriates on the drilling rig. Whitted next wanted to flee the Rig without telling the men once the sun set that night and take his chances

rather than be confined to the Rig. McDaniel refused to go along with Whitted's idea to quietly abandon the Rig location on foot once night fell and leave the seven other ex-pats on location completely helpless. Taking everything into account and after giving the Defendants seven hours do what they assured the Plaintiff they would do in a situation like this, the Plaintiff solicited U.S. military intervention into the situation from his contacts in the U.S. Consulate. The Plaintiff was informed that help was on the way. A U.S. Predator drone was dispatched and arrived within hours to the skies above the Plaintiff's drilling rig. Hours later, additional U.S. aircraft arrived circling the Plaintiff's drilling rig. Additionally, the Plaintiff's U.S. contacts let him know that a U.S. Surveillance jet that was gathering signals' intelligence and aerial imagery maintained in the skies above In Amenas was operated by "them." Considering this and the extreme amount of communication the Plaintiff maintained with his U.S. contacts, it is undeniable that the Plaintiff had access to information no other expatriates had – including the Plaintiff's fellow American Wellsite Leader who admitted at the UK Coroner's Inquest that he "didn't ever talk to" the Plaintiff's primary U.S. contact. Considering all the evidence we have today, it is indisputable that the Plaintiff's actions in soliciting U.S. intervention into the situation saved the lives of the men on his drilling rig, after the Defendants' security arrangements proved to be a total failure at best. In the very least, the overt air presence froze up any terrorist movements in the area while calming the nerves of the expatriates who were panicking on the drilling rig, including the Plaintiff's fellow Wellsite Leader, Billy Whitted. During this time, the Plaintiff's U.S. contacts began questioning why the Plaintiff and his men had not been evacuated from the Rig. Given the overall severity of the situation, the Plaintiff's U.S. contacts were trying to arrange for an extraction team to retrieve the Plaintiff and his men from the Rig. The Plaintiff was informed that the Algerian government would not allow U.S. boots on the ground to extract the Plaintiff and his men, but if

the Plaintiff could make it across the Libyan border, the Libyan government had approved the team meeting him there and extracting him from Libya. The Plaintiff refused to abandon the other expatriates on his Rig who as a Wellsite Leader, for whom he was both morally and legally responsible.

Hours after the sun set, Tom Martin and Billy Whitted locked themselves in their rooms for the night leaving the Plaintiff and HSE Man to maintain night watch. That night, the Plaintiff, in further preparation for a terrorist attack, made a make-shift foxhole, held a night watch fully exposed from the top of the Drilling Supervisor's Office, and fortified the Rig as best as possible given the lack of trust of the "guards" who were still tasked with guarding the Rig. The Plaintiff maintained contact with his U.S. contacts throughout the night. The Plaintiff could hear multiple aircraft maintaining a presence above the Rig.

Once night fell on the first day of the attack, McDaniel was stationed on the top of the Drilling Supervisor's Office where he could see the entire inside and outside perimeter of the Rig site. McDaniel's location was fully exposed, but he wanted to make sure he had a clear line of sight for any possible threats. From that position McDaniel was also able to keep the U.S. authorities updated as to anything suspicious and was able to spot their drones. At approximately 4:30 a.m. on Thursday, January 17, a security alarm was suddenly sounded at the entrance to the rig site by the Al Qaeda linked SARL BAAT "guards/drivers" BP tasked with guarding the location. In response, McDaniel immediately began climbing down the ladder from the roof of the Drilling Supervisor's Office. About half-way down the ladder, in complete fear due to the security alarm sounding, McDaniel jumped to the ground below. As a result, McDaniel landed in an awkward position, causing him to hyperextend his right knee. As it turned out, the SARL BAAT "drivers/guards" had sounded a false alarm with the aim of negatively affecting the Plaintiff. By

knowingly placing disgruntled Al Qaeda linked labor strikers as "guards" of the Plaintiff's drilling rig, the Defendants' gross negligence is directly responsible for the Plaintiff's knee injury.

McDaniel and others informed BP the Rig, which had 93 men on it, was low on food and water beginning the morning of the second day. Throughout the duration of being left on the Rig, McDaniel continued to maintain close contact with the U.S. authorities and updated them as to the situation and their status on the Rig. At multiple points, the U.S. authorities had been informed by local Algerian and/or BP representatives the Rig had been safely evacuated. The first occurrence of this misrepresentation to the U.S. authorities occurred on the second day of the siege and the last occurrence being on the afternoon of the third day. In each occurrence, McDaniel informed the U.S. authorities they were still on the Rig and had not been evacuated. At one point on the second day, a U.S. Air Force colonel called the Plaintiff's cell phone from an airplane above In Amenas to confirm the Plaintiff and his men had safely made it to the In Amenas airport as BP and the Algerian government had reported. The Plaintiff informed the colonel that, no, he and his men were still on the drilling rig at the same GPS coordinates he reported on the first day. In response, the U.S. authorities were very concerned for their safety and advised them to remain patient, and they would work to try to get them off the Rig. Given the false information they had been given about the Plaintiff's evacuation, the Plaintiff was advised that his U.S. contacts would be "pinging" his and other expats cell phones to confirm their positions. The Plaintiff continued to deliver all the information he could to his U.S. contacts regarding his coworkers that were in hiding or being held hostage at the main facility. This became key after noon on the third day as BP had begun notifying expatriates' families of their loved ones' deaths, who, in fact, were still being held alive as hostages in the gas plant. In fact, key BP executives' testimony and silence

allowed the UK Coroner's Inquest to incorrectly rule that the last expats were killed on the afternoon of the third day.

Given the distrust as to their situation on the Rig, fear of the unknown or an impending terrorist attack on the Rig (whether from the outside or internally), McDaniel and the other ex-pats began contemplating commandeering vehicles at the Rig site to evacuate themselves. Importantly, McDaniel and the other ex-pats were not being informed or told as to the situation or when they would be evacuated while lies were being told on multiple occasions about their being evacuated while they had not been. With limited information and a known terrorist attack ongoing 7.5 miles away, fear and anxiety had set in among the ex-pats reaching a level of desperation. To identify the vehicles they would commandeer and use to evacuate from the Rig, McDaniel painted a large letter "H" and a letter "X" on the roof of the vehicles so he could inform the U.S. authorities which vehicles they were using to evacuate. The Plaintiff and other expatriate workers on location were not confident self-evacuating would work, but given the overall situation they were in at that point, judged that anything was better than being captured and tortured to death.

On the morning of Saturday, January 19, 2013, McDaniel and the other ex-pats were finally evacuated from the Rig in several vehicles. However, the route taken from the Rig back to the base camp was concerning. The convoy of evacuation vehicles drove right through the area where active military operations focused at the BdV and gas plant were ongoing. The area was covered in military vehicles with troops still pointing guns toward the BdV and gas plant. There were also burnt and bullet-hole ridden vehicles spread around. The convoy came to a stop and military personnel came by the vehicles. McDaniel overheard one of the military commanders speaking with the driver of his evacuation vehicle and relayed to the driver that there were six or seven hostages still being held in the BdV. After thirty minutes, the evacuation convoy proceeded to

VCP 1 where Algerian forensics teams were going through the bus convoy ambush vehicles. After thirty minutes there, the evacuation convoy finally proceeded to In Amenas. U.S. authorities wanted to fly McDaniel and Whitted to Algiers for a debriefing and then fly them directly back to Texas in a U.S. government G3, but BP insisted they wait hours at the In Amenas airport for a BP chartered plane to arrive so they could be flown to Hassi Messauod and then be brought to London to be "supported" by BP.

BP America's Mark Cobb, as the BP General Manager of In Amenas, was responsible for the security of the In Amenas field. Considering his failed responsibility leading up to the attack, Cobb had an obvious motive and desire to keep what happened at In Amenas inside Algeria and internal to BP. Cobb admonished McDaniel's acts in communicating and working with U.S. authorities during the attack. While McDaniel was still on the Rig and in harm's way trying to do everything he could to save lives, Cobb attempted to use his senior position within BP to intimidate McDaniel from cooperating with U.S. authorities. In one such attempt, on Saturday, January 19, Cobb called McDaniel on his cell phone and angrily stated, "YOU DON'T WORK FOR THE U.S. GOVERNMENT, and YOU WORK FOR BP....YOU DON'T HAVE TO TELL THEM ANYTHING..." In response, McDaniel asked, "Is that what you want me to tell the U.S. State Department?" Cobb replied, "You tell them what I told them, (expletive) you, I don't work for you, you work for me..." BP's treatment of McDaniel since the attack is consistent with Mark Cobb's sentiment during this phone call. It was obvious BP and Cobb had sided with the Algerian government during the four-day siege and did not want any assistance from or communication with U.S. authorities.

**The BP Defendants' Unlawful Overt Acts after the January 2013 In Amenas Siege:**

Prior to being flown home after the attack, McDaniel was sent to London on Sunday, January 20, 2013, and met with BP's senior security personnel. During the meeting, McDaniel disclosed the information and evidence he had against BP. As the meeting progressed, McDaniel began to feel fearful for his life and started recording the meeting with his cell phone. In BP's own words during this recorded meeting with the Plaintiff in London on 20 January 2013, a high-ranking BP "Security" advisor stated that what the Plaintiff did "was definitely heroic, you did the right thing, you kept your wits about you…" After feeling he was not being heard, but more interrogated by BP's representatives, McDaniel left the meeting. He returned to his hotel room at Heathrow Airport and found that his personal belongings had been searched in the room. McDaniel tried to go to sleep but was awakened by someone utilizing a key to quietly gain entry to his hotel room. Very disturbing things happened over the next several hours. Now even more concerned for his safety, he phoned the FBI in Washington, D.C. reporting the occurrences and sent text messages to his wife. He barricaded his hotel room until daylight when he departed on a flight back to the U.S. Upon returning to the U.S., McDaniel could no longer access his BP work e-mail account on several occasions and his BP email was "hacked," and emails were mysteriously deleted. BP declined to restore the deleted emails to his email account from BP's server.

The Plaintiff has not worked for BP since the attack. The Plaintiff has opted to go to work for an honest and reputable company, which promotes employees based on performance and merit and not nepotism. In this environment, the Plaintiff has become the highest-paid U.S.-based product of the Wellsite Leader of the Future Program – making almost double what his peers in BP's Wellsite Leader of the Future Program are making on assignments in Deepwater Gulf of Mexico. The Plaintiff assisted U.S. and U.K. authorities in their investigation of the In Amenas

terrorist attack and provided all evidence and materials he has in support of the same. Additionally, as stated above, McDaniel provided federal investigators evidence in the Deepwater Horizon case based on his personal knowledge and information received concerning the Well Site Leader of the Future Program. McDaniel has been transparent in presenting his evidence in both investigations and providing all the information and documents/evidence he has obtained. The details of the Plaintiff's heroic actions in "doing the right thing" in the face of what was really going on at In Amenas 16-19 January 2013, as well as the Plaintiff's objections to BP's Wellsite Leader Program in relation to the Deepwater Horizon Disaster, are well-known not only within BP but also the oil and gas industry as a whole. Rather than doing the right thing to give the Plaintiff closure in this matter, the Defendants have gone to great lengths in attempts to discredit the Plaintiff while attempting to ensure he does not emerge from his terrible experience as a success story. BP has refused to offer even the slightest compensation to the Plaintiff without the condition of "Full Confidentiality" and a waiver of full liability upon BP. Given the BP Defendants' well-known history of deceitful and immoral conduct, the Plaintiff feels this leaves him wide open to be further slandered and defamed by BP, putting his future income for the 30+ years left in his career in jeopardy. After undisputable evidence has come out from multiple sources, including "Highly Confidential" and "Confidential" BP evidence, which they were forced to produce in Texas Civil proceedings, BP's blatantly dishonest and self-serving cover up about what really went on before, during, and after the January 2013 In Amenas Hostage Crisis has been exposed. In stark contrast to BP's false narrative, the Plaintiff testified about the details of his first-hand knowledge of what really happened before, during, and after the incident. During the four-day siege, the Plaintiff not only did whatever it took to protect his own men on the drilling rig for the four-day siege, but also everything he could to save the lives of his coworkers who were in hiding or being held hostage at

the main facility.  Among other things, the Plaintiff has detailed under oath the Algerian DRS's complicity in the attack and the Algerian DRS's executions of the six or seven final hostages on the fourth day of the siege after they were initially "rescued" from the gas plant. BP first informed family members of these final six or seven hostages' deaths beginning a day before their actual deaths, this while the Plaintiff was working relentlessly with U.S. authorities to rescue them and/or secure their release.  Multiple BP Executives, including Defendant Mark Cobb, gave detailed statements and testified under oath at the UK Coroner's Inquest into In Amenas lying and covering up the truth from being told to the deceased families.  BP Executives and Defendant Mark Cobb chose to sit in the court room every day of the hearing while taking notes on their tablets.  The widows thanked the Plaintiff for giving his testimony during the inquest and detailed their disgust with the BP Executives and Mark Cobb believing that they were only there to intimidate the witnesses who were still working for BP from telling the truth.  In the court room in London filled with widows and other family members of the deceased, Defendant Mark Cobb even went as far as making loud sound effects mocking the Plaintiff as he answered questions under oath that went against BP's and Mark Cobb's dishonest accounts.  An expert witness on radical Islamic networks has studied the Plaintiff's case and has testified that he can no longer safely work overseas. Beyond this, considering the Plaintiff has first-hand knowledge and undeniable non-public evidence that contradict BP's and the Algerian DRS's account about In Amenas, the Plaintiff has been advised he can no longer safely work abroad and could possibly be targeted for assassination even inside the United States.  Disturbingly, the Plaintiff has reported multiple security incidents to both FBI and local law enforcement that match tactics known to be used by the Defendants in recent history to target and/or intimidate adversaries in the United States where a lot less was at stake.  This given BP's and BP's chosen security contractor's known history in the recent past of targeting

adversaries for a lot less. For example, the U.S. House of Representatives Report on the Alyeska Covert Operation detailed how whistleblowers against a pipeline partly owned by BP were being targeted by a security contractor named Wackenhut. BP has had long-standing contracts with G4S Wackenhut and still does business with them today. Credible accounts of countless individuals who have challenged BP in the aftermath of the Gulf Oil Spill also confirm the Plaintiff's fears. To further the Plaintiff's fears, defectors of the Algerian DRS have testified in detail concerning their highly trained operatives' assassinations of adversaries outside of Algeria, including but not limited to Western Europe. Considering the security incidents even here in the U.S., the Plaintiff was advised that the best thing he could do to make himself and his family safe was to go public with what he knew. Among other things, the Plaintiff created a social media page containing reports and detailing evidence of his accounts. This page can be found with a simple internet search of the Plaintiff's name and BP -- "Brad McDaniel BP." Due to not being able to safely work overseas and his reluctance to travel even within the United States, the Plaintiff has lost significant future earnings potential in the 30 + years remaining in his career. In order to receive even the slightest compensation, BP has demanded the Plaintiff succumb to full confidentiality including, but not limited to, ceasing criminal accusations against them. The Plaintiff strongly feels this would not only make him more vulnerable to being targeted by people looking to contain his first-hand knowledge and the non-public evidence he has against them, but would also leave him open to continue to be defamed and slandered by BP – further damaging his career even more so than it has already been damaged. In the very least and with all evidence considered, there is no doubt that the Defendants have taken part in a civil conspiracy to commit intentional infliction of emotional distress on the Plaintiff.

**V.**

**FACTS**

**BP'S SECRET RELATIONSHIP WITH AL QAEDA IN THE ISLAMIC MAGHREB AT IN AMENAS, WHICH BP VIEWED AS MORE INTERESTED IN "CRIMINAL-ORIENTED ENTERPRISE" THAN RADICAL ISLAMIC TERRORISM, POTENTIALLY VIOLATED THE US. PATRIOT ACT UNDER 18 U.S. CODE 2339B**

5.01   **23 April 1998:   Workers near BP's Drilling Rig 47 near Krechba, Algeria, were surrounded by at least 24 heavily armed "bandits/terrorists" in multiple vehicles.   *A propaganda letter signed by the G.I.A. was then read to all on site. The bandits left and warned the inhabitants not to move from the site or they would all be killed. One of the bandits/terrorists had a glass eye and was later identified as Mokhtar Belmokhtar, the terrorist leader who masterminded the terrorist group that attacked the IA project site on 16 January 2013.   The bandits were in possession of the following weapons:  A heavy calibre twin-mounted machine gun, 1 x RPG rocket launcher, 4 x Russian rifles, 2 x shotguns, 4x Kalashnickov's, Grenades.*   (IA Post Incident Security Overview Report, Page 8)**

5.02   Five detailed meetings in 2001 between BP's Social Programmes/Security Advisor for In Amenas Dr. Jeremy Keenan; BP's then Algeria Business Security Manager, Mark Whitecomb; and BP "Senior Security Executive" Barry Halton. "… *The subject matter was whether* **(Dr. Keenan)** *could meet with MBM* **(Mokhtar Belmokhtar)** *and deliver a deal by which he would desist from attacking any BP facility, personnel, etc.* **Dr. Keenan** *was told that BP's security budget for Algeria at that time, was very considerable (close to a nine figure sum, in dollars, for a rolling three-year period). Discussions centered around whether* **Dr. Keenan** *could meet with* **MBM** *(the answer, which was yes) and what sort of financial deal (i.e. buying him off) might be*

69

*attractive and acceptable to him; and finally what sort of guarantee structures we could build into the deal to ensure that he did not renege on it. The sum of money we were discussing was an "eight-figure sum" (in dollars). At that time, MBM had the capacity to "knock out" an entire facility with ease... during Dr. Keenan's five meetings with BP, (he) learned a great deal about MBM's weaponry and BP's very understandable concerns. Dr. Keenan recalled specifically being told (by BP) how MBM had the weaponry to fire ordnance from some 14 miles away, i.e. "over the horizon." Much of this information was given to BP by the DRS ... After five meetings, by which time* **Dr. Keenan** *had set up the process of (his) meeting with MBM through his "gatekeepers," the meetings came to a sudden end... "* (Former BP Social Programmes/Security Advisor Dr. Keenan's written statement to UK Detective Wixey of the SO15 Counter Terrorism Command dated 30 April 2014*)*

(a) 26 October 2001: President George W. Bush signs U.S.A. Patriot Act into law including 18 U.S. Code 2339B – which prohibited providing material support or resources to designated foreign terrorist organizations. This statute made the deal BP was seeking to arrange with Al Qaeda's Mokhtar Belmokhtar as discussed with Dr. Keenan illegal.

(b) BP's Algeria Business Security manager 2006 – Present, Barry Shaw, confirmed that his predecessor, Mr. Whitecomb, and BP's Mr. Halton met with Dr. Keenan on multiple occasions during this time period. Barry Shaw: *"On all meetings they turned down. Everything he – this is what Mark (Whitecomb) tells me subsequently. Whatever Keenan was offering them, they just re --- turned it down."* Question: *So if they turned it down, why did they have as many meetings as they had, do you know? Barry Shaw: "I think – well, from what (Mark) tells me, Keenan offers them a series of – made them a series of offers, each different --- sort of a different offer each time, and each one of them they turned down."* (Barry Shaw deposition dated 24 July 2015, Page 453)

(c) As BP's Algeria and Libya Business Security Manager, Barry Shaw's job required for him to liaise with "local civic leaders" including organized criminal tribes who partook in the smuggling of illegal weapons, drugs, and other contraband. Barry Shaw detailed that the area near In Amenas was under the control of the Zintan tribe and that he *"traveled in this area of Libya myself with the Zintan. They guarded jealously their control over the land and, although smugglers, they are not terrorists..."* (Witness Statement of Barry Shaw, BPALGERIA_0054412)

(d) *Threat:  Terrorists and Criminal Organizations (Bandits/Smugglers):  The threat from bandits and smugglers has been constant within the project area and the security forces have periodically encountered such groups around the project locations. Bandit and smuggling groups' activities are generally property theft, 4x4 vehicle theft, cigarette and drug smuggling, and people trafficking, and aside from isolated incidents, their attacks have not exhibited the same level of gratuitous, senseless violence as the terrorist organizations.  Nonetheless criminal gangs operating in the southern desert regions are normally heavily armed and represent a very real and ongoing threat to IA (In Amenas) operations.  However, to date their standard operating procedure is to avoid where possible well-protected targets with military protection.  The cross over and joint activities between terrorist and criminal gangs is significant but often difficult to define and often opportunistic targets such as expatriates travelling without adequate security measures and in isolated regions who offer soft kidnapping targets often lead to commercial enterprise between criminal gangs and terrorists.  Due to the bandits' capacity to work in the desert, the terrorist groups are willing to pay for the services of the bandits to attack specific targets that provide significant impact and publicity for their cause.* (In Amenas Project Security Management Plan dated June 2012, BPALGERIA_0276009)

(e) *BP Intelligence & Analysis Unit "North Africa Overview" "AQIM* (Al Qaeda in the Islamic Maghreb) – *There are distinct differences between the northern and southern alignments with the former embracing a more jihadist orientation and willing to engage targeting government and security forces. The latter has become a more criminally oriented enterprise ... the southern group mostly engages in kidnapping and contraband smuggling..."* (BP IAU North Africa Overview dated 9 December 2011, BPALGERIA_0367467)

(f) *"For years, the security services worked an informal "arrangement" with the bad guys: we let you pass and leave us alone. And, give us a cut. No more.... As such, western Libya (Ghadames) will be a de facto no-man's land for a long time. The trans-Algerian (desert) highway will be cut-off."* (BP's Director International Security Affairs, Greg Saunders in BP Email dated 23 January 2013, BPALGERIA_0362953)

(g) *"...Over the past 20 years, Belmokhtar has developed an intricate and highly mobile criminal network composed of militant elements, Sahrawi nomads, and drug smugglers with a thorough knowledge, provided drug smugglers with armed escorts in return for cash payments while nomads and tribes in the Sahara have assisted al-Qaeda elements through the sale of petrol or water, among other high demand products..."* (G4S Assessment of the In Amenas attack, Page 3, Dated 24 January 2013, BPALGERIA_0364300)

(h) *"... Insider information looks to have played a significant part in the planning of this attack, and particularly, although not exclusively, the drivers. The impact of the six-month drivers' strike and the ill feeling towards management should not be underestimated. Local ill feeling towards a government organization such as SH (Sonatrach) were high and the perception that the local population was being poorly treated are both key elements that would have played a part in target*

*selection. The IA drivers due to region, culture, and lack of employment opportunities have linked and formed relations with local bandits/smuggling operations...*" (IA Post Incident Security Overview Report, Page 21, BPALGERIA_0162030)

(i) BP Security Consultant Geoff Porter "*Apparently, MBM's new katiba (Signatories in Blood) is claiming it. I smell a rat. Something doesn't add up here... If it were Belmokhtar, why would he shift from a very profitable and sustainable kidnap-for-ransom method outside Algeria to one in Algeria that is surely going to end in his death or capture?*" (BP email between Geoff Porter and BP Senior Security Analyst William Skidmore, dated 16 January 2013, BPALGERIA_0364184)

5.03    Instead of making the deal directly with Al Qaeda's Mokhtar Belmokhtar through Dr. Keenan (which would have been a violation of the Patriot Act 18 U.S. Code 2339B), BP opted to launder the money to Belmkhtar's boss, the emir of AQIM, Abou Zeid, by employing his brothers company SARL BAAT, at In Amenas.  SARL BAAT contracted hundreds of workers a day to the In Amenas project and provided a conduit to deliver the millions a year in safe payment funds to Al Qaeda's Abou Zeid.

"*6.1 Vetting (Individuals and Companies) Newspaper reports stated that BP and its partners used a transport company owned by the brother of the AQIM's regional Commander Mohamed Ghediri, also known as Abou Zeid. Abou Zeid is reported to be one of the most violent and radical terrorist leaders operating in the Sahel region.  Abou Zeid had previously worked with Mokhtar Belmokhtar who masterminded the attack on the In Amenas site.  Reports indicate that their relationship has soured and that Mokhtar Belmokhtar has split from AQIM and created his own autonomous group, which executed the In Amenas attack.  The name of the transport company*

*is believed to be EURL SASSI and is registered in Hassi Messaoud, Ourargla. Checking back in Maximo in Hassi Messaoud the following contracts with this organization were located. 1. Contract number: 700173 (Teg, Reg, & Krechba), for drivers and vehicles from 26th June to 07th of July 2007. 2. Contract number: 700227 (Hassi Messaoud), for drivers and vehicles from August to September 2007 (One month). Additionally BPXA had a contract with the same company in 2010 that they terminated when they became aware that one of the owners (Named Ghedeir) had been arrested on arms smuggling charges. There are several versions of the spelling Ghediri, Ghedeir, Ghedair and Ghdaiar, but all are believed to be the same family. On 07th May 2012, a fax was received from the authorities stating that the **IA Driver Mohamed Ghedeir, assigned to KCAD Rig T0212 had been arrested and was presently in prison.** No reasons were given for the arrest and the details were reported to the IA and HMD HR as well as the IA SH President. The Ghedair name is apparently common in the Deb region so it is unclear if the arrested driver had close or any links with the owners of EURL SASSI or Abou Zeid...."* (IA Post Incident Security Overview Report, Page 12, BPALGERIA_0162030)

(a) Newspaper report IA Post Incident Security Overview Report, Page 12, was referring to:

*"... British firm BP employed through a local contractor a freight transport company owned by the family Ghediri that is none other than the brother of Abou Zeid, the leader of AQIM in the South.... company registered under SARL BAAT legally registered in Ouargla was foaming with a fleet of trucks, at least thirty trailers, worked at the In Amenas site for at least three years ... many employees were suspected of being part of a network that supported terrorism and the brother of Abou Zeid had repeatedly been detained for investigation. But each time, despite the warnings from the Algerian government, BP did not terminate the*

*contract with the brother of the head of AQIM in the South...*" (Algerie360, dated 19 January 2013)

(b) Newspaper report IA Post Incident Security Overview Report, Page 12, was referring to: "*Algeria: BP 'was warned about al-Qaeda leader relative providing transport'.  BP and its gas production partners were warned by the Algerian authorities that a relative of an al-Qaeda leader worked in a senior position in a company that provided transport at the In Amenas site, it has been claimed.  Sources close to the Algerian intelligence services said the warning was given two years ago... it appears unlikely the Algerian authorities would have missed any familial connections between the firm servicing the plant, and Abou Zeid, the "emir" of al-Qaeda in the Islamic Maghreb...*" (The Telegraph, dated 29 January 2013)

(c) Newspaper report IA Post Incident Security Overview Report, Page 12, was referring to: "*BP hired Al Qaeda leader's brother*" An Algerian former colonel claims that Statoil's partner BP awarded a transportation contract to a company headed by the brother of Al Qaeda's leader in the Maghreb... Colonel Mohammed Chafik Mesbah*" (Aftenbladet, dated 28 January 2013)

(d)  BP's Andrew Collins email dated 15 February 2011 "*Subject: Civil Armed Guards ... If the Project were to employ CAGs (Civil Armed Guards) then the Wali and authorities should be made aware that the project could not afford duplicate guards. Given our current BAAT guards could not be employed as CAG's, some if not all of them would need to be stood down to mitigate costs. This would affect up to 150 guards (75 posts) in TEG, REG, ISG rigs. The social unrest this would cause in In Salah would be considerable and in contrast to our commitment in social investment.  This would also be exacerbated by the fact that they would be replaced mostly by people from outside the region ... we have also just received directives*

*to use an approved company in place of **BAAT** across ISG and IA (In Amenas). This is an*

*ongoing issue and an SH (Sontrach) directive... (this) would leave to even more civil*

*tension..."* (Andrew Collins deposition, Exhibit 178, email dated 15 February 2011, Page 3)

**FIVE MONTHS AFTER THE DEEPWATER HORIZON BLEW OUT, BP AND THE BP DEFENDANTS "PROMOTED" THE PLAINTIFF TO THE GREATER IN AMENAS AREA. BP AND THE BP DEFENDANTS GRAVITATED THE DEFENDANT THERE BETWEEN 2011 THROUGH 2013 AS THE SECURITY SITUATION DETERIORATED GREATLY. DURING THIS TIME, THE DRILLING RIG COUNT DROPPED FROM FIVE RIGS DOWN TO ONLY ONE RIG. THE PLAINTIFF WAS TRANSFERRED FROM RIG TO RIG AS THE RIGS DROPPED, KEEPING HIM WORKING IN THE IN AMENAS FIELD INSTEAD OF BEING TRANSFERRED ELSEWHERE.**

5.04 August 2010:  The Plaintiff was notified he was being "promoted" to the BP Libyan Ghadames Onshore Exploration Project located 200 miles northeast of In Amenas. After waiting almost five months for his work visa application to be approved, the Plaintiff's first hitch in Libya was in January 2011.  After BP declared force majeure in Libya in March 2011, the Plaintiff was actively recruited to work in BP operations outside of North Africa.  BP ultimately told the Plaintiff he would be assigned to work in their BP In Amenas operations, where defendant Mark Cobb was BP's "General Manager."

    (a) The Plaintiff's former co-worker highly recommended the Plaintiff to join him in operations in BP outside of Algeria: *"Richard, Should you be looking for any Night Mentors, I would like to recommend a young guy named Brad McDaniel.  Brad is in the Wellsite Leaders of the Future program and an engineer from Texas Tech.  We worked together in Libya as Brad was assigned as my night man. I found Brad to be very pro-active and on top of his game.  Brad has had experience as a Sr. Wellsite Leader in Wyoming.  When the time comes that Joe and I will need a night mentor I would love to have this guy on board.  Regards, Bill"* Reply by BP's Richard Leturno *"Already working on him!!!!!"* (BP email dated 23 March 2011)

5.05   Once assigned to BP's In Amenas, Algeria, field, the Plaintiff was kept there as the drilling rig count dropped from four to only one rig.

5.06   BP evacuated all non-essential expatriate workers from the In Amenas field after threats of violence were made by the Al Qaeda linked SARL BAAT labor strikers.  Meaning drilling operations would cease and no expatriate Wellsite Leader would be allowed in the field. Despite this and during the bitter labor strike, BP assigned the Plaintiff to go in and release Enafor Rig 20 from the most dangerous and remote field any rigs in In Amenas had worked in.  BP could have called in an Algerian National Wellsite Leader that was available to release the rig but assigned the Plaintiff.

    (a) 17 November 2012: *"Brad (Plaintiff), I am getting you booked to go straight to Rig 20. I will get someone to bring your bag to the airport.  You will begin preparation*

*for Rig 20 to be released.  This decision has not been made, but I am sure it is coming. Regards, Van"* (BP email dated 17 November 2012)

5.07   After the Plaintiff successfully released Enafor Rig 20 from Hassi Farida location, BP only had one rig left working in the In Amenas field. Less than two weeks before the January 2013 In Amenas attack, BP transferred the Wellsite Leaders that were assigned to that rig elsewhere and assigned the Plaintiff to take their place. The evidence in this case will show that BP and BP Defendant Mark Cobb quietly knew the In Amenas field had become a death trap at this point.  As BP Defendant Mark Cobb later volunteered under oath at the UK Coroner's Inquest, he and BP *"... always felt that if there was going to be an attack on an installation, it would be a ... drilling rig because they have a tendency to be much more remote... so I mean that was always, you know, what we believed and the intelligence led us to believe that the rigs were a more vulnerable target and more likely to be attacked than the static facility itself* (where Cobb was located)*... When you think about the numbers, and again I have quoted I think there were roughly 160 Gendarmes on the site, on a drilling rig there was 30 Gendarmes... "* (Mark Cobb's transcript UK Coroner's In Amenas Inquest, Day 3, 17 September 2014, Pages 127-128).

(a) 15 December 2012: "Brad, Trust everything is OK and looking forward to this festive period.  We have just got news that the strike is over and we are going back to work.  I see from the rotation schedule you are due back on the 10th January.  Is that correct and are you good to travel?  You will be going to Rig T-212, replacing Majid as always.  Cheers, Ian Rees" (BP email received by Plaintiff and replied to on 1 January 2013, 15 days before the January 16 In Amenas siege began)

5.08   BP Defendant Mark Cobb detailed threat-level to Plaintiff and other relatively low-level expatriates working at In Amenas as "Low" but quietly operated at "Medium."  BP has a very detailed, written way of assessing risks and communicating them to their employees giving them specific options if the threat level is changed.  If the threat level is raised to "Medium," BP must notify all expatriate workers the details of why it has been raised and give them the option of taking another assignment within BP with zero consequences to their BP careers.  If the threat-level is raised to "High," BP must immediately evacuate all expatriates, no questions asked until they can mitigate the threat back down to "Medium."  This was detailed in multiple testimonies by BP managers, including BP Defendant Mark Cobb in his first deposition in Houston on 16 January 2015 *"Q. ... had you actually been at the medium-threat level instead of just, quote,*

*operating under it, it would have been mandatory for BP to let every ex-pat know why the threat*

*level was raised, correct?  A. It would have been mandatory if the threat level was increased.  Q.*

*Yes. A. Yes, everyone would have been notified of that... Q. But by keeping it at the low level,*

*although, quote, operating at the medium level, you voided that requirement, correct?  A. (Not*

*responsive)... Q. By keeping it at the low level and not raising it to the medium level, that*

*effectively avoided the requirement of letting all the expats know that the level had been*

*increased and why, correct? A. From low to medium. Q. Yes. A. I guess so, yes...*" Cobb

Deposition, 16 January 2015, Day 2, Pages 150-151).  BP uses these written policies, mandatory

notifications, and assurances regarding security situations on assignments as a way of recruiting

and retaining highly skilled expatriate workers like the Plaintiff to work at places like In

Amenas.  Expatriate workers like the Plaintiff must go through a lengthy process in order to

acquire a work visa.  Leading up to the January 2013 In Amenas siege, this process was getting

harder and harder.  If expatriate workers like the Plaintiff and the 39 expatriates who were killed

in the In Amenas attack were told the truth, there is no way they would continue to work at In

Amenas.  In the Plaintiff's case, especially not in a position known by BP and BP America

Defendant Mark Cobb to be "...*a more vulnerable target and more likely to be attacked than the*

*static facility itself (where Cobb was located)...* " Beyond the BP Defendants $18+ billion

motive to negatively affect the Plaintiff, BP also had significant monetary reasons to keep the

Defendant in the dark and transfer him to work on the only drilling rig left at In Amenas at the

time of the attack.  In just two obvious examples in BP's own emails leading up to the strike: "*In*

*Amenas Industrial Action 6 July 2012. Background:  BAAT personnel began industrial action at*

*In Amenas on June 21.  There are approximately 130 drivers and 190 BAAT support workers*

*working at In Amenas... Impact:  We have identified several potential threats to the safety and*

*security of our people and plant: 1. Travel to and from the airport to site: The strikers have blocked by action or threat all efforts to mitigate this issue, including threatening civil unrest on the escort convoy in the town of In Amenas. 2. Safety/Security at Site – Tensions have been rising between strikers and non-strikers and at least two physical assaults (fist fights) have taken place. No strikers have been threatened by the strikers...* **3. Business Interruption – The two drilling rigs have been idled for several days and the frac campaign demobilized as a result of the strike. We estimate the cost of this to be $115k per day for the rigs and an additional $85k for the cost of employees disrupted by this...** *4. Freedom of Movement – Strikers have at various times internally debated the idea of keeping expats "hostage" in the base..."* (In Amenas Industrial Action 6 July 2012, Page 1, BPALGERIA_0014392 which is an attachment to BP email dated same, BPALGERIA_0014391). And "... ***The strike is generating rig standby costs and caused the cancellation of the planned fraccing campaign. In addition to this additional financial cost, production losses will be experienced over the next years, which will have a detrimental effect on the Association's efforts to maintain Plateau production...***" (Labor Strikers Contract Decisions, Dated 5 September 2012, Page 105, BPALGERIA_0094261).

**BP INSISTED AFTER THE JANUARY 2013 IN AMENAS ATTACK THAT SUCH AN ATTACK WAS "UNPRECEDENTED." HOWEVER, THE PLAINTIFF WAS NARROWLY MISSED ON AT LEAST TWO OCCASIONS BY HEAVILY ARMED TERRORIST/BANDIT GROUPS PRIOR TO THE 16-19 JANUARY IN AMENAS SIEGE. THE LIKES OF BP'S BARRY SHAW MAINTAINED CLOSE RELATIONSHIPS WITH THESE ORGANIZED CRIMINAL GROUPS AS WELL AS AL QAEDA IN THE ISLAMIC MAGHREB WHO BP KNEW OPERATED IN THESE AREAS.**

5.09    21 February 2011: The Plaintiff was allowed to go home much sooner than expected when his residency visa was processed earlier than anticipated. The Plaintiff was on his first hitch in the BP Libya-Ghadames Onshore Exploration project and working on BP's Weatherford Drilling Rig 802, which was 200 miles northeast of In Amenas. The Plaintiff was expecting to have to stay in

country at least two months but was suddenly allowed to go on days off once his visa was processed one month into his hitch. Less than two weeks after the Plaintiff left the rig much earlier than expected, six truckloads of heavily armed terrorists attacked the rig, machine guns blazing asking, "Where are the Americans???"

(a) UK Judge Nicholas Hillard "I have been asked to call a witness Louis Frank Galvan, who deals with the incident in Libyan in 2011. Mr. Ritchie says that if Mr. Galvan is correct, it was an armed terrorist attack on an oil and gas installation with a view of taking hostages … I've already heard hearsay evidence about this from Mr. Cobb and another witness Brad McDaniel (Plaintiff) produced BP's own daily operations report about it. It seems there must be a limit to this…. To come to Mr. Ritchie's point, and the part that he is really interested in, Mr. Galvan says that other people, unidentified, told him that the attackers asked a local, also unidentified, where the expats were. If this happened, the reasons for it are in my judgement entirely speculative. Was it, for example, to rob them? Or to ask them where any valuables, if there were any were? Or for some other reason? Mr. Galvan believes the attackers wanted to hold westerners hostage for ransom…." (UK Coroner's "In Amenas Inquest", Page 1, Day 12, 6 October 2014)

(b) *"Tuesday 22 February 20:00: Armed militia visited the rig site during the night. Shots were fired and looting occurred."* (BP Libya Civil Crisis Plan – Incident Timeline Overview, BPALGERIA_0361492)

(c) BP Defendant Mark Cobb deposition "Q: Now, there was an attack on a rig in February 2011, Weatherford rig 802 in February 2011. That was a BP rig with BP staff … Were you aware of that event? A: I was aware that there had been a rig in Libya that had been ransacked… Q: If you had been told that there were six vehicles with armed men who demanded where the expat workers

were, would that have changed your view? A: Not necessarily…" (Mark Cobb Inquest Testimony, 17 September 2014, Day #3)

(d) BP Email string dated 22 February 2011 with top email from BP Wellsite Leader in charge of Weatherford Rig 802 to Mr. Blackman, Weatherford Contract Drilling's country manager (BPALGERIA_0000479 – BPALGERIA_0000492)

5.10   Summer 2012: Near miss when a heavily armed terrorist convoy confronted an ENI drilling rig that was working nearby the Plaintiff's drilling rig in Hassi Farida, Algeria about 40 miles southwest of In Amenas's main facility. The terrorist convoy included a truck mounted 12.7mm like the one used in the January 2013 In Amenas attack less than six months later. The terrorist convoy was allowed to leave without shots being fired by either side after it was determined, they "weren't where they thought they were."

**JANUARY 2013 IN AMENAS ATTACK WAS HOURS BEHIND SCHEDULE, HAD BEEN PLANNED AT LEAST TWO MONTHS PRIOR, AND TARGETING THE MAIN FACILITY WAS NOT THE TERRORIST GROUP'S ORIGINAL PLAN OF ACTION**

5.11   *"(1) Around 05h30 on 16th of January 2013 a total of 34 terrorists arrived via Libya in about seven 4x4 vehicles. (2) Unconfirmed reports suggest that before crossing the border into Algeria, the terrorist group had an RTA (Road Traffic Accident), and two members of their group were killed. (3) A further RTA occurred near the Tiguentourine stockade south of the project site…"* (IA Post Incident Security Overview Report, Page 12, BPALGERIA_0162030)

5.12   *"LPD RISK MANAGEMENT Algeria Security Update "… It is assessed as highly unlikely that the AMB attackers crossed more than 1,200 km of desert from Mali with specific intent to attack and occupy the BP/Statoil In Amenas facility. By Belmokhtar's own admission, and as indicated by the demands and actions of the attackers themselves, the original plan was to seize a*

*small number of hostages and hold them in a secure desert location for their ransom value and use as political bargaining chips…. Salient Points resulting from the attack: - Planning and preparation is likely to have started well before the attack – likely earlier than December 2012…"* (BP email dated 26 January 2013 from IAU to Derek Porter stating the author of this report, Tony Ling "is a former and highly respected BP Group Security Employee" BPALGERIA_0362809)

5.13 "The Course of the Operation: The battalion started out from a point 400km from the target. The group was comprised of 29 individuals divided over four cars, three of which were bearing security signals and colours and one roadster.  The distance is covered in two stages, the first on land pathways, and the second on official roads, this is why the cars are camouflaged with security colours, so that they wouldn't attract attention and deception if done this way. The operation was supposed to take place before one o'clock (at night)…" (Barry Shaw deposition exhibit, BP_ALGERIA_0024967)

5.14 BP OLC assigned to rig T212 during the siege, Tom Martin *"Q: So at that time what was noticed about the drivers?  A: I had already observed I was missing two vehicles or two vehicles weren't parked or were absent from their normal parking area. At this stage it was confirmed that two of the drivers, the names are in the statement, were not there.  Q: That is Mr. Cehffaoui?  A: Mr. Cehffaoui, Ouled Hamma and Oughilal…  Q: Two were missing? A: Yes"* (UK Coroner's Inquest, Page 100, Day 14, 8 October 2014)

5.15 *"SARL BAAT Drivers who went missing from T212 before the attack: Hamma Ouled, Oughilal Cehffaoui. Two Vehicles missing from T212 before the attack: 92 – took small arms fire during the attack, 85, still unaccounted for by BP"* (The Plaintiff's hand written notes produced in discovery request responses by Plaintiff in 2015)

5.16   Plaintiff Brad McDaniel, Wellsite Leader on rig T212 during the siege "Q: On the evening before 16 January, perhaps the early hours of the morning, I think you were at the rig when you came across a meeting of some of the drivers and guards?  (Al Qaeda linked SARL BAAT labor strikers)  A: That's correct. 2 o'clock in the morning they were mustered in the guard house. I walked in on them. 12 to 15 guards and drivers, unlike anything I had ever seen before. They had guilty looks on their faces when I walked in. Q: What do you mean by guilty looks? A: Like, "oh crap", you know, I walked in on something, you know, I caught them in the act, if you will.  Q: Do you speak Arabic? A: Basic Conversational.  Q: What were they saying when you walked in? A: Well, they were sitting around. They were excited.  They were drinking hot tea. They were all wide away and wide alert. Q: Are these the guards and drivers that work the night shift? A: There shouldn't be that many. At the very most at that time at night I would expect to see two if I'm lucky and hopefully both of them would be awake.  The Algerian people generally aren't really ambitious.  They're not really driven to be accounted for at their duty stations in large numbers…" (UK Coroner's Inquest, Page 180, Day 14, 8 October 2014)

5.17   Email from FBI legal attaché at the U.S. Consulate in London "Subject: Follow-up, Good afternoon Brad (Plaintiff). I hope you slept well at the Sofitel and hopefully headed home. A couple of follow up questions, if I may. Am I correct that you did not record any of the radio chatter? And do you recall any names, even nicknames, of the guard on duty or any locals in the guard shack Tuesday night?  If you could, please don't delete any of your texts or emails since the Met had difficulty downloading your phone last night.  We may have someone meet up with you sometime once you are home to do it, if that's okay.  Thanks. Stay safe." (FBI.gov email to the Plaintiff dated 23 January 2013 produced in discovery request responses by Plaintiff in 2015)

**THE PLAINTIFF WAS ASKED BY U.S. CONTACTS TO GATHER SPECIFIC INFORMATION REGARDING**

THE HOSTAGES AND MEN IN HIDING AT THE MAIN FACILITY.  DURING THE FOUR-DAY SIEGE, THE PLAINTIFF LOGGED 313 MINUTES OF PHONE CALLS AND DOZENS OF TEXT MESSAGES BETWEEN HIM AND U.S. CONTACTS. THE PLAINTIFF QUICKLY BECAME HIS U.S. CONTACTS' CHOSEN CONTACT ON THE DRILLING RIG. THE PLAINTIFF KNEW THINGS OTHER EXPATS ON THE RIG DIDN'T KNOW, AND THE PLAINTIFF WAS TOLD THINGS HE WAS TOLD NOT TO SHARE WITH ANYONE ELSE BY HIS U.S. CONTACTS.

5.18     Phone records showing 313 minutes of phone calls between Plaintiff and U.S. contacts while he was on the ground at In Amenas produced in discovery request responses by Plaintiff in 2015.  95 minutes of those calls were all coded and blocked incoming calls that showed up on the bill one month after the majority of the phone calls from the four-day In Amenas siege came in. The Plaintiff mostly spoke with U.S. contacts on the phone but texted discretely when he was in places he couldn't talk (among Algerian DRS, Algerian military, or Algerian Gendarmes).

5.19     Sample of screen shots of text messages between the Plaintiff and U.S. contacts during the four-day In Amenas Siege.  Mr. Gordon Rowan was the Plaintiff's BP America co-worker who was murdered on the afternoon of the fourth day.  The "Algerian Services" officers, aka DRS officers, are who the Plaintiff is shaking down for intel about Mr. Rowan on the fourth day (all produced in discovery request responses by Plaintiff in 2015):

(a) Text 17 January 2013 7:29 a.m. CST *"Brad. I am (redacted) with U.S. Embassy Security. Trying to call but can't reach you. Pls call me at ext. 2188 asap. Looking to arrange for your exit with Algerians.  (Plaintiff replied: Can't call out) Understand. Pls text me name and tel number of genderie chief with you.  Also need telephone numbers of colleagues in facility if you have in your phone.  Can email them to (redacted) @state.gov My land line is (redacted)..."*

(b) Text to night time U.S. contact (text to contact's cell number, which the Plaintiff had dozens of minutes of phone incoming and outgoing calls to on 17 January 2013 at 12:26 a.m. CST *"Sun is up.  No problems last night.  Thanks!"*

(c) Text 18 January 2013 12:38 p.m. CST *"(redacted), I have marked three of our possible evacuation vehicles as below.  I will let u know if and when we are in them and if so which ones. I expect we will leave the Hilux pick up behind ... Black '0' on white roof of white land cruiser with blue stickers on each door that barely read 'IA' on each front door.  Yellow 'X' on dark blue roof on dark blue land cruiser with black external roll cage with clear White 'IA' on each front door.  Black 'H' on white roof of white Toyota Hilux D-4D pickup with black bed liner. (U.S. Contact replied:  Copy. Thanks!..."*

(d) Text on 19 January 2013 2:31 a.m. CST *"Leaving behind all previously mentioned vehicles.  In green and white special frontier forces vehicles."*

(e) On the fourth day of the siege, one day after BP dishonestly claimed in post-incident report that the last expats in the gas plant had been killed. Text on 19 January 2013 4:17 a.m. CST *"Gas plant still active.  Told explosives in place.  Six or seven hostages still at gas plant."*

(f) Text on 19 January 2013 4:35 a.m. CST *"At gendarme base in In Amenas town. Here for a while paperwork. Then Sontrach base. Then airport. Won't be at airport for a while. (U.S. contact replied:  Copy. Glad you made it to Amenas.  Who told you about the gas plant?  Any info on hostages in plant?  We stopped off between the base camp and gas plant where vehicles got lit up by helicopters for 30 minutes.  Our driver was talking to lots of military and gendarmes there. He told us.  Our driver.  Don't have any specifics about the hostages whatsoever. At least four or five terrorists in gas plant.  No one got any nationalities.  Working on it.  English speaking Algerians showed up in fancy clothes and have been asking questions. They know numbers counts of t212 and the 343 frac location where 9? Americans escaped or got out.  Maybe eight in their group.  Only approached by two so far. **Algerian services** they call themselves.... **Gordon Rowan***

*is accounted for and ok according to them.* *They had a missing/killed list, and he wasn't on it. I'm sure y'all knew that.* *(Contact replied: K. K.)... I assume y'all have that list (Contact replied: K). That or he lied to me. He went down the list real fast. Thought I recognized one of the names on the list as one of the French nationals from the bus ambush. So expect it was above-mentioned list. Paul Morgan know y'all have his name. His name was on that list.* **Gordon Rowan's** *name either wasn't or he lied to me... Lots of info getting bounced around doing my best while I can. The English speaking Algerian I'm talking to has been on the phone a lot talking to someone accounting for Algerian nationals. Maybe he's a Sonatrach employee. He is a Sonatrach employee says he's human resources. Name sounds like Dee-es. Close to sounding like Spanish name Diaz. Sounds pretty credible. Could he be right...?"*

(g) Text on 19 January 2013 6:15 a.m. CST *"Sound like they might have took a group from the base camp to the gas plant early on. So it's possible* **Mr. Rowan** *could be in there if he's unaccounted for. Had one of the expats confuse above-mentioned Hans with the completions Hans. So maybe two Hans's. Almost to the airport. Good luck. (Contact replied: K thanks. Pls* **focus on latest info)** Plaintiff: **Yes sir.** *Mark Cobb might be able to clarify all that noise I got from Diaz. 001-210-241-0548. Texas. He should know who Diaz is. Heading to Algiers. Me and all nine expats from t212 are on board.*

(h) Text on 19 January 2013 10:02 a.m. CST *"Cleared off Norwegian so critically wounded from gas plant could be cared for. All nine expats from t212 Heading to Hassi Messauod in a Beechcraft. I know y'all are swamped and are way more in the loop now than I am so I've kept quiet since I don't have anything useful.* **(Contact replied: You have been a great help. We thank you! Safe travels.)**

5.20   Billy Whitted, the Plaintiff's fellow BP America Wellsite Leader, quickly became apparent to the Plaintiff's U.S. contacts as not being the one they wanted to talk. The Plaintiff quickly became the obvious contact from them to get accurate information from. Among other things, Billy Whitted panicked, lost all composure, wanted to flee the location as soon as the sun set the first day without telling anyone (despite being "scared of the dark" and not even having one bottle of water in his bag he intended to flee with), didn't have a clue about what was going on, was telling his wife EVERYTHING he shouldn't have been real time – Billy's wife in turn called the U.S. Consulate in Algiers non-stop frantically babbling on. The Plaintiff and low-level U.S. State Department staff in the U.S. Consulate spent a significant amount of time and effort during the four days keeping Billy Whitted and his wife calm. The Plaintiff kept certain terrifying details he knew secret from Billy Whitted to accomplish this task as well as to keep him from blurting it to his wife on an open line. Billy Whitted's testimony at the UK Coroner's Inquest was obviously affected by BP managers and lawyers. Billy Whitted was scheduled to give a deposition to the Plaintiff's legal team but canceled at the last minute, refusing to take any more advice from BP's lawyers and demanded his own lawyer as an individual. Once the Plaintiff is finally allowed to take a deposition from Billy Whitted, we expect he will admit and detail that the Plaintiff's actions likely saved his life. Billy Whitted's testimony at the Inquest is a good place to start to touch on these facts.

  (a) Billy Whitted Inquest Testimony *"Q: And your recollection when you signed this witness statement back in March was the guard said that five or six terrorists approached the FRAC site on foot? A: I've always remembered three specifically, but again, that's what I was told and just what they were carrying. Q: And what they were carrying, what is your recollection of that? A: Two were supposedly carrying AK47s or small arms fire rifles and one had possibly a* **rocket propelled grenade rifle***. Q: An* **RPG, rocket propelled grenade rifle***? A: Yes sir..."* (UK In Amenas Inquest, Page 109, Day 22, 21 October 2014) After having worked in Algeria for five years at this point, to think an RPG is a "rifle" is pretty shocking.

  (b) Billy Whitted Inquest Testimony *"Q: Did you know of Mr. McDaniel having contact with the U.S. authorities? A: Yes, he talked to them quite a bit. Q: Who was he talking to do you know? A: He was talking to various different people. I think he talked to liaisons quite a bit. Q: So the liaison being? A: They were just – Q: Is AFMC part of liaison or? A: Without having a proper description, I think it was just the person in the office who answered the phone, if that makes sense. Q: At a U.S. authority or is this at the liaison AFMC? A: U.S. authority, and just a person and there was a couple of times he told me he talked to an operations specialist, which would have been somebody that might assign a team to possibly infiltrate or do something offensive I guess, so .. but I never did talk to that man."* (UK In Amenas Inquest, Page 85, Day 22, 21 October 2014)

  (c) Billy Whitted Inquest Testimony *"Q: You also said that you had some contact with the State Department. Presumably you were updating them as to the information which you had? A: Well, I think they knew everything – they already knew what we had. Every conversation I had with them, whatever told them they already knew. Q: And were they*

*updating you with information that you didn't know?  A: They would confirm things that we would guess, like we'd see planes flying overhead, yes, those are ours and that was basically the extent of it."* (UK In Amenas Inquest, Page 122, Day 22, 21 October 2014)

(d) Billy Whitted Inquest Testimony *"... Q: The reason I ask is that Mr. McDaniel says at some point whilst you were at the Gendarme camp – actually, he has provided some texts to the coroner and in one of those texts he seems to be in contact with his American contact and saying that the driver told him at that point that there were six or seven hostages alive in the CPF.  Do you recall the driver of your vehicle at any time communicating that information to you?  A: Not in the way that you have just described it there.  I remember asking him questions and trying to get an answer if they could answer us, but to really not have a translator there and somebody to have a conversation you're not going to get one or two word answers and that's all you get.  Q: To your recollection you didn't get any substantive information from the driver of your vehicle? A: No, because even if he answered the question – The CORONER: Because his English wasn't good enough to give you?  A: No, sir, and that is why I say even if it was a good enough to give you a yes or no answer you really can't trust that he understood what you asked him ....  Q: So to summarise what you are able to tell us it is simply based upon the impression you gained about conversations that you were overhearing and part to and that was at the VCP about people potentially being alive at the CPF?  A: Yes, like I say, most everything that I have is third party at best.  Q: So there was no official source of that information?  A: No, because – believe it or not I don't speak Arabic after five years of working there."* (UK In Amenas Inquest, Page 124, Day 22, 21 October 2014 * Billy shockingly doesn't seem to grasp that most relevant conversations between expats and nationals in Algeria happen in French.  In the Plaintiff's testimony, he stated that his French/Portuguese tool pusher in the back seat translated all conversations for him in French.  Arabic is handy when speaking to particularly Tuaregs, which Gendarmes and most technical staff are not.)

(e) Billy Whitted Inquest Testimony after being shown a video of the bus ambush scene he stopped at on VCP1 on 19 January 2013 *"Q.... I would just like to ask a few questions about the vehicles you saw at VCP1.  You pointed out on the video clip that was played to you the vehicle which you saw which you believed to be the OLC vehicle.  I wondered whether we might be able to bring up that clip again, please.  (Video Played) If we could just pause it there for a moment.  You mentioned before – we see between the bus and the white vehicle in the foreground a grey vehicle and you said you don't recall that?  A: Yes, I don't believe that vehicle was there.  Q: That is what I wanted to confirm with you. Is it simply that you can't remember it being there or you can positively recall that when you were there that grey vehicle wasn't?  A: There was two vehicles there when we made it to VCP1.  Q: Two vehicles in addition to the bus or including the bus?  A: No, the bus and the one white vehicle.  Q: So it follows from that white vehicle in the foreground was also not there when you passed by VCP1, is that right?  A: Can you repeat that one?  Q: You said that you saw two vehicles, one was the bus and one was the vehicle that was pointed off the road with the bullet holes in the wind screen?  A: Yes.* (Billy babbles on for several minutes painting an incorrect picture of the bus ambush scene at VCP1, the Plaintiff knows exactly what he saw because he covertly snapped pictures of this ambush

crime scene while Algerian forensics teams were going through it from his waist while pretending to be urinating from behind structure.  The Plaintiff knew when he took these pictures, the Algerians had been lying to U.S. authorities and covering up the crime scene for at least a day..  The Plaintiff provided these pictures to interested parties in the UK Coroner's Inquest after Billy's inaccurate testimony.  The point is, looking at Billy's testimony, it's obvious why he wasn't the one the Plaintiff's U.S. contacts wanted to talk to in the situation they were in at In Amenas 16-19 January 2013).  (UK In Amenas Inquest, Page 126, Day 22, 21 October 2014)

(f) Billy Whitted Text to the Plaintiff regarding his view of Tom Martin in a conversation about their respective interviews with BP Security weeks after the attack.  BP now claims that Tom Martin was the security "expert" in charge of the rig at the time of the siege, "*I told him how incompetent Tom was too. Also told him how everyone underestimated everything.*"

**IN THE COMPLETE ABSENCE OF ANY ASSISTANCE OR EVACUATION FROM BP NOR ANY REINFORCEMENTS OR AIR SUPPORT FROM THE ALGERIAN MILITARY OVER THE FIRST SEVEN HOURS OF THE ATTACK, THE PLAINTIFF SOLICITED U.S. MILITARY INTERVENTION TO ADDRESS THE THREAT POSED BY TERRORISTS WITH RPGS AND MACHINE GUNS ONE MILE NORTHEAST OF THE PLAINTIFF'S POSITION WHO TRAVELED FREELY THERE UNHINDERED IN BROAD DAYLIGHT ON THE FIRST DAY OF THE SIEGE. THE PLAINTIFF'S U.S. CONTACTS SCRAMBLED A PREDATOR DRONE FOLLOWED BY TRANSPORT AIRCRAFT LOOKING FOR APPROVAL TO EXTRACT THE PLAINTIFF AND HIS MEN FROM THE RIG, AS WELL AS SURVEILLANCE JETS WHO NOT ONLY EMPLOYED AERIAL IMAGERY BUT ALSO TOOK IN SIGNALS INTELLIGENCE.**

5.21   Evidence U.S. Predator was scrambled to rig site and at the request of the Plaintiff

(a) ABC News Report 17 January 2013: "*A U.S. Official told ABC news that a Predator drone was providing surveillance over the Ain Amenas facility… Leon Panetta, U.S. Secretary of Defense "One thing that is being looked at was how the U.S. can bring our military assets to bear in order to deal with it"…*"

(b) Tom Martin UK Coroner's Inquest "*Q. I think over the evening there was no particular incidents but somebody informed you that they had seen a drone? A. I had been informed by Mr. McDaniel (Plaintiff), the company man, I think it was him or Mr. Whitted, that he was in fairly close continual contact with someone I believe in the American, I'm not sure if it was Algiers or elsewhere, that there was something overhead…*" (UK In Amenas Inquest, Page 110, Day 14, 8 October 2014)

(c) Billy Whitted Inquest Testimony "*Q: Did you know of Mr. McDaniel having contact with the U.S. authorities? A: Yes, he talked to them quite a bit.  Q: Who was he talking to do you know? A: He was talking to various different people. I think he talked to liaisons quite a bit.  Q: So the liaison being? A: They were just – Q: Is AFMC part of liaison or? A: Without having a proper description I think it was just the person in the*

*office who answered the phone, if that makes sense. Q: At a U.S. authority or is this at the liaison AFMC? A: U.S. authority, and just a person and there was a couple of times he told me he talked to an operations specialist, which would have been somebody that might assign a team to possibly infiltrate or do something offensive I guess, so ... **but I never did talk to that man.**"* (UK In Amenas Inquest, Page 85, Day 22, 21 October 2014)

(d) Billy Whitted Inquest Testimony *"Q: You also said that you had some contact with the State Department. Presumably you were updating them as to the information which you had? A: Well, I think they knew everything – they already knew what we had. Every conversation I had with them, whatever told them they already knew. Q: And were they updating you with information that you didn't know? A: They would confirm things that we would guess, like **we'd see planes flying overhead, yes, those are ours** and that was basically the extent of it."* (UK In Amenas Inquest, Page 122, Day 22, 21 October 2014)

(e) Operation Serval, Northern Mali, Wikipedia *"... France and the United States aim to assist African and Malian troops to restore government authority in the north by providing surveillance and intelligence, including the use of spy planes and drones, as well as by helping with logistics and the transport of troops and equipment.*

*French officials said they had asked Washington to speed up its contribution by sending drones to improve surveillance over the vast area held by the rebels..."* NY Times article *"French Airstrikes in Mali Deter Islamist Rebels"* dated 12 January 2013, (https://en.wikipedia.org/wiki/Operation_Serval)

5.22   Surveillance jet and transport planes circling above the Plaintiff's drilling rig

(a) Time-stamped pictures dated 17 January 2013 showing contrails of U.S. jets circling the Plaintiff's drilling rig. (Produced in discovery request responses by Plaintiff in 2015)

**BP EVACUATED NEARLY 100 EXPATS FROM IN AMENAS WITHOUT ISSUE BUT DID NOT EVACUATE THE PLAINTIFF AND HIS MEN. BP'S OWN IMT TIME LOG CONFIRMS THE PLAINTIFF'S STATEMENTS THAT BP TOOK PART IN "FAKE" EVACUATIONS OF THE PLAINTIFF AND HIS MEN WITH THE MOST CLEARLY DOCUMENTED EVENT TAKING PLACE ON THE AFTERNOON OF THE THIRD DAY.**

5.23   BP'S evacuations of hundreds of other expatriates without issue:

(a) BP's expatriates working on a wellsite in the Bourahet Field were evacuated up Route National 3 up through BP's In Amenas field without issue on the morning of the first day. *"09h40 16 Jan 13 **Flight can land at IA Airport (no restriction), BPXA air craft on route to IA – TD from HMB 09h15...**"* (BP Form 2 – Incident Log Sheet, Page 1 of 15, Jeff Yates Witness statement)

(b) The Plaintiff and the eight other expats on the Plaintiff's rig could easily have been evacuated up the same route, avoiding the main facility entirely. Tom Martin "*Q: In any event, the evacuation proceeded albeit on the Saturday? A: Yes. Q: As effectively as you could have hoped and expected? A: No. As I said, I think the lowest risk, the quickest route out, would have been directly east from T212 onto route National 3 straight to the airport. So I'm not sure whether it was the ground conditions that we drove over or instruction but we then changed course and went up to VCP2 and up to the Gendarme Camp...*" The Gendarme Camp was between gas plant and main facility where vehicles were "lit up by helicopters" where Plaintiff confirmed six or seven expats still being held hostage in gas plant on the fourth day. (Tom Martin UK Coroner's Inquest Day 14, Page 172, 8 October 2014)

(c) After hiding in the relatively well secured Incident Command Room, BP Defendant Mark Cobb fled the main facility, abandoning his men in the first hours of the attack. Cobb was evacuated from the In Amenas main facility without issue on the first day (UK Coroner's Inquest testimony, depositions of Mark Cobb)

(d) Dozens of BP expatriates were evacuated from the In Amenas main facility as they became free on the first through third day of the siege. (BP IMT Time Log, Jeff Yates Witness statement)

(e) Hundreds of BP expatriate workers in Algeria were evacuated quickly from their work places hundreds of miles from In Amenas on the first through third day of the siege. (BP IMT Time Log, Jeff Yates witness statement)

5.24  Rig move on the second day of the siege without issues

(a) Time-stamped picture taken by Plaintiff on 17 January 2013 at 7:55 a.m. (Produced in discovery request responses by Plaintiff in 2015)

5.25  BP's Incident Management Team was informed that the Plaintiff's drilling rig was low on food and water on the morning of the second day of the siege. The rig was never resupplied throughout the entire four-day siege.

(a) "*09h22 17 Jan 2013: Informed by Wells Drlg Supv that Rig 212 has contacted them to inform them that the rig site is almost out of food and water. IMT to arrange re-plen with military...*" (BP IMT Time Log, Page 4 of 15, Jeff Yates witness statement)

5.26  Evidence supporting Plaintiff's Testimony that BP and Algerian government lied to the U.S. Government multiple times over the four-day siege dishonestly stating that the Plaintiff and his men had been safely evacuated from the rig

(a) "*447917721422 If ur up please can you a) confirm your whereabouts and b) confirm whether those on rig212 have been taken from site to HMD? Thank you 18/01/2013*"

91

*00:11:14 UTC Carolyn Edwards* (BP Human Resources London)…" (BP Defendant Mark Cobb's Text Messages, Page 13, BPALGERIA_0011559)

(b) Other

5.27   BP email from Drilling Superintendent on Day 3 of the siege telling other powerful companies in Algeria such as Halliburton, Schlumberger, Weatherford, and KCAD not to evacuate their employees from the Plaintiff's drilling rig "*I have received numerous requests regarding the movement of personnel and equipment in and around our In Amenas project… I repeat, do not travel in the In Amenas project area without prior executive approval* (from BP)" (BP email at 10:42 a.m. local time on 18 Jan 2013, Produced in discovery request responses by Plaintiff in 2015)

5.28   Well documented "fake" evacuation of the Plaintiff and his men the afternoon of the third day.  The Algerians used a "dummy run" to try to convince the U.S. government's eyes in the sky above the Plaintiff's drilling rig that he and his men were being evacuated.  Their attempt at pulling away the Plaintiff's air cover/surveillance once again failed.

   (a) "*18/1/2013 11:42 Team in HMD working on a plan to remove all personnel from Rig T-212 Site*" (BP IMT 2 Time Log, Page 4 of 11, Jeff Yates Witness statement)

   (b)   "*18/01/2013 15:08 Locstat information received for T-212 showing nine expats still at site (Names known)*" (BP IMT 2 Time Log, Page 4 of 11, Jeff Yates Witness statement)

   (c) "*18/01/2013 15:45 9 Expats at site T-212, Military arrived at site to transfer them to IA Airport, the Gendarmes have refused any movement as yet!!*" (BP IMT 2 Time Log, Page 4 of 11, Jeff Yates Witness statement)

   (d) "*18/01/2013 16:35 Discussions ongoing to allow Gendarmes to permit the military to take the nine expats to IA airport and board the second U.S. Military flt out of country*" (BP IMT 2 Time Log, Page 4 of 11, Jeff Yates Witness statement)

   (e) "*18/01/2013 16:46 Reported from T-212 Personnel that intense smoke plumes can be seen coming from the IA CPF*" (BP IMT 2 Time Log, Page 4 of 11, Jeff Yates Witness statement)

   (f) "*18/01/2013 19:25 **nine expats from Rig T-212 not yet arrived at In Amenas airport, however reportedly on their way***" (BP IMT 2 Time Log, Page 4 of 11, Jeff Yates Witness statement)

   (g) "*18/01/2013 21:00 9 Expats at site T-212 will remain at site tonight, transfer to IA for flight departure tomorrow*" (BP IMT 2 Time Log, Page 4 of 11, Jeff Yates Witness statement)

5.29   U.S. Government issued an ultimatum to get the Plaintiff and his men out – no more lies,

no more "fake" evacuations. You get the Plaintiff and his men out by 10:00 a.m. local time, or we'll come in and get them. BP's IMT time log clearly states that a "U.S.A.F. Col (Colonel) is "requesting an update of the American status"… " and "American colonel in Algiers being given command of all assets…" As the Plaintiff testified in his deposition, he received a call from a U.S.A.F. colonel on his cell phone during the four-day siege. BP has mocked the Plaintiff surrounding this fact in depositions and court motions:

(a) Plaintiff's lengthy phone calls to U.S. contacts Saturday morning (Produced in discovery request responses by Plaintiff in 2015)

(b) *"07h00 19 January 13 Formal request to Gendarme via Sonatrach requesting evacuation of T212 personnel giving cut off of 10h00. HR to contact IA with request"* (BP IMT Time Log, Page 8 of 15, Jeff Yates witness statement)

(c) *"09h00 19 Jan 13 Confirmed that vehicles and escort arrived at T-212 location to evac nine expats…"* (BP IMT Time Log, Page 8 of 15, Jeff Yates witness statement)

(d) *"BST requested an update of the American status to pass to U.S.A.F. Col. Nick to complete"* (BP IMT Time Log, Jeff Yates Witness statement)

(e) *"09h00 19 Jan 13 Barry Shaw requested coordinates for TG377…"* (Wellsite that Plaintiff's rig T-212 was drilling; BP IMT Time Log, Page 8 of 15, Jeff Yates witness statement)

(f) *"19/01/13 14:38 American colonel in Algiers being given command of all assets. Direct contact with Jon Wigg"* (BP IMT 2 Time Log, Page 6 of 11, Jeff Yates Witness statement

WHEN TERRORISTS WERE REPORTED WITH RPGS AND MACHINE GUNS WITHIN 1 ONE MILE OF THE PLAINTIFF'S DRILLING RIG AROUND NOON ON THE FIRST DAY OF THE SIEGE, THE AGREED PLAN CHANGED, AND THE PLAINTIFF AND OTHER BP WELLSITE LEADERS WERE FORCED INTO THEIR ROOMS AT GUN POINT. WHEN THE PLAINTIFF ASKED TOM MARTIN WHY THE PLAN CHANGED, HE WAS TOLD THAT THE GENDARME CAPTAIN "WANTED TO KNOW THE EXACT LOCATION OF THE AMERICAN COMPANY MEN ON THE RIG BECAUSE THE TERRORISTS WERE GOING TO WANT TO TALK TO THEM."

5.30   BP Wellsite Leader Billy Whitted *"… they give us more Tom Martin's direction because he was afraid we were going to get arrested, which would just make the situation worse on location, the two senior people getting arrested just doesn't match…."* (Two Senior People on the rig are the two BP Wellsite Leaders), (Billy Whitted UK Coroner's Inquest Day 22, Page 80, 21 October 2014)

EVIDENCE THAT THE IN AMENAS HOSTAGE CRISIS/FOUR-DAY SIEGE OF THE PLAINTIFF'S DRILLING RIG WAS A "FALSE FLAG" ATTACK ORCHESTRATED BY THE ALGERIAN DRS THAT WENT HORRIBLY WRONG.

5.31   BP's Intelligence Analysis Unit report on Day One of the Siege, 16 January 2013 *"Mali,*

*the In Amenas Connections and Regional Threat... **Belmokhtar is alleged to have had links to the Algerian secret service (the DRS). The Algerians are thought to have maintained both links and a high level of penetration within the Sahel militant movements** and may have felt they had control over the situation, which until recently had led them to resist foreign intervention in neighboring Mali..."* (Derek Porter Deposition, Exhibit 167, 28 January 2015, BPALGERIA_0016403)

5.32   BP's Former Social Programmes/Security Advisor for In Amenas Dr. Jeremy Keenan's November 2016 "REPORT ON IN AMENAS: INQUEST COVER UP AND WESTERN INVOLVEMENT IN ALGERIAN STATE CRIMES," which is a 283-Page, 14.5 MB, Peer Reviewed Report compiled after three years of studying the facts surrounding the January 2013 In Amenas Hostage Crisis/Four-Day Siege of the Plaintiff's Drilling Rig.  Dr. Keenan resides in London and compiled the report in the UK.  Given the UK's very favorable laws protecting corporations such as BP, if Dr. Keenan's report is false and his detailed statement regarding his first-hand experience setting up negotiations with Al Qaeda's Belmohktar in 2003, why has no legal action been launched against him?

   (a) Executive Summary Page 10 "…During the 20 months between the end of the siege and the opening of the London inquest, there was absolutely no cooperation from the Algerian authorities. The Algerians said this was because they were preparing to hold their own judicial inquiry. Three and a half years later, there has been no enquiry.  Nor is there likely to be.  The reason for this is because the Algerian authorities, in the form of the DRS, were almost certainly complicit in the In Amenas attack.  **Evidence in this report strongly suggests that the attack was a false-flag operation organized by the DRS that went drastically wrong**… this report reveals how London's Metropolitan Police, which were given responsibility for collecting evidence for the London inquest, working with the intelligence services and the advisers to the inquest, excluded key evidence from the inquest that would have thrown light on the relationship between the Algerian authorities and the terrorists involved in the In Amenas attack… the report also details how **Secretary of State Hillary Clinton received high-level intelligence information during the course of the In Amenas siege, notifying her that there was a working agreement between the Algerian authorities and MBM (Belmohktar)**…" (www.statecrime.org/data/2016/11/KEENAN-IN-AMENAS-REPORT-FINAL-November-2016.pdf)

   (b) Hillary Clinton email released by the U.S. State Department that was referenced by Dr. Keenan, dated 19 January 2013 "… *according to this sensitive source officers of the Algerian DGSE are working to meet in secret with Belmokhtar or one of his lieutenants in Northern Mauritania in the immediate future.  They have been ordered to establish the reason why Belmokhtar violated their two-year-old secret agreement and launched attacks inside of Algeria... "*

   (c) Hillary Clinton email released by the U.S. State Department that was referenced by Dr. Keenan, dated 18 January 2013 "… *According to sources with access to the Algerian DGSE, the Bouteflika government reached a highly secretive understanding with Belmohktar after the kidnapping in April 2012 of the Algerian Consul in GAO (Mali).*

*Under this agreement Belmokhtar concentrated his operations in Mali, and occasionally, with the encouragement of the Algerian DGSE, attacked Moroccan interests in Western Sahara, where Algerians have territorial claims..."*

(d) The U.S. Patriot Act under U.S. 2339B prohibits the financial support of designated terrorists' organizations with the aim of crippling their network in order to prevent more attacks like the September 11 attack from happening again. However, additionally, BP's safe payment arrangement and agreement to allow Al Qaeda to operate in the greater In Amenas area unchallenged also allowed Al Qaeda in North Africa to expertly train and export terrorists from training camps near In Amenas to the battlefields in Iraq and Afghanistan where they could kill and injure United States soldiers there.  This is thoroughly established in Dr. Keenan's report.  In one example, this fact about Al Qaeda's Abou Zeid, whose brother owns SARL BAAT can be seen in an Hillary Clinton email released by the U.S. State Department that was referenced by Dr. Keenan, dated 18 January 2013 *"Abu Zayd Group:  This group is one of the most active and important of the AQIM member groups... According the sensitive sources, Abu Zaid is based in the Hoggar Massif, in the Tamanrasset region.  (Note:  This is a rugged mountainous plateau located 1,000 miles from the Atlantic Ocean, lying mostly in southern Algeria, on the Tropic of Cancer).  On the eastern edge of this region, the Abu Zayd Group is active in assisting Islamic fighters traveling to the Horn of Africa, Iraq, and even Afghanistan..."*

5.33 *"Paul, Two articles published in the current edition of "The National Interest," the journal of the DC-based research house The Center for National Interest (formerly the Nixon Center).... Useful insights...Algeria's Hidden Hand by John Schindler"* Which BP's William Skidmore replies *"You're probably also familiar with Schindler's Article, "The Ugly Truth about Algeria," (10 July 2012) in the National Interest...* Which BP's Greg Saunders eventually replies **"Picky, picky, picky.  In my humble view, Algeria would look like Libya or Pakistan without the DRS, etc. Still does not make it right, but at least there was sufficient stability..."** (BP's Director International Security Affairs, Greg Saunders in BP email to Paul Kolbe dated 23 January 2013, BPALGERIA_0362953)

(a) In *"The Ugly Truth About Algeria"*, among other disturbing things, Schindler, a former counterintelligence officer with the NSA details with multiple, specific references that *"... Some of the most notorious massacres of civilians were perpetrated by military special units masquerading as mujahidin, or by GIA squads under DRS control..."*

(b) Along with 25 other referenced reports and articles, to substantiate his points in *"The Ugly Truth About Algeria,"* John Schindler references http://algeria-watch.org/pdf/pdf_fr/Dossier_presse_proces_Nezzar_Souaidia.pdf, which a 241-page report containing evidence provided by Habib Souaidia, who defected as an officer in the Algerian Special Forces to France.  Mr. Souaidia has detailed his involvement and witnessing of "False-Flag" terrorist attacks carried out by ninja death squads on behalf of the Algeria DRS to eliminate anyone they saw fit – including up to 200,000 innocent civilians in massacres in the 1990s – many of whom were

innocent women and children – including the slitting of throats of babies in diapers and beating to death old ladies with axes by Algerian forces masquerading as terrorists.

**BP SECURITY ADVISOR SIR MARK ALLEN'S "REMARKABLE RELATIONSHIP" WITH ALGERIAN DRS AND GHADDAFI'S INTELLIGENCE CHIEF MOUSSA MOHAMMED KOUSSA.**

5.34   Public hearings in the UK implicating BP's Sir Mark Allen in the rendition of Gaddafi's political enemies back to Libya where they were prisoned and tortured.  BP's written correspondence between Gaddafi's Libyan Intelligence Chief Moussa Mohammed Koussa details the "remarkable relationship" they had built.

   (a) Belhaj & Boudchar –v- The Rt. Hon. Jack Straw, Sir Mark Allen; Neutral Citation Number: [2014] EWCA Civ 1394 Case No: A2/2014/0596

   (b) Notoriously brutal, even outside of Libya, Moussa Mohammed Koussa expelled from the UK in the 1990s for detailing his orders of the murders of Libyan critics of Ghaddafi who lived in UK.

5.35   Before that, Sir Mark Allen had an even longer and stronger relationship with the notoriously brutal Algeria DRS who in turn had a very close working relationship with Gaddafi's notoriously brutal Libyan Intelligence Service led by Moussa Mohammed Koussa.

5.36   BP Defendant Sir Mark Allen's relationship with Ghaddafi's Libya was detailed in the U.S. Senate Report "Justice Undone" dated December 2010.  This report details BP's and specifically BP Defendant Sir Mark Allen's role in negotiating the release of the Lockerbie Bomber in return for BP's multi-billion exploration deal with Ghaddafi's Libya.

   (a) *"Senator Mendez invited Mr. Tony Hayward, former Group Chief Executive of BP;* **Sir Mark Allen,** *a consultant to BP and former MI6 agent.... All these individuals declined to participate or to send representatives to participate in the hearing.... **Executive Summary:  On December 21, 1988, Pan Am Flight 103 exploded over Lockerbie, Scotland, killing 270 people, 189 whom were U.S. Citizens.** Twelve years later, Libyan national, Abdelbaset Ali Mohamed al-Megrahi, was convicted of conspiracy for planting the bomb that brought down Pan Am Flight 103 and was sent to a Scottish Prison to serve a life sentence.  On August 20, 2009, however, Scottish Government officials released al-Megrahi .... **The UK Government played a direct, critical role in al-Megrahi's release.  The UK has always been protective of its energy companies, especially BP, which has strong historical and economic ties to the government, and it has a history of intervening with foreign government on behalf of BP.  Libyan oil and***

*natural gas resources were extremely attractive UK energy companies, and at the time of al-Megrahi's release, BP was negotiating a $900 million oil exploration deal... By facilitating al-Megrahi's release, the UK government violated this carefully negotiated agreement and left the families of the Lockerbie bombing victims without justice...*" (U.S. Senate Report, Justice Undone, dated December 2010, Pages 5-8).

**BP AMERICA DEFENDANT RONALD MILLER'S LONG EXPERIENCE WORKING WITH BP SECURITY AND THE LIKES OF BP DEFENDANT SIR MARK ALLEN DATING BACK TO BP'S NOTORIOUSLY DIRTY COLOMBIA OPERATIONS IN THE 1990S WHERE BP WAS IMPLICATED IN THE MASS MURDER OF TENS OF THOUSANDS OF INNOCENT CIVILIANS WHO OPPOSED BP'S $25 BILLION OIL INTERESTS THERE.**

5.37   After retiring from BP, Ronald Miller formed his own company he calls "MESA International, Inc.," where on his website he boasts his experience "*internationally for nearly 50 years, he understands the challenges you face better than anyone else. In addition to providing both drilling and completions services, Ron also brings a vast array of highly specialized skills to the table such as security, intelligence, and special operations...*" (www.mesainternationalinc.com/more-about-mesa/  )

5.38   Ronald Miller's OilPro resume confirms his role as stated by the Plaintiff within BP's Wellsite Leader program "BP Drilling Coach-Advisor ... June 2007 to September 2014 ... developing Wellsite Leaders & Drilling Engineers of the Future. Fully engaged with this process from the point of screening and interviewing new-hire candidates... Also worked directly with and assisted the BP Skills & Competency group in assessing the frontline leaders..." (http://oilpro.com/ron-miller)

5.39   Ronald Miller's OilPro resume confirms that he worked for BP's notoriously dirty Colombia Operations in the 1990s where BP was implicated in the mass murder of tens of thousands of innocent civilians who opposed their $25 billion oil interests there along with numerous other misdeeds made famous in articles exposing the scandal like the Guardian's "*Secret Soldiers,*" which ultimately led to the sacking of BP's then-security chief "*Operations Manager – Parker Drilling Company... Coordinated and operated four (4) land rigs with Top Drives under contract for BP Exploration...*" (http://oilpro.com/ron-miller)

**BP MANAGERS, BP EXECUTIVES, AND BP'S INTELLIGENCE ANALYSIS UNIT CORRECTLY ASSESSED THE DANGEROUS SECURITY SITUATION THAT DEVELOPED AT IN AMENAS BUT DID NOT LIVE UP TO THEIR PROMISES TO EVACUATE THE DEFENDANT AND HIS MEN FROM THE DRILLING RIG IN THE DAYS LEADING UP TO THE 16 JANUARY 2013 IN AMENAS HOSTAGE CRISIS, INSTEAD NOT EVEN WARNING THE PLAINTIFF OF THE DANGERS THEY KNEW HAD DEVELOPED**

5.40   After BP's Intelligence Analysis Unit (IAU) correctly identified the increased risk BP's expatriates working at In Amenas faced in the weeks leading up to the January 2013 In Amenas Hostage Crisis.

(a) 3 January 2013 "*Mali:  Internal Troubles with Regional Implications*"; "*Summary: For BP it is the regional implications of the downturn in the security situation in Mali that is of concern. Without converted action to bring the northern areas under control it is plausible that Al Qaeda in the Islamic Maghreb (AQIM) and other international jihadists might use the ungoverned space to plot and plan terrorists activities in the region; **BP operations in Algeria and Libya could thus be at greatest risk**.... Foreign military intervention to retake the north from the Islamists is not inevitable ... **Military intervention could also impact negatively the security situation in Algeria.** And while AQIM attacks would most likely be targeted against the Algerian military, **operations in southern Algeria could be a higher risk, exacerbated by the many weapons available in the region since Gaddafi's fall.**"* (BP IAU, dated 3 January 2013, BPALGERIA_0361936)

(b) 9 January 2013 BP email "*IAU report:  Mali – internal troubles with regional implications*"; BP IAU Senior Analyst correctly warns multiple BP executives responsible for In Amenas that "*... **Intervention could also lead to reprisal attacks as the Islamist extremists seek to deter military action**...*" (BP email dated 9 January 2013, Felipe Posada Deposition, Exhibit 189, BPALGERIA_0030081)

(c) BP email dated 14 January 2013 from BP Security Advisor Geoff Porter to BP IAU Senior Analyst William Skidmore "*Subject: Implications of Mali for North Africa*": "*Dear Bill, Over the last several days there has been lots of analysis about AQIM and about how the situation in Mali and France's bombing campaign came to be...*" *(*Military Intervention in Mali started on 13 January 2013 giving BP time to act on Jane's warning in 5.39 (b)) (BP email dated 14 January 2013, BPALGERIA_0364031)

5.41  BP Executives and Managers realized the dangerous security situation that arose at In Amenas due to the Al Qaeda linked SARL BAAT labor strike (V. Facts 5.03) and evacuated all expatriates out in the months leading up to the attack.  However, when the labor strike started up again three days before the 16 January 2013 In Amenas Hostage Crisis began, the BP Defendants not only did not evacuate the Plaintiff and his men on his drilling rig up to what they perceived as relative safety, they also didn't even warn them.

(a) BP email dated 6 July 2012 from BP Algeria Business Support Manager to BP's Andy Collins with BP America Defendant Mark Cobb cc'ed. "*Subject: Urgent: In Amenas Industrial Action Update*" "*Gentlemen, I have attached a briefing paper which provides an update on the current industrial action at In Amenas and request a teleconference between the shareholders.  As described in the paper, the situation appears to be worsening and we believe shareholder intervention is required...*" (BP email Dated 6 July 2012, BPALGERIA_0014391) with "Confidential" attachment that was not shared with relatively lower-level expatriate workers like the Plaintiff who actually had skin in the game: "*Briefing Note In Amenas Industrial Action 6 July 2012, Background: BAAT personnel began industrial action at In Amenas on 21 June 2012. The strike has been instigated by BAAT support workers and drivers... There are approximately 130 drivers*

*and 190 BAAT support workers working at In Amenas…. Impact: **We have identified several potential threats to the safety and security of our people and plant**: 1. Travel to and from the airport to site… The strikers have blocked by action or threat all efforts to mitigate this issue including threatening civil unrest on the escort convoy… 2. Safety/Security at Site – **Tensions have been rising between strikers and non-strikers and at least two physical assaults (fistfights) have taken place. Non-strikers have been threatened by the strikers**… 3. Business Interruption – The two drilling rigs have been idled for several days and the frac campaign demobilized as a result of the strike. We estimate the cost of this to be $115k per day for the rigs and an additional $85k for the cost of employees disrupted by this… 4. Freedom of Movement – **Strikers have at various time debated the idea of keeping expats "hostage" in the base**… Actions We Have Taken: Suspended drilling operations… reduced non-essential expats on site from 110 to 58… **The environment continues to sour each day and given the increasing threats from the strikers and bouts of physical violence (albeit limited so far) we are reaching the point at which we may no longer be able to ensure the safety and security of our people and plant**…* " (BPALGERIA_0014393)

(b) BP email dated 23 September 2012 from In Amenas Ops Manager Tore Bech to BP's Andrew Collins and BP America Defendant Mark Cobb *"Subject: IA strike development / demob of non-essential expats"* "Mark/Andy/Victor, Please find the below strike situation at In Amenas as per today 23rd September 2012. IA Drivers, Personnel Contracts for the drivers has been available… The feedback from the drivers is that they will not sign on a one-year contract and will continue the strike. **By the end of the month, they will be out of contract and will not be allowed at site, but they have assured us that they will not leave site before the issue has been resolved**… Based on the above status, we today have decided to reduce the number of expats on site to a minimum. This will mean that we will reduce from 75 persons to 27 by Wednesday 26th September… A possible outcome is that we will have to shut down the plant unless we can make sure that we can operate in a safe manner." (BPALGERIA_0094284)

(c) BP email dated 24 September 2012 from IA MGT Project Manager to numerous low level expatriate workers "Subject: URGENT Demobilising of expats from In Amenas… Importance: High. Good morning to all expats… Due to the situation, the management on site has decided to demobilize most of the expats from site. Only a few key personnel will remain at site. Please be aware that there is **no security situation**…" This email is undeniable proof that BP Executives, most of who had zero skin in the game, were intentionally misleading relatively low level expatriates about the security situation at In Amenas in order to keep them willing to work there. (BUTTACCIO-0000364)

(d) BP email dated 26 November 2012 where BP's Jeff Yates referencing threats of violence made by Al Qaeda linked SARL BAAT labor strikers less than six weeks before the 16 January In Amenas attack threatening that they would kill 25 expatriates for every one hunger strikers who died *"Bill and JOC members, It is clear to me that Sonatrach have real concerns over civil unrest and security and instruct the JV to reverse our decisions, I support the decisions to pay the salaries* (of the SARL BAAT labor strikers) *as*

*request... I would be interested to know if Sonatrach have some specific intelligence concerning the threats and if the JV should be removing expats from the site.*"

(e) BP email dated 13 January 2013 from Liaison IA OPS OLC to BP's Barry Shaw and other BP Security people "Subject: Sitrep Tiguentourine 13 January 2013" The driver Team A came back from conge met Paul for meeting. They threatened to strike again... Lotfi Benadouda and Marc (sic) Cobb don't want receiving the strikers and agreeing to their requests. A part of drivers don't want following hard core of striker. Situation is: Team A: 12 drivers on strike. 14 on work. 3 on leave sick. 1 unauthorized absence..." (Bill Johnston Deposition, 12 January 2016, Exhibit 753, BPALGERIA_0197766)

(f) BP America Defendant Mark Cobb Deposition Page 56 detailing temporary agreement made with Al Qaeda linked SARL BAAT labor strikers "... *you'll stop your strike actions for four months. That was what was agreed in December. SO actually when I left site in December I left on what I thought was a very positive note and in fact made the comment to a number of people that truly the near year is going to be a new year for In Amenas. Q: But I think in fact when it came to January there was some deterioration in the situation against with the drivers? A. Yes, I went home for Christmas holidays in December and I got some phone calls from staff on site telling me the drivers were becoming restless again. That the drivers I had made the agreement with to stop the strike had changed out with the other group of drivers because we worked a 4 and 4* (week) *schedule, so the new group of drivers had come in and allegedly some of them said no, we didn't agree to this. We don't agree to this...*" (Mark Cobb Deposition Page 56)

(g) BP America Defendant Mark Cobb UK Coroner's Inquest Witness Statement "... *I went home for the holidays in December thinking that this was soon going to be resolved; however, when I got back I heard grumblings that the drivers were going to restart the strike. The night before the attack on the 15th January 2013, Tore BECH, Lotfi and I had a meeting with the drivers again between about 6 p.m. and 9.30 P.M. It was an ugly meeting back over old ground... there must have been over 100 people there...*" (Mark Cobb UK Coroner's Inquest Witness Statement page 15 of 18)

(h) The Telegraph dated 16 September 2014 "*Algeria gas plant bosses were 'warned of bloodshed' before attack*" "*... An inquest into the death at the Royal Courts of Justice in London heard that in the months before the attack there had been several labour disputes with local workers at the site... Mark Cobb was asked about a meeting the night of January 15 between management and representatives of Algerian drivers who had gone on strike at the site. Bridget Dolan, counsel for the coroner, put to him claims that a translator had overheard one of the drivers' representatives say:* "**You have made your law but tomorrow when you awake you will have a surprise and there will be bloodshed**"*...*"

Considering all of these threats and warnings, the BP Defendants didn't evacuate the Plaintiff and his men from the only drilling rig left working at In Amenas at that time to what they perceived as a relatively much-better-protected main facility. Nor did they

even have the courtesy to warn them that this "ugly meeting" had even taken place. The BP Defendants had just transferred the Plaintiff to this drilling rig less than two weeks before this, taking the Wellsite Leaders who were assigned to this rig off and switching them to the Plaintiff's assignment (*V. Facts 5.07*).

## GENERAL FACTS

5.42 After graduating from Texas Tech University with a degree in Mechanical Engineering, McDaniel went to work with Baker Hughes as a Field Engineer in June 2004. He was recruited by BP starting in 2006 to enter into the Well Site Leader of the Future Program. BP represented that the Well Site Leader of the Future Program was performance-based where McDaniel would be competing for promotions inside of BP among other similarly qualified candidates. McDaniel attended various interviews with BP representatives in Houston from 2006 through 2007 concerning the Well Site Leader of the Future Program. McDaniel left his job as a Senior Field Engineer with Baker Hughes to join BP's program on January 16, 2008. The program was for one year with the biggest said measures of performance to be oral panel assessments administered after the first 6 months and at the end of the program. BP's representations about this program being "performance based" couldn't be further than the truth.

5.43   In May of 2011, Defendants recruited and offered Plaintiff a job as a Level I – Wellsite Leader in In Amenas, Algeria.  Defendant BP America sent Plaintiff a "Letter of Rotational Assignment" and identified BP America as the "Employing Company."  Pursuant to the terms and conditions of the Letter Agreement, Plaintiff was to begin working in In Amenas on May 16, 2011, and the Letter Agreement provided a term of three (3) years, ending on May 15, 2014.  On page 5 of the Letter of Assignment under "Proper Law & Jurisdiction 44.  This Letter shall be governed

by and construed in accordance with the laws of the United States of America and **both parties agree to submit to the exclusive jurisdiction of the U.S. courts.**" (PLTF 000105).   Plaintiff commenced work pursuant to the Agreement and was assigned to live and work on the Rig in early January 2013.  This was Plaintiff's first rotation on the Rig which had been idle for several months due to security concerns stemming from a recent labor strike. Plaintiff was assigned to work a 28 days on/28 days off rotation on the Rig.   Defendants provided all meals, accommodations, and security on the Rig.   The Rig was located approximately 7.5 miles southwest of the Base de Vie and the In Amenas Gas Plant during the four-day In Amenas Siege.   However, the Plaintiff was brought up to the main facility by Algerian forces on the fourth day of the siege and parked at a command post.   During this time, the Plaintiff was brought within feet of the blown up and burnt out vehicles were burnt bodies and blown up body parts of his coworkers still were located.

5.44  BP's cover up about what actually transpired during the January 2013 In Amenas Hostage Crisis/Four-Day Siege of the Plaintiff's drilling rig has now been exposed. Undeniable evidence produced in this case has exposed BP's blatant dishonesty and omission of evidence attempting to cover up their guilt in the crisis while covering up the guilt of their partners in the Algeria government's crimes in order to maintain BP's billions of dollars of oil and gas interests in Algeria. The majority of the expatriates killed during the crisis were murdered by the Algerian government, not the terrorists. The most disturbing evidence shows that BP dishonestly began notifying the significant others of the last group of hostages deaths on the third day of the siege, 18 January 2013. The Plaintiff testified under oath at the UK Coroner's Inquest that he was "certain" this last group of hostages had not been killed until after noon local time on the fourth day, 19 January 2013. The Plaintiff's text messages from the fourth day of the crisis show that he was instructed

by his U.S. contact to gather all the information he could about these hostages.  On 19 January 2013, the morning of the fourth day, the Plaintiff was brought by Algerian forces to a position within half a mile from those six or seven hostages who were still being held alive. The Algerian forces parked the Plaintiff within several feet of vehicles that had been blown up, shot up, or burned up when Algerian helicopters engaged their vehicles on the afternoon of the second day. The wreckage of these vehicles still contained the burnt bodies and body parts of the expatriates he had been working to save.  Multiple BP managers, including Defendant Mark Cobb, did not testify truthfully about the fact that they knew these hostages to still be alive on the fourth day of the siege.  BP and Defendant Mark Cobb hid from the public undeniable BP evidence which substantiates the Plaintiff's first-hand account of what took place.  BP and Defendant Mark Cobb hid all the evidence they deemed "Confidential" from the public and allowed the Judge who presided over the inquest to falsify this evidence and dishonestly rule that these hostages were killed on the third day. As the Plaintiff has maintained, several of these last hostages, including at least one BP America employee, were freed from the terrorists on the afternoon of the fourth day only to be murdered by the Algerian DRS hours later – who blamed their "executions" on the terrorists.  BP sought to cover up the truth about how and when these hostages died for many reasons.  One of the obvious reasons was BP's attempt to protect their partners in the Algerian government in order to maintain their billions of dollars of oil and gas interests in Algeria.  The evidence BP has deemed "Confidential" in order to successfully hide it from the public up to this point will further substantiate this fact.  By blatantly lying about and covering up what actually occurred during the In Amenas Hostage Crisis, BP continues to misrepresent the true danger of working in Algeria to relatively low-level expatriates. If these expatriates were told the truth, there is no way they would continue working in Algeria for BP. Without these expatriates, BP would

not fulfill their end of the oil concession they have with the Algerian Government thus losing billions in oil and gas interests.

5.45    On the morning of Wednesday, January16, 2013, the In Amenas field was penetrated by militants.  From the Rig floor, Plaintiff observed explosions and smoke from base de vie, where his fellow workers were housed, and the gas plant.

5.46    During the terrorist attack on the base de vie and gas plant, Plaintiff was able to intercept various radio communications from terrorists and personnel within the facility.  Realizing the importance of the radio communications, Plaintiff contacted the U.S. Consulate in Algeria and reported there was an emergency situation at the gas plant.  Plaintiff relayed information about the attack to the U.S. authorities and continued to stay in contact with them to pass along intelligence of the attack and the ensuing hostage situation.

5.47    Throughout the remainder of the morning after the initial attack, Plaintiff and other workers on the Rig began preparing for an attack and evacuation of the Rig.  Given the content of the intercepted terrorist radio transmissions, all BP expat leaders on location, including Plaintiff, agreed to not be taken alive.  Plaintiff began fortifying the perimeter of the Rig and advising personnel of where to position themselves should the terrorists attempt to take the Rig.  At approximately 12:45 p.m., an unidentified man was seen walking towards the Rig, prompting the security alarm to trigger.  It was then reported that men with Rocket Propelled Grenades and machine guns were positioned within one (1) mile of the Rig.  A co-worker assigned by the Defendants as the security liaison for the Rig, went against the agreed plan and told all personnel,

including Plaintiff, to go into their rooms and lock their doors where they did not have windows or cell phone reception. When BP expat leadership on location refused, the Gendarme captain, who was armed with an AK-47, forced them into their rooms. Defendants' "Security Alarm" Plan states that upon hearing the alarm, gunfire, or explosion, personnel should "if outdoors, take cover and lay down behind or under something solid"; "if indoors, stay indoors. Switch off all appliances TV's, computers, lights etc. Lay down"; and "remain in cover while the OLC and military assess and deal with the situation. This may take some time." An argument ensued between BP expat leaders on location, including Plaintiff, and the Defendants' security liaison. When asked why the plan changed, Plaintiff was informed by the security liaison that the Gendarme captain *"wanted to know the exact location of the American company men* (the Plaintiff and Billy Whitted) *on the Rig because the terrorists were going to want to talk to them."* BP's other Wellsite Leader on location fell apart and lost all composure in the face of the obvious "set up" that was taking place. The Plaintiff refused to go along with other Wellsite Leader's plan to quietly abandon the Rig location on foot once night fell and leave the seven other expats on location completely helpless and for whom the Defendants were responsible. In preparation for a terrorist attack, Plaintiff made a make-shift foxhole, held a night watch fully exposed from the top of the Drilling Supervisor's Office, and fortified the Rig as best as possible given the lack of adequate protection and security at the Rig. Plaintiff gathered tools that could be used as weapons from around the rig (axes, knives, hammers, etc.) and distributed them among the expats.

5.48  Despite the obvious and known security concerns, Defendants had provided no safe houses, bulletproof fortifications, armored vehicles, or security/evacuation plans in the event of an attack. The primary safety precaution from BP was an instruction to "hide under your bed."

As a result, workers like the Plaintiff were literally at the mercy of merciless terrorists. Defendants and Mr. Cobb made decisions, and delayed decisions, about the security measures for the gas plant and Rig, including but not limited to allowing improved security measures to be delayed and/or unfulfilled.

5.49    Plaintiff and his co-workers were stranded on the Rig and in immediate threat of attack for four days following the initial attack on the base de vie and gas plant.  At no time did the Defendants attempt to evacuate the Plaintiff or his co-workers from the Rig despite significant resources, influence, and leverage to do so.  In contrast the Defendants quickly evacuated all BP Managers located at Hassi Messauod, which is over 400 miles from the gas plant, along with hundreds of other expatriates working for BP in Algeria hundreds of miles away from In Amenas. BP quickly evacuated defendant Mark Cobb after he ran away from his hiding place at the Base de Vie within hours of the attack abandoning his men. BP also quickly evacuated expatriate workers in the first hours of the attack from a wellsite nearby the Plaintiff's rig in Bourahet with the evacuation team traveling up Route National 3 through BP's In Amenas field without issue. BP evacuated dozens of expatriates as they escaped from the In Amenas facility on the first, second, and third day of the crisis without issue – but did not evacuate the Plaintiff and his men, who could have easily been evacuated up Route National 3, completely bypassing the main facility. Bad actors in BP and the Algerian government needed to draw away U.S. air surveillance in order to cleanly eliminate the Plaintiff.  Attempting to accomplish this, evidence obtained in this case will show beyond a reasonable doubt that, multiple times during the four-day siege, BP took part in distributing misinformation to the U.S. government claiming that the Plaintiff and other expatriate workers had been safety evacuated from the rig when in fact, they hadn't been. Bad

actors in BP and the Algerian government's final attempt at pulling away U.S. air cover above the Plaintiff's drilling rig took place on the afternoon of the third day when a convoy of vehicles containing Algerian forces reached the rig, and BP reported on their incident management team time log that the Plaintiff and his men were "on the way to the airport." This dummy run attempt to pull away U.S. air presence with eyes on the situation is well-documented in BP's "Confidential" Incident Management Team time log, which was hidden from the public at the UK Coroner's Inquest.

5.50    Throughout the duration of the attack on the base de vie and gas plant, the Plaintiff remained on the Rig and discretely communicated with U.S. authorities, reporting all developments and information he received from his observations, conversations, and radio traffic. Plaintiff feared for his life and safety but continued to risk the same to maintain communications about the events and to seek help for and to protect his fellow co-workers. The Plaintiff knew in detail of the suffering and deaths of some of his co-workers. After four days being fearful of his life and fearful of being captured alive and tortured to death, the Plaintiff was eventually evacuated from the Rig only after extreme pressure was exerted by the U.S. government. While being evacuated, the Plaintiff continued to gather information from all sources available, including Algerian Intelligence Officers, about co-workers still being held hostage in the gas plant on the fourth day of the siege, which he secretly relayed on to U.S. authorities.

5.51    Defendant Mark Cobb, as the BP General Manager of In Amenas, has been named responsible for the security of the field. Considering his failed responsibility and shameful actions leading up to the attack, Mark Cobb had a desire to keep what happened at In Amenas inside

Algeria and internal to Defendants.   Mark Cobb did not condone the Plaintiff's acts in communicating and working with U.S. authorities during the attack.  While the Plaintiff was still in harm's way and was doing everything he could to save lives, Mark Cobb attempted to use his senior position within BP to intimidate the Plaintiff from cooperating with U.S. authorities.  In one such attempt, Mark Cobb called Plaintiff on his cell phone and angrily stated, "**YOU DON'T WORK FOR THE U.S. GOVERNMENT; YOU WORK FOR BP....YOU DON'T HAVE TO TELL THEM ANYTHING**..."  In response, the Plaintiff asked, "Is that what you want me to tell the U.S. State Department?"  Mark Cobb replied, "**You tell them what I told them, (expletive) you, I don't work for you, you work for me**..." BP's treatment of the Plaintiff since the attack is consistent with Mark Cobb's sentiment during this phone call. (Plaintiff's cell phone bill shows incoming call from Mark Cobb at said time on 19 January 2013, Produced in discovery request responses by Plaintiff in 2015)

5.52    BP's chosen narrator for the UK Coroner's Inquest regarding the 4 day siege of the Plaintiff's Rig was Military Liaison Tom Martin who has been "hooked up" with a higher paying position for BP. Considering Tom Martin's cowardly actions and subservience to the Algerian Gendarme Captain at the drilling rig during the 4 day siege, it's obvious why his version of events is skewed. Tom Martin "*couldn't recall*" many details of the Plaintiff's account at the Inquest. In a text to the Plaintiff weeks after the crisis, Billy Whitted also states that he too told BP Security investigators "*How incompetent Tom was too*". Tom has been "promoted" by BP to the much higher paying position of HSE Advisor on a drilling rig in Algeria. Upon the "advice" of BP, Tom has declined to turn over the statement he gave to the UK Met Police which partly substantiates the Plaintiff's experience.

5.53    Texas resident Billy Whitted is still working for BP. Billy canceled the deposition he was scheduled to give in February 2017 and refused to take any more advice from BP's legal team. Billy demanded his own attorney as an individual. Upon the "advice" of BP, Billy too has declined to produce the statement he gave to the UK Met Police which will partly substantiate the Plaintiff's experience.  In a text to the Plaintiff weeks after the In Amenas Hostage Crisis, Billy stated that he too told BP "Security" investigators how "*How incompetent Tom was too*". (Text Produced by Plaintiff in 2015)

5.54    After the January 2013 In Amenas Hostage Crisis / 4 day siege of his drilling rig, BP demanded that the Plaintiff be brought back to London where he would be "processed" by BP.

    (a)   Email from Plaintiff to Federal Investigators on 21 June 2014 detailing his treatment in London at the hands of BP on 20 January 2013 "*… After making it out of the Algerian Hostage crisis, I was not happy with BP. I met with BP Security at a high level in London on 20 January. I called them out on their hand before and during the Algerian Hostage Crisis. I was told the person I was talking to a person "at the executive support, St. James Square with the board level Bob Dudley involved…" – I was so fearful at that point, I recorded that part of the meeting on my Iphone 4. The meetings got to the point when I felt some back vibes. I let them know I had evidence against them "it was digital and damning"… this is when things got extremely scary. Among several other things, while I was down stairs meeting with support personnel, someone had gotten insider my hotel room without forced entry and went through all my things.*

*It went from bad to worst after that; the night before I flew home, I was in serious fear*

*for my life due to the shenanigans and harassment against me while barricaded inside*

*my hotel room at London Heathrow Airport. Even before this (after I below the whistle*

*on the "cheating" email in January 2009), I was fearful of BP. And now after the*

*London incident, I have refused to return to work for them anywhere, despite the large*

*amount of money they have thrown at me to "return to work"..."* (Email from Plaintiff

to BSEE Investigator Ross Laidig Dated 21 June 2014, Freedom of Information Act

Request, US Department of Interior, Page 45)


(b)    High points of audio recording mentioned in above

email of Brad McDaniel's meeting with BP in London after

being brought there by them after the Jan 2013 In Amenas

Hostage Crisis. Bob Dudley is BP's CEO. Paul Kolbe is

BP's "Director of International Security Affairs". Paul

retired from the CIA after 25 years and joined BP in 2009.

Fearful for his life, on 20 Jan 2013 at 15:04 BP GMT,

Plaintiff Brad McDaniel (BM) recorded a meeting with BP

Group Security's Bill Briggs (BB) in hotel conference

room at London Gatwick – BM had got very little sleep

since 16:00 GMT on 15 Jan 2013 so he was up and going

for almost 96 hours straight at this point.

Bill Briggs BP Security (BB) *"Have you been speaking to your wife*

*Brad?"*

Brad McDaniel "*Yeah, via texts messages and uh... a little bit, yeah, she knows I should be home tomorrow.*"

BB "*So look listen. I've committed to all your phone bill for all of the things so if you need to speak to her on the phone, you just speak to her. I will get that sorted out*"

BM "*OK*"

BB "*Has anyone in the FBI been in touch with you ... since we last spoke?*"

BM "*I've been holding off*"

BB "*So umm ... I ... after you went, I spoke to **Paul Kolbe**, whose name you've got, you've got it on that piece of paper haven't you.*"

BM "*Yes Sir*"

BB "*Because he is at the Executive Support, he's at St. James's Square, you know with the because they're at **the board level with Bob Dudley (BP CEO) involved** etc, etc*"

BM "*Sure*"

BB "*So he done ... is pretty much, because of the sensitivity of the issue, just like you want to be guided by the FBI so did we so this is the situation, these are the concerns... I*

described... **_We understand the concerns. It's not, you know, crazy to expect what you expect to happen is a very logical expectation._** *What they've ... because we're following their instructions as well. They've said that they are going to contact you to talk to the issues. And they'll guide both of us because obviously we don't want to say anything either that could have an effect on US Security issues. That's more than ... we're unpopular enough already as it is... but the FBI should be contacting you like very very soon. They said they'd be reaching out to you now. They have all your contact details haven't they? So .... I would like to leave it at that for now.... I'm ... I'm about to move my stuff down here so I'm going to be in a hotel room here as well ...."* (only the first 2 min and 14 seconds into the recorded meeting)

Recording skips ahead to 7 minutes in ....

BB *"... I love BP, I haven't worked for them as long as you this is the best job I've ever had I really like the organization I've been here since September 2011 but I believe in truth, this is the ... we need to know exactly what happened and everything needs to be ... this is not ... tell the FBI or DEA or whoever the proper American agency ...."*

BM *"... this is not a threat, I just want yall to know..."*

BB *"... I'm not taking it that way...."*

BM *"... I just want yall to know that if yall for some reason try to aggress towards or slander or distance yourselves from me and I feel aggressed at ...."*

BB *"... you're a BP employee, we're not going to distance ourselves ...."*

BM *"... **I just get a shady feeling from this room**, I don't know if it's genuine or not, I just get a feeling after the phone call with the man, that maybe I might try to get screwed around here, I'm just saying, know this, it's going to shock the hell out of some people when I pull this out, it's electronic, it's ah, it might not be related to this incident (Deepwater Horizon), but ah, don't (screw) me around on this…"*

BB *"… Brad look, I can't say 100% for some people but I can say 100% for me, I can say I know, I have a good insight into the way the organization is behaving, **I can't see them doing that and if they did, I can't see it but of course you would have to strike back – I would – I would – I can't conceive that's going to happen. However, you know - never say absolutely never…**."*

BM *"… I hope it never comes to that – I'm just saying I will defend myself…. "*

BB *"… **how would we look if we attacked a victim of this most appalling incident, it can't possibly make it better…**."*

Recording skips ahead to 14 minutes in ….

BM *"… this idea that somehow I'm this country boy from Texas, oh you know, I feel like I'm being underestimated and dismissed, that's a big mistake on yall's part…"*

BB *"… I am absolutely certain that … well I think you're being underestimated but I don't think you're being lowly estimated …. It's not*

*that other people are diminishing you ... I'm sure that will be very*

*apparent to you when the FBI get in touch ... you are ... **what you did was***

***definitely heroic, you did the right thing, you kept your wits about you,***

*and I'm sure the consulate had information that they couldn't have got*

*from anyone else, because nobody had the view, I understand all of that,*

*the point is, let's take our advice from the FBI, because in terms of the*

*press strategy, this is one where, actually, you guys deserved to be*

*celebrated, except, if it wasn't for the counter side, you deserve to be*

*celebrated in the press, however, as a - the consequences of being*

*celebrated is going to have other consequences, let's let the FBI talk about*

*it....*"

The "FBI" called Brad after this meeting to discuss the issue but Brad had
no way of knowing whether or not it was really the FBI or BP "Security"
people posing as "FBI"... during the call, the "FBI" offered Brad the
following advise "... don't talk to the media about this..." (Full
Recording was produced in discovery request responses by Plaintiff in
2015)

**Since then, after hearing parts of the Plaintiff's experience working**

**for BP and the evidenced to go along with it, the Plaintiff has been**

**encouraged by multiple Federal Agents to pursue legal action against**

**BP.**

(c) Upon experiencing terrifying occurrences in London at the hands of BP, the Plaintiff sent
text the following text messages to his wife "***Yes. But phone is on vibrate. Going back to***

114

*sleep. If the good guys need me, tell them I've had to silence my phones due to the above mentioned BS. If they need me, send a badge to the above mentioned hotel Rm5311*" (Text message time stamped 21:07 on 20 January 2013, Produced in discovery request responses by Plaintiff in 2015) The Plaintiff had to unplug both of his land lines in his hotel room as well as his cell phone after he received multiple calls "wanting to make sure he was staying the night". This among other very concerning occurrences, including some utilizing a key attempting to enter his hotel room while he was sleeping. Fortunately, the Plaintiff had already barricaded his door.

(d) The above text message was followed by "***Don't count on me being home tomorrow. Same shady folds who are pulling all this stuff are the ones that booked my flight...***" The BP Defendants booked the Plaintiff's flight home from Dallas. (Text message time stamped 21:16 on 20 January 2013, Produced in discovery request responses by Plaintiff in 2015)

(e) The Plaintiff text his brother, Brett McDaniel, time stamped starting at 5:08am on 20 January 2013 "*In London. (Redacted) still holding an apartment in London? Is she here right now? **Might have to drop of the BP radar. Might need a place to hold up.** If she's here, what's her number? **BP (company has blacked out my internet access and they are practically holding me as a willful prisoner right now) can walk out anytime but might need a place to hold up.** Hotels are mostly full due to flight delays and snow*" Brett responded "*Yeah no problem at all her number is* (redacted). *Also her address is* (redacted). *Take the district line all the way to southfields to get there.*" Plaintiff responded. "*Ok. It's settled down a bit. Shouldn't need it :) But thanks so much.*" Brett responded "*No problem sorry it took a while. Glad your alright*". After returning home and getting some rest, the

Plaintiff was trying to figure out why they were after him in London. The Plaintiff responded to the text message on 29 January 2013 "**Google tall blond hair blue eyed terrorist Algeria and I think you'll understand why I was getting the strange treatment in London**". Sadly, that was the only reason the Plaintiff could fathom at the time why they were trying to kill him – they must have thought he was a terrorist. Based on what we know now, it's obvious that wasn't the case. The Plaintiff clearly let BP know in the recording he was done playing their game. Any reasonable person will see it obvious that BP sought to eliminate the Plaintiff as not only a $20+ billion insider witness against them in the Deepwater Horizon but also for what he knew took place and the evidence he had supporting it at In Amenas. (Text message time stamped 5:08AM on 20 January 2013, Produced in discovery request responses by Plaintiff in 2015)

(f)   Considering his terrifying experience in London at the hands of BP, the Plaintiff backed up this recording, along with other digital evidence on multiple SD cards. The Plaintiff felt he needed to transfer the evidence to someone he trusted in case "BP Security" was waiting for him upon landing in the United States. Former Dallas Cowboy and NFL commentator Daryl Johnston happened to be waiting in line with him to check in on the flight from London Heathrow to Dallas/Fort Worth International Airport. The Plaintiff introduced himself to Daryl and they took a picture together. On the flight, the Plaintiff sent a note to Daryl describing his situation stating he feared "that his employer, BP was trying to kill him" in order to contain insider evidence he had against them in the Deepwater Horizon Disaster and the In Amenas Hostage Crisis. In the note, the Plaintiff asked Daryl to take

116

possession of one of the SD cards and deliver it to either the Plaintiff's brother or an FBI contact the Plaintiff had in Midland, Texas. Daryl took possession of the SD card and agreed to deliver it to a contact he had in the FBI for the Plaintiff. Once landing in Dallas, the Plaintiff was met by multiple Federal Agents holding a sign that read "Brad McDaniel". The Plaintiff requested to see badges and explained what he had experienced and why he was taking precautions. The Federal Agents were very friendly and let the Plaintiff know that they were only there to see him home safely.

(g)    Upon landing in Dallas, the Plaintiff sent out a lengthy group text message to his father, mother, three brothers and wife. The Plaintiff texted at 1:17pm on 21 January 2013 "*Landed in Dallas... You guys have been in the circle of trust and have been privy to* (some) *sensitive information. U must understand how big this could possibly get.* ***Strange things*** **(were)** ***happening to me in London. If I had to choose, I'd rather be out on that rig again than deal with those cocky Brits in London. I was practically being held as a voluntary prisoner, blacked out phones and internet, under constant surveillance, constantly being tailed and accounted for, was subject to having them access my room – they helped themselves going through my things when I was being questioned, and subject to harassment and sleep deprivation by people representing BP. I hope I don't get the same treatment in the US but only time will tell. Knowing what you know, watch your backs. If you see any suspicious activity, please let me or local low level FBI know.*** *It is critical that we remain quiet about the sensitive details. Also, it is critical that we don't all group up in the same place until things settle out. No family get togethers – at least not all at once. I'm fine and remaining strong through this. U guys need to protect your families first. If things get crazy and I don't feel secure, I will be protecting myself the old fashioned way*

*living out* (at) *the ranch until things settle out. I do not want my family to be put at anymore*

*risk than they already have been. Thanks, Brad*". (Text message time stamped 1:17pm on

21 January 2013, Produced in discovery request responses by Plaintiff in 2015)


5.55  An expert witness on terrorists networks, Dr. Shaul Gabbay, has testified that due to the

actions the Plaintiff had to take in order to not only ensure the safety of his men on the drilling

rig but also in doing everything he could to help his coworkers who were being held hostage or

were in hiding at the main facility, the Plaintiff can no longer safely return to work overseas. The

Plaintiff's future earnings potential has suffered significantly due to this. In the Plaintiff's current

role as a Senior Drilling Engineer, he could easily make twice per year working abroad.

Considering the Plaintiff has at least 30 years remaining in his career and given his unique skill

set, it's reasonable to assume the Plaintiff would continue to climb the career ladder versus his

peers – especially in opportunities in relatively higher paying upper managerial positions

overseas.

    (a)    Dr. Shaul Gabbay Deposition "…Q. **It's your opinion that Mr. McDaniel can never return to the Middle East or the Muslim world. A. He can return. The question is if he can come back.** Q. All right. You think -- is it your opinion that if Mr. McDaniel were to go to any Muslim country today, that he would be, what, killed? **A. Killed, tortured, kidnapped.** Q. And what is your basis for that? A. The terrorist organizations are a network. Q. Okay. A. Global network operating in different places in the world. Q. All right. A. He is a person who brought death in some of his actions, in some parts of what he did, being in touch with the American government, things that people could find, being in touch with the American consulate, bringing the drone. Therefore, **if he returns to the Muslim world, he would be a prize. He would be a target for what took place and his role**…" (Dr. Shaul Gabby Deposition, 8 November 2016, Page 164-165)


    (b)    Dr. Shaul Gabbay "Professional Analysis of the Case of Brad McDaniel" dated 16 May 2016. "I was asked to examine the case of Brad McDaniel with regards to his work with British Petroleum (BP) and the incidents he endured during the In Amenas siege in January 2013… In preparation for this analysis, I have thoroughly reviewed Court documents and

supporting evidence surrounding Mr. McDaniel's case. Additionally, I have telephonically interviewed Mr. McDaniel on multiple occasions. Given my research and knowledge concerning the current conditions in Algeria, of which I will delineate and explain in this report, **it is my professional opinion and unequivocal conclusion that Mr. McDaniel's accounts of the incident are accurate... while the incidents of the siege of In Amenas may seem fantastical to some – even something out of Hollywood – the events of the incident have been well-documented. More than that, the consequences Mr. McDaniel continues to endure are very real, and should not simply be brushed off as "paranoia" or "delusional"**.... this presents an extreme danger to Mr. McDaniel as an American man that is known for his work in In Amenas, as well as his cooperation with U.S. Government concerning intel he provided on his attackers. **Even if it were possible that McDaniel could return to work in the region, it would not be advisable. Upon his return to Algeria, he will be targeted by the very extremist groups he fears.** Most importantly, and has been discussed in this report, the government has been prostrate in its attempts to afford any protection to individuals being consistently targeted by extremist groups. In the same vein, **the probability that Mr. McDaniel would be accused of spying for the West is quite high and presents a very realistic concern**. The war on terror has resulted in the use of increased personal espionage to gather inside information, and the terrorists groups mentioned earlier in this report who are infiltrated throughout the society are continuously on alert for potential spies or CIA agents. **Those who are suspected of working with Western governments to spy on potential terrorist activities are often tortured into providing information or proving they are innocent**. Suspected spies have also been the target of vigilante style murders... Conclusion: Without question, the case presented by Mr. McDaniel is complex, and there are many factors to consider. To an individual not versed in the history and current events in Algeria and the MENA region, the incidents described by Mr. McDaniel may seem surreal, or even fictional. However, after thoroughly examining Mr. McDaniel's case, and after conducting my own independent, rigorous research on the matter, I can categorically state that Mr. McDaniel's depiction is not only plausible, it is quite real...." (Dr. Shaul Gabbay Deposition, Dated 16 May 2016, Pages 1-28, Exhibit 1081)

5.56   Former BP Security / Social Programmes Advisor for the Algerian Sahara, Dr. Jeremy Keenan was retained as an exclusive expert witness by the legal team representing one of the American's family that was killed in the January 2013 In Amenas siege in a case consolidated with the Plaintiff's. At this time, the Plaintiff was trying to better understand who was behind the suspicious security incidents he was experiencing at home – including being followed by suspicious cars. Any reasonable person will agree that BP "Security" / Wackenhut was behind the incidents, probably more so looking to intimidate the Plaintiff from going outside of BP with

the Deepwater Horizon evidence, than anything else. **Seeking to understand why he was such a high value target at In Amenas, to gauge if he could safely return to work in the U.S. and to confirm that his and his family members' lives could be at risk from retaliation from the Algerian DRS even within the U.S., the Plaintiff contacted Dr. Keenan asking for his expert opinion. Dr. Keenan responded on 21 November 2013**

"Brad, I have copied out your email questions into this word-doc so that I can answer them more fully and clearly. I have answered them, as best I can, as if I was "under oath in court". My answers are *in italics.*

(1) During a major international crisis, such as the In Amenas attack, if the DRS (or others working with them) knew that someone who was physically on Algerian soil was extensively exposing their lies and signs of possible collusion with terrorists real time to say, the U.S. government, how much danger would that person be in while still on the ground in Algeria? For the four days of the siege, what if the Algerian government was, on multiple occasions, lying about this person's location to the U.S. government? For example, "he's been evacuated and is safe in town X at the airport", when he is/was actually still held up in an unsecured area? What if there were other significant signs that something wasn't right and it seemed this person was being targeted? If the DRS could discretely get away with eliminating this person (witness), would they do it if they thought they could get away with it?

*That person would be in extreme danger. If the DRS was in possession of the information covered in the first sentence, I believe that the DRS would seriously consider that person's elimination, assuming, of course, that they felt they could "get away with it". The second question is more a matter for the individual and US government. However, if such a situation occurred during those 4 days, I would not be at all surprised to learn that the DRS (or the "Algerian authorities") were lying about the location of individuals. Put another way, my experience of the DRS is that it is an habitual "liar", or what one would call, more professionally, "a purveyor of disinformation". The DRS has got rid of ("exterminate" was the dominant word in the 1990s) tens of thousands of people over the last two decades. "Getting rid" of Algerians is of little consequence to them. It is being done continually, although obviously in lesser numbers today than in the 1990s. However, killing a "foreigner", especially one from a major Western power, would probably not be undertaken lightly. If they deemed it necessary to protect themselves from the sort of exposure you describe, I think they would do it, probably by devising an "accident" (car crash, or something along those lines, or even a "false flag" terrorist killing).*

(2) That same person makes it out of Algeria alive and still retains non-public information of the DRS's lies and signs of possible collusion with terrorists. How brutal is the DRS? Might they or others that work with/for them kill that person to keep their secret or keep him or her from publicly releasing the information? Might they or others possibly kill the person in pure revenge if the DRS (or others) received blow back from the information he provided to the U.S.

government?

*The DRS has always been brutal and ruthless. However, my experience is that they are far more cautious operating in other countries, especially Western power countries, such as UK, France, US et al. This is because the DRS works closely with those countries and does not want to lose the considerable "freedoms" it enjoys in those countries to check on, molest, harass, etc., its own "citizens" living in or visiting those countries, especially those Algerians who have left Algeria permanently. For instance, the DRS has considerable freedom and scope to "spy on" and threaten Algerians in the UK. My understanding is that the UK grants it these 'freedoms' (as an ally) on condition that it does not overstep its mark in that host country. About three year's ago, certain members of the Algerian opposition living in the UK (as UK citizens) received threats from the DRS and were offered protection by the British authorities. The offer was also made to me, so I believe. However, it was not taken up, as, I believe, the DRS was warned off by the UK authorities. I suspect the same sort of 'relationship' exists in the USA.*

Would it be safe for that person with his identity known to:

   (a)  go back to work in Algeria?
*No. Besides, I would doubt if Algeria would grant them entry.*

   (b)  work in any other country in North Africa?
*No. The DRS' reach extends right across North Africa and the Sahel.*

   (c)  work in any country in Africa?
*Less risky as one moves south, although I would never take the reach of the DRS for granted, not it readiness to settle 'old scores'.*

   (d)  work in any Third World / Developing country? (There isn't a real market for Americans to earn a good living in the UK, Spain, Canada, France, Australia, Bora Bora, etc)
*The biggest risk here would be in 'Arab' speaking country, such as the Middle East, Gulf regions. Etc. I do not enough experience of the Far East, Latin America, etc., to comment, although I would imagine those regions are a little beyond the reach of the DRS, although I would still never underestimate them.*

   (e)  work and/or travel within Europe or any other country without adequate security? (I had

a terrifying experience in London on January 20th-21rst)
*The DRS has an extensive network across Europe, which is "well protected" (see above) by the host countries with whom it works (e.g. Spain, France, UK, Italy, Germany, etc.).*

(f) could it be possible that within the U.S. that the DRS (or others acting on their behalf) could get to the witness?

*I do not have personal experience of DRS operations within the US. I would imagine that they are far less well developed than in Europe. Also, the DRS has very close working relations with certain US intelligence agencies (not sure precisely which ones, although I am aware of close links with the FBI, CIA and Pentagon intel agencies). I am therefore unable to assess the risk in the US. **I would place it as lower than in Europe, but would never regard it is zero. I think much would depend, as in the case of my other answers, on how much of a "risk" the DRS thought you were.***

(3) A person makes his living working overseas in Third World countries (mostly non-U.S. friendly countries). It took him about five months to get cleared separately by both the Libyan Government (2010) and Algerian Government (2011). These governments required many certified documents (college degree, birth certificate, certifiable employment history, etc.) on this individual to prove he is who he says he is, partly to prove he isn't there as a spy or to overthrow the government. Let's say information is known in detail about this person previously working with say the U.S. Government during a time of crisis (specifically the CIA, State Department, Military, and/or the like).

Could this person possibly be denied a work visa in those countries due to the country considering him a security risk while on the ground within their borders (possible spy)? *I am sure the answer to that would be "Yes".*

(4) Let's say that person gets the work visa and is working on the ground in a Third World country, and they find evidence in detail about his previous work with the U.S. Government (possible spy). How much danger might he be in?

Could they possibly pull his work visa and never allow him to return? *I would imagine that their most likely action would be to have him deported from the country.*

*NB.*

*One proviso to all these questions and answers is that we do not have much knowledge (in fact virtually none) on how the DRS is operating since its "dismantlement" on September 11, 2013. I*

*have therefore answered these questions on the basis of my knowledge of the DRS prior to that date. "* (Email and Expert Opinion attached to email Produced by the Plaintiff in 2015)

**5.57   Just 2 months after getting this sobering expert opinion from Dr. Keenan, the Plaintiff's younger brother, Brett McDaniel, was killed in an automobile crash in South Dakota in January 2014. Members of the Plaintiff's family immediately suspected foul play in his death due to the Plaintiff's situation as previously laid out in this petition. Upon hearing the news of his brother's death, the Plaintiff immediately traveled up to the crash scene. The Plaintiff hired a former South Dakota State Trooper, Brad Booth, who was a "Crash Scene Expert" to fully investigate the automobile crash.  The Plaintiff paid Mr. Booth over $10,000 out of pocket to fully investigate the crash. To date, Mr. Booth cannot say with certainty that no foul play was involved in the fatal crash. The Plaintiff's younger brother looked so identical to him, people often confused them for each other. This was less than four months before the Plaintiff did what he ultimately did in May 2014 when he presented devastating insider evidence against BP and the BP America Defendants to a Senior Advisor on a U.S. Congressional Committee followed by federal investigators regarding BP's April 2010 Deepwater Horizon Disaster / Gulf Oil.**

5.58    After returning home to the United States, the Plaintiff has experience multiple security incidents matching tactics known to be employed by BP "Security" in the recent past. The Plaintiff has reported the major security incidents in great detail in writing to the FBI and local law enforcement. After the latest incident, the Plaintiff refuses to travel outside the state of Texas and tries to avoid all travel at night if at all possible. Outside of law enforcement, the Plaintiff has

vetted, retained, and utilized costly but very well trained and outfitted local private security contractors to respond to and help document any additional stalking and/or assassination attempts on the Plaintiff. The Plaintiff has also acquired thousands of dollars state of the art, ITAR restricted equipment to give him a tactical advantage and/or detection capability of said threats by BP "Security" goons. The Plaintiff has bought a house laid out with security in mind and has made thousands of dollars of improvements in security features. This includes a modified the perimeter fence more liken to an expatriate compound one would encounter in the Middle East versus suburban America – including remotely operated electronic gate. Considering the security incidents he experienced, in the spring of 2015, the Plaintiff began creating a Facebook "Public Figure" page with the aim of taking away anything the BP Defendants might be able to contain if he turned up dead. After experiencing a serious security incident in August 2015 which he reported in writing to FBI and local law enforcement, the Plaintiff switched the Facebook page to "Public" making the evidence he's compiled against BP supporting his assertions that BP and the BP Defendants conspired in attempts to murder him in on several occasions, including at In Amenas 16-19 January 2013. It was in fact the BP Defendants who brought this Facebook page before the Texas Civil Court in Cause Number 2014-54027 in their motions for summary judgement (www.facebook.com/BradMcDanielBP ). Since going public with the evidence he has against the BP Defendants, the Plaintiff has been threatened in writing by lawyers representing the BP Defendants multiple times. The stress that BP's cover up has caused the Plaintiff as well as the security incidents here even within the US have, understandably, greatly affected the Plaintiff. The Plaintiff's on the job performance has suffered from the distractions and stress induced by the BP Defendants but more sadly, the effect this entire situation has had on his young family is inexcusable. The Plaintiff's three young daughters and wife have been forever effected by the

conduct of the BP defendants – conduct that is well known to be employed by them in the recent past against "problem" employees and whistle blowers in the recent past where much less was at stake (US House of Representative's Report on Alyeska Covert Operation dated July 1992; Charles Hamel v Alyeska Pipeline Service Co).

Sadly, given the facts as laid out in this petition, the Plaintiff feels he is more likely to be targeted by bad actors acting on behalf of BP "Security" than the terrorist networks themselves. Considering this, the Plaintiff refuses to go anywhere BP "Security" has reach where he isn't afford the rights and due process that exists in Texas to defend himself if needed. Considering this, the Plaintiff hired a private security detail when he travel to London in October 2014 to testify against BP in the UK Coroner's Inquest into In Amenas. Even traveling within the state of Texas, the Plaintiff has hired a security detail to help protect him. Security incidents the Plaintiff has reported in writing, in detail to the FBI and local law enforcement match … BP harassment, threats, and stalking of the Plaintiff even here at home in the US which he has reported in writing in great detail to the FBI and local law enforcement are of great concern. BP's conduct is consistent with well-established and well know tactics they've used on adversaries in the recent past with a lot less at stake. The Plaintiff fears being targeted by BP "Security" even more than the Algerian DRS and/or terrorist networks. Due to this and BP Security's well established networks in most countries in the world, the Plaintiff refuses to even travel abroad to visit family members or go on vacation.

5.59   As a result of the foregoing events, including the Plaintiff's treatment at the hand of BP in London and the security incidents he's experienced hear at home, Plaintiff has suffered and continues to suffer from emotional distress and mental anguish for which he has sought and

continues to undergo medical treatment. Additionally, while reacting to a false security alarm that was sounded at an opportune time by the Al Qaeda linked SARL BAAT labor striking *"Guards/Drivers"* that BP tasked with "guarding" his drilling rig during the attack, Plaintiff sustained a knee injury for which he was required to undergo surgery and rehabilitation. Due to this along with the reasons laid out in the above petition, the Plaintiff is now unable to work abroad in the oil and gas industry and has sustained significant economic loss.

(a) The BP Defendants repeatedly insisted that they would cover any and all medical bills – including counseling and therapy sessions – associated with the January 2013 In Amenas Siege. For example, in one BP Letter from BP's Vice President Operations & Operated by Others, Algeria Country Manager, North Africa Region mailed to the Plaintiff, dated 21 October 2013 *"Dear Brad* (Plaintiff)*, I look forward to seeing many of you on 7 November in London. In the meantime, I would like to respond to question that I believe a number of you have on your mind, particularly about return to work and support in 2014. Medical & Psychological Treatment Support: As you know, our primary focus has been to support your recovery. Firstly, **I'd like to reassure you that any medical expenses associated with the incident, including psychological support, will continued to be covered in full by BP, for as long as required. This applies whether or not you choose to stay with BP*…."* (BP Letter dated 16 January 2014, produced by Plaintiff in 2016)

(b) Seeking to fully recover from his experience working for BP as laid out in this petition, the Plaintiff took BP up on that offer and received medical treatment from Dr. Harvey Rosenstock starting in November 2013. In therapy sessions, the Plaintiff detailed his

experience to Dr. Rosenstock as laid out in this petition. Dr. Rosenstock "Psychiatric Evaluation" of the Plaintiff dated 19 February 2016. "... *Treatment Sessions designed to assuage symptoms of extreme stress associated with fears of being followed by a person or persons with the intent of doing serious bodily harm to him, possibly killing him, because of the information he possesses regarding Instant case* ... *in addition to the acute symptomatology suffered during the initial year after the Instant Case, has continued to suffer from the following seqaelae: 1) Paranoid thoughts of being followed; 2) Fears of being murdered...* " (Dr. Rosenstock's "Psychiatric Evaluation" dated 19 February 2016, Page 2 & Page 5). Dr. Rosenstock's primary concerns in evaluating and treating the Plaintiff stem from incidents the Plaintiff has detailed in in this petition which match almost exactly tactics know to be utilized by BP "Security" / Wackenhut in recent history for critics of BP where much less was at stake (V. Facts 5.54 – 5.58) & (US House of Representative's Report on Alyeska Covert Operation dated July 1992; Charles Hamel v Alyeska Pipeline Service Co).

(c) BP re-reimbursed all expenses the Plaintiff incurred up to May 2014 when he approached the US Congressional Committee followed by federal investigators with the insider evidence regarding the Deepwater Horizon disaster. Shortly after that, the BP Defendants have not paid for any medical expenses. The Plaintiff put in his 2 weeks' notice of his plans to resign from BP on 14 July 2014. The Plaintiff started working for the company he currently is with on 28 July 2014. Upon leaving the BP and retaining legal counsel, the Plaintiff was advised by his attorneys that all communications with BP should go through them. The Plaintiff was under the impression that his attorneys were covering these expenses which would come out of the settlement they claimed to

be working towards since he hired them. In early 2017, the Plaintiff learned from Dr. Rosenstock that no one had been paying his balance and it had accumulated to over $50,000. In the other two cases Dr. Rosenstock was treating with similarity to the Plaintiff's, the balance was being paid down by the attorney Francis Spagnoletti, who was the General Counsel in the Plaintiff's case. The Plaintiff was informed Dr. Rosenstock had no problem holding the balance until the case was either settled or a jury awarded him the medical expenses which BP had repeatedly, in writing committed to covering – but Dr. Rosenstock found it odd theirs were being paid while his weren't. The Plaintiff informed his attorneys of the outstanding balance and was informed not to worry as that balance would be taken out of the settlement – hopefully that would be reached in their mediation that was set for 23 February 2017. In this mediation, the BP Defendants staunchly stuck by their ridiculous false narrative as laid out in some of the recent court filings. The Plaintiff was told that BP would not compensate the Plaintiff a dime – including the medical expenses they committed to pay for (V. Facts 5.59 a) – unless the Plaintiff signed "Full Confidentiality" in a 9 page non-disclosure agreement that includes a waiver of any and all liability attached to any settlement offer compensating the Plaintiff for above referenced damages, took down his Facebook Public Figure Page, and ceased making criminal accusations against BP. As laid out in the petition above, the Plaintiff found such demands unacceptable in his situation and seeks to recover any and all damages due to him in a jury trial.

(d) After declining the terms of BP's settlement demands at mediation, Dr. Rosenstock has sense re-negotiated on his willingness to hold the medical expenses until trial in this case. Shockingly to the Plaintiff, Dr. Rosenstock demanded that the Plaintiff pay the

outstanding balance in full, which stands at $59,000. The Plaintiff informed his attorneys of this and they offered no relief. Dr. Rosenstock hired a debt collector who has harassed not only the Plaintiff and his family, but also his in-laws. After the debt collector failed to collect the debt – in full – Dr. Rosenstock has hired an attorney who has threatened legal action if the Plaintiff does not pay the balance in full – over $59,000 - by 13 December 2013. The Plaintiff insists that Dr. Rosenstock honor the original agreement and hold such balance until after the trial.

5.60  Plaintiff's injuries occurred in a facility managed, operated and/or controlled by Defendants.

5.61   The Plaintiff suffered a medial meniscus tear during the 4 day siege while reacting to a false security alarm that was sounded at an opportune time by the Al Qaeda linked SARL BAAT labor striking "*Guards/Drivers*" that BP tasked with "guarding" his drilling rig around 04:30am local time on 17 January 2013. The Plaintiff attempted to rehab the nagging knee injury but ultimately had surgery on 10 January 2014. BP agreed that the knee injury was suffered during the siege and paid the Plaintiff's out of pocket expenses for the diagnosis, surgery, and rehabilitation for the knee injury. BP's lawyers have since attempted to claim that the knee injury did not occur during the siege. BP's reasoning for this includes that the other expatriates on the rig claim they knew nothing of the injury, the Plaintiff didn't mention the injury during an exam with a Physician Assistant in 2013, and because of the year that passed between the injury and the surgery and during this time the Plaintiff was able to work on his ranch and take part in hunting trips. To further substantiate the Plaintiff's testimony regarding the knee injury, WebMD states

*"Symptoms of a meniscus tear depend on the size and location of the tear and whether other knee injuries occurred along with it... with small tears, you may have minimal pain at the time of the injury. Slight swelling often develops gradually over several days. Many times you can walk with minimal pain, although pain increases with squatting, lifting, or rising from the seated position. These symptoms usually go away in 2 or 3 weeks although pain may recur with bending or twisting."*

## VI.

### CAUSE(S) OF ACTION

**Count I:**

**Civil Damages under Racketeer Influenced and Corrupt Organizations Act**

(a) BP Defendant Mary Streett, was the sister of Clinton Foundation Executive Director, Stephanie Streett.

(b) Tony Podesta, the brother of Bill Clinton's former Chief of Staff, John Podesta, lobbied on behalf of BP on issues including the Gulf of Mexico spill response and recovery.

(c) The U.S. Secretary of State at the time of the Gulf Oil Spill and January 2013 In Amenas Hostage Crisis was Hillary Clinton. During this time, Hillary Clinton's foundation, *"The Clinton Foundation"*, received tens of millions of dollars from BP, major stake holders in BP, and the Algerian Government. This includes over $80 million from the UK Government who is a major stake holder in BP and over $500,000 from the Algerian Government.

(d) During her time as U.S. Secretary of State, Hillary Clinton made decisions that benefited BP at the expense of victims of not only the Gulf Oil Spill but also victims of the January 2013 In Amenas Hostage Crisis, including the Plaintiff. A couple examples can be found

in emails recovered in U.S. Department of State Freedom of Information Act Requests (U.S. Department of State Case No. F-2014-20439 Doc No. C05768877, Email Dated 30 April 2010, and Doc No. C05793345, Email Dated: 10 January 2012) and BP internal emails discovered in cases consolidated with cause number 2014-54027 (BP Email Dated 20 January 2013, BPALGERIA_0362904).

(e) The Plaintiff's attorneys acted upon obvious conflicts of interest and withheld key evidence from both the court and the Plaintiff in cause number 2014-54027. Upon investigation of these conflicts of interests, the Plaintiff learned that the "General Counsel", Francis Spagnoletti, of the attorney representing him in the case, Brent Allison, was a long time Clinton donor dating back to at least 1999 when he donated to Hillary Clinton's New York Senate Campaign. The Plaintiff also found that Francis Spagnoletti's son also had abnormal ties to the Corporation "Stratfor", the world's leading geopolitical intelligence platform, who had significant ties to certain BP Defendants and the Podesta Group. After giving them opportunity to explain their actions and inaction with no success, the Plaintiff terminated his attorneys with good cause in September 2017.

(f) The Plaintiff also found that the judge presiding over cause number 2014-54027 had a history of large contributions to the Democratic Party which supported Hillary Clinton's run for the November 2016 Presidential Election.

(g) Independent of the active RICO investigation into the Clinton Foundation, it can be adequately established that the BP Defendants fall under conduct actionable by the civil provisions as laid out in RICO themselves.

**Count II:**

**Civil Damages under Section 806 of the SOX, 18 U.S. Code 1514A** which grants protections to whistleblowers who are employees of publicly traded companies.

**Count III:**

**Negligence and Gross Negligence**

  6.01  Defendants are liable to Plaintiff or their negligent and grossly negligent actions for the injuries and damages sustained by Plaintiff.

  6.02  Defendants were negligent and grossly negligent in failing to protect its contractors, employees and invitees, including Plaintiff, from conditions they knew, or had reason to know, created an unreasonable risk of harm to its contractors, employees and/or invitees.  Defendants were negligent and grossly negligent in the following manner:

1)  Failing to provide a safe work place for Plaintiff;

2)  Failing to provide security measures and/or failing to provide adequate security measures to protect its contractors, invitees and/or the employees, including Plaintiff, at the Rig and the In Amenas joint venture in Algeria.  Such measures include, but are not limited to, providing adequate and sufficient security guards; evidence will show that in fact, the Defendants chosen "guards" at drilling rig were known by the Defendant to be Al Qaeda linked.

3)  Failing to provide and/or to properly and adequately provide sufficient training information to its contractors and/or invitees and/or employees at the Rig and the In Amenas joint venture in Algeria;

4)  Failing to ensure that contractors, invitees and/or the employees at the Rig and In Amenas joint venture in Algeria were properly investigated and/or screened prior to being hired to work at the Rig and the In Amenas, Algerian joint venture in Algeria;

5)  Failing to require periodic background checks of personnel who worked at the Rig and the In Amenas joint venture in Algeria;

6)  Failing to take precautions to prevent foreseeable criminal acts of a third party;

7)      Failing to provide safe rooms, panic rooms, safe houses, bulletproof facilities, armored vehicles, and/or safe areas for its contractors, employees and/or invitees in the event of such incidents;

8)      Failing to provide adequate protection and/or security at the Rig to prevent and/or deter the easy access to the Rig from attack;

9)      Failing to provide and/or request armored personnel carriers with capability to oversee and prevent entrance to its facility at ingress/egress points;

10)     Failing to provide reinforced entrance barriers at ingress/egress points;

11)     Failing to increase protective measures that may have been in effect;

12)     Making false assurances to contractors, invitees and/or employees, that the premises were safe and that crime and/or the probability of an attack was not a problem;

13)     Failing to upgrade inner security;

14)     Failing to communicate results of BP's internal assessments of turmoil in the region;

15)     Failing to take action in security posture based on BP's internal assessments of turmoil in the region; and

16)     Other various acts and/or omissions which will be shown at the trial of this matter.

6.03    Defendants' acts and/or omissions rose to the level of gross negligence and warrant the imposition of exemplary damages. Defendants were aware of the dangers and conditions at the Rig and In Amenas facilities, yet exhibited conscious indifference to the rights and welfare of Plaintiff, which proximately caused his injuries and damages.

6.04    Plaintiff further asserts that Defendants are liable for negligent activities. Defendants did, or failed to do, what person(s) or entities of ordinary prudence would have or would not have done under the same or similar circumstances. These activities include, but are not limited to the following:

1)      Failing to provide security and/or failing to provide adequate security;

133

2)      Making false assurances to the Plaintiff that the premises were safe;

3)      Failing to increase protective measures previously in effect; and

4)      Failing to inspect and/or properly inspect its premises.

**Count IV:      Negligent Assumption of the Risk and Negligent Misrepresentation**

6.05    Plaintiff re-alleges the facts set out in the preceding paragraphs and incorporate those allegations by reference below as is fully set forth *verbatim* herein. Pleading further, and/or in the alternative, Defendants are liable for acts and/or omissions pursuant to the Restatement (Second) of Torts, Section 302(b), under the legal doctrine of negligent assumption of risks of intentional or criminal conduct:  An act or omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person, which is intended to cause harm, even though such conduct is criminal.  Defendants realized or should have realized that the conditions at In Amenas posed an unreasonable risk of harm to Plaintiff.

6.06    Additionally Defendants are liable for acts and/or omissions pursuant to the Restatement (Second) of Torts, Section 311, under the legal doctrine of negligent misrepresentation involving risk of physical harm:  (1) One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information where said harm results (a) to the other, or (b) to such third persons as the actor should expect to put in peril by the action taken.  (2) Such negligence may consist of failure to exercise reasonable care (a) in ascertaining the accuracy of the information or (b) in the manner in which it is communicated.

Defendants' express and implied representations as to the safety of the In Amenas facility and failure to apprise Plaintiff of the conditions at In Amenas placed Plaintiff in danger and peril.

6.07 Defendants' acts and/or omissions rose to the level of gross negligence and warrant the imposition of exemplary damages.  Defendants were aware of the danger, yet exhibited conscious

134

indifference to the rights, safety and welfare of Plaintiff, which proximately caused his injuries and damages.

**Count V:       Breach of Contract**

6.08    Plaintiff incorporates the foregoing by reference.  Further, and in the alternative, Plaintiff also asserts a claim for breach of contract.  BP made assurances and/or representations regarding the safety of the premises prior to Plaintiff going to work there, and these were plain and explicit expressions of BP's willingness to protect him from the acts of third parties in exchange for his willingness to work on site.

6.09    Defendants breached this contract and are responsible for all damages that resulted from it.

6.10    Further, Defendants had, in the alternative, voluntarily assumed a program of security by providing a security guard on the premises and by representing to its contractors, invitees and/or employees, that the Rig and In Amenas facilities were a safe place to work.

6.11    Defendants breached this contract and are responsible for all damages that resulted from this.

6.12    In accordance with Texas law, Plaintiff seeks his reasonable and necessary attorneys' fees.

**Count VI:      Premises Liability**

6.13    Plaintiff re-alleges the facts set out in the preceding paragraph and incorporates those allegations by reference as if fully set forth *verbatim* herein.  Further and in the alternative, during the time Plaintiff was at the Rig, he was Defendants' invitee.

6.14    Defendants had a duty to use care to maintain the premises in a safe condition.  This duty included, but was not limited to, a duty to protect their invitees, employees, contractors, and other workers from the criminal acts of third parties if they knew or had reason to know, that risk of criminal conduct at the In Amenas Facility (such as a terrorist attack) was so great that such risk was both unreasonable and foreseeable.  Certainly, at a minimum, dangerous events occurred and dangerous conditions existed (such dangerous events and conditions have been set forth throughout this pleading) long enough prior to January 16, 2013, that the Defendants had actual or constructive knowledge of them and of risk of harm to their invitees, employees, and others at the In Amenas Facility that that was both unreasonable and foreseeable.

6.15    Defendants also had a duty to make and maintain the In Amenas Facility reasonably safe for invitees, employees, contractors, and other workers because Plaintiff and others had to use the In Amenas Facility to do their work despite the unreasonable and foreseeable risk of a terrorist attack at the In Amenas Facility and were unable on their own to take measures to avoid this unreasonable and foreseeable risk of a terrorist attack.  Defendants knew and certainly should have anticipated that invitees and others such as the Plaintiff were unable one their own to take measures to avoid this unreasonable and foreseeable risk of terrorist attack. This duty included, but was not limited to, a duty to protect their invitees from criminal acts of third parties such as terrorists because they knew, or had reason to know, that the risk of criminal conduct at the In Amenas Facility (such as a terrorist attack) was so great that such risk was both unreasonable and foreseeable. Certainly, at a minimum, dangerous events had occurred (such dangerous events have been set forth throughout this pleading) and dangerous conditions existed (such dangerous conditions have been set forth throughout this pleading) long enough prior to January 16, 2013, that the Defendants had actual or

constructive knowledge of them and of the risk of harm to their invitees and others at the In Amenas Facility that was both unreasonable and foreseeable

      6.16    Defendants also had a duty to provide Plaintiff and others with adequate warnings regarding security of the In Amenas Facility. This duty included, but was not limited to, a duty to warn invitees of the risk that the In Amenas Facility may be subject to a terrorist attack because the Defendants knew, or had reason to know, that the risk of criminal conduct at the In Amenas Facility (such as a terrorist attack) was so great that such risk was both unreasonable and foreseeable. Certainly, at a minimum, dangerous events had occurred (such dangerous events have been set forth throughout this pleading) long enough prior to January 16, 2013, that the Defendants had actual or constructive knowledge of them and of the risk of harm to their invitees and others at the In Amenas Facility that was both unreasonable and foreseeable.

      6.17    Defendants failed to make and maintain the In Amenas Facility reasonable safe for invitees and others.  Defendants failed to provide adequate security measures to all its employees/invitees and to all others present at the In Amenas Facility, including the Plaintiff. Defendants also failed to provide the Plaintiff's deceased American co-workers, Mr. Lovelady, Mr. Buttacio, and Mr. Rowan, and others, with adequate warnings regarding the security of the In Amenas Facility.  These breaches of legal duties and failures created an unreasonable risk of harm to Plaintiff that was foreseeable and known to the Defendants, yet Defendants failed to address or correct.

      6.18    Defendants' failure to protect Plaintiff from foreseeable danger resulted in injury and damages.

      6.19    The nature of Defendants' errors and omissions warrants the imposition of exemplary damages.

**Count VII:    Fraud and Fraudulent Inducement**

6.20     Plaintiff re-alleges the facts set out in the preceding paragraphs and incorporates those allegations by reference below as if fully set forth *verbatim* herein. Further, and in the alternative, Plaintiff asserts claims for fraud and fraudulent inducement.  BP, by and through its agents, representatives, officers and employees, made specific assurances to Plaintiff regarding the safety and security of the Rig and BP's In Amenas facilities in Algeria thus inducing him to continue working in In Amenas.  Such representations and assurances pertained to the safety of the premises and BP's ability and willingness to protect him from the acts of third parties in exchange for his agreement to work at the Rig.

6.21     The representations and assurances made by BP and its agents, representatives, officers and employees, including Defendants Mark Cobb, Ronald Miller, and Charles Powell, were made for the explicit purpose of inducing Plaintiff to work for BP at the Rig at In Amenas under the belief that BP had adequate security and procedures in place to protect him from acts of terrorism by third parties and other dangers attendant to that part of the world.

6.22     At the time that these representations and assurances were made to Plaintiff, both BP and Mark Cobb, Ronald Miller, Charles Powell, and other BP agents, representatives, officers and employees, knew that such representations and assurances were false and that no such security measures and procedures were in place and/or were wholly inadequate to protect persons working at the Rig.  Such representations and assurances were made to Plaintiff with the intent that he rely upon them in making his decision to accept employment with BP at the Rig at In Amenas.

6.23     Plaintiff relied upon the representations and assurances made by BP through its agents, representatives, officers and employees and acted upon such representations and assurances in accepting employment.   Plaintiff's reliance thereon was justifiable and reasonable and his belief

therein was a reasonable belief and induced him to act on the information in making his decision to work for BP at In Amenas.

6.24    The representations and assurances made by BP, as outlined above, were both false and/or were made recklessly without any knowledge of their truth and were made as positive assertions with the specific intent that they be relied upon by Plaintiff and were a proximate cause of his injuries and damages.

**Count VIII:    Fraud and Breach of Confidential Relations**

6.25    Plaintiff re-alleges the facts set out in the preceding paragraphs and incorporates those allegations by reference below as if fully set forth *verbatim* herein.  Pleading further, and/or in the alternative, BP recruited Plaintiff for employment at a remote, international location.  His employment required him to live at a BP-controlled facility and perform a BP-controlled job.  In doing so, promises, guarantees and assurances to Plaintiff concerning BP's commitment to the safety of its employees, contractors, invitees, and/or other workers and Plaintiff relied upon such promises, guarantees and assurances to his detriment and to the detriment of the lives of his 39 expatriate coworkers whom he relentlessly attempted to save.

6.26    During the attack on In Amenas, BP had direct communications with the terrorists as the terrorists negotiated the conditions by which the attack would be concluded.  Plaintiff's life was literally in BP's hands because BP had the opportunity to negotiate and/or pay for the end of the attack and the safely of the personnel under its control and protection.

6.27    These facts gave rise to a relationship of trust and confidence under Texas law.

6.28    The parties' confidential relationship gave rise to a duty for BP to disclose facts it knew related to the security for the region.  BP did not make full and frank disclosure of the risks of which

it was aware.  Instead BP made false assurances that the premises were safe and would remain safe and that the probability of an attack was not a problem.   BP made such false statements, promises, guarantees and assurances to induce Plaintiff to work at the Rig in In Amenas and Plaintiff relied upon them to his detriment.

6.29     The statements, promises, guarantees and assurances made by BP to Plaintiff and to the general public as well, some of which came through BP's own website, include, but are not limited to the following:

(a) *Accommodation at Hassi Messauod and other infield bases consist of basic living quarters, enclosed within secure compounds, which have stringent security measures in place.* (BP.com: Algerian Travel Policy, North Africa SPU / Mark Cobb Exhibit 2)

(b) *In a business that has made safety the number one priority, helped us set the standards for our industry.* (BP.com: Careers – Experience professionals – HSSEE – Crisis and Continuity Management / Mark Cobb Exhibit 4)

(c) *BP aims to guard against hostile actions that could cause harm to our people or disrupt our operations, and we monitor for emerging threats and vulnerabilities.  We identify and assess security risks, such as hostile acts and cyber threats, with aim of mitigating them, and we update our security plans accordingly.* (BP.com: Sustainability – Safety – Security and Crisis Management / Mark Cobb Exhibit 5)

(d) *We are now focused on building a safer and stronger BP everywhere we work.  This determination will drive how we manage risk, how we operate, how we partner with others, and how we reward our employees.* (BP.com: Sustainability Review 2010, page 2 / Mark Cobb Deposition Exhibit 8)

(e) *We are determined that BP will be a safer, more risk-aware business.* (BP.com: Sustainability Review 2010, page 1 / Mark Cobb Deposition Exhibit 8)

(f) *We make it a top priority to protect our own safety, as well as that of our colleagues and everyone else we come in contact with.* (BP.com: BP Code of Conduct / Mark Cobb Deposition Exhibit 9).

(h) *We always strive to do the right thing.* (BP.com: BP Code of Conduct / Mark Cobb Deposition Exhibit 9)

(i) *We care deeply about how we deliver energy to the world. Above everything, that starts with safety and excellence in our operations. This is fundamental to our success.* (BP.com: BP Code of Conduct / Mark Cobb Deposition Exhibit 9)

(j) *Safety is a legitimate personal expectation and a constant individual responsibility. Every member of staff should be able to go home at the end of the working day without having suffered or caused harm in any way.* (BP.com: The Golden Rules of Safety / Mark Cobb Deposition Exhibit 116)

(k) The entirety of the document entitled The BP Golden Rules of Safety, in evidence as Mark Cobb, Deposition Exhibit 116.

6.30   BP also failed to advise of threats of which it was aware that would directly impact people BP had put in harm's way by recruiting them to a remote, desert location and also failed to disclose the position Sonatrach and/or the Algerian government had in dealing with terrorists and terrorism, fact of which BP was aware by virtue of its position as Sonatrach's joint venture partner. BP also failed to disclose its knowledge of Sonatrach and/or the Algerian government's covert infiltration and support of terrorists and terrorist organizations to fulfill a larger objective. Plaintiff relied on BP's misrepresentations, promises and assurances and omissions, as demonstrated by his willingness to go to the Rig in In Amenas to work. The nature of Defendants' errors and omissions

in combination with the Defendants' motive and meeting of the minds warrant the imposition of exemplary damages.

6.31    The nature of Defendants' errors and omissions in combination with the Defendants' motive and meeting of the minds warrant the imposition of exemplary damages.

**Count IX:    Negligent Performance of Undertaking to Render Services**

6.32        Plaintiff re-alleges the facts set out in the preceding paragraphs and incorporates those allegations by reference below as if fully set out in the preceding paragraphs and incorporates those allegations by reference below as if fully set forth *verbatim* herein.  Pleading further, and/or in the alternative, Defendants are liable for acts and/or omissions pursuant to the Restatement (Second) of Torts, 323, under the legal doctrine of negligent performance of undertaking to render services:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

6.33    Defendants undertook to render services to Plaintiff and others at the Rig in In Amenas to protect those persons and failed to exercise reasonable care providing protection and security for Plaintiff and others.  Plaintiff relied upon Defendants' undertaking to render security services at the Rig in In Amenas and was injured and suffered damages as a result of such reliance. Defendants' failure to use reasonable care to protect Plaintiff proximately caused his injuries and damages.

**Count X:    Intentional Infliction of Emotional Distress**

6.34    Plaintiff re-alleges the facts set out in the preceding paragraphs and incorporates those allegations by reference below as if fully set forth *verbatim* herein with emphasis on BP's now exposed blatantly dishonest cover up of the truth about the Plaintiff's experience. Further, and in the alternative, Plaintiff asserts claims for intentional infliction of emotional distress.

6.35    Defendants' conduct in contacting and recruiting Plaintiff to accept a position at the Rig in In Amenas, yet failing to inform or disclose to Plaintiff the area was not safe and secure was intentional and reckless. Indeed, Defendants' conduct coupled with their motive and meeting of the minds was extreme and outrageous.

6.36    Defendants' blatant dishonesty and their attempted cover up of what actually happened at In Amenas has aggravated and amplified the Plaintiff's terrible experience.

6.37    Defendants' conduct proximately caused severe emotional distress to Plaintiff.

6.38    Plaintiff's severe emotional distress cannot be remedied by any other cause of action.

6.39    Defendants' wrongful conduct caused Plaintiff to sustain severe emotional distress and mental anguish.

6.40    The nature of the Defendants' errors and omissions, blatant and continued dishonesty about what the Plaintiff endured, coupled with their motive and meeting of the minds warrants the imposition of exemplary damages.

**Count XI:    Civil Conspiracy to Commit Fraud**

6.41    Plaintiff re-alleges the facts set out in the preceding paragraphs and incorporates those allegations by reference below as if fully set forth *verbatim* herein. Further, and in the alternative, Plaintiff asserts claims for civil conspiracy to commit fraud.

6.42   Defendants including BP America's Mark Cobb, Ronald Miller, and Charles Powell had a meeting of the minds.

6.43   Defendants conspired to accomplish an obvious objective.

6.44   Defendants took part in one or more unlawful, overt acts and/or acts with an unlawful purpose.

6.45   Plaintiff suffered damages as a proximate result.

6.46   The nature of the Defendants' errors and omissions, blatant and continued dishonesty about what the Plaintiff endured, coupled with their motive and meeting of the minds, warrants the imposition of exemplary damages.

**Count XII:     Civil Conspiracy to Commit Intentional Infliction of Emotional Distress**

6.47   Defendants' took part in a civil conspiracy and proximately caused severe emotional distress to Plaintiff to discredit his testimony and evidence against the Defendants in both the April 2010 Deepwater Horizon Disaster/Gulf Oil Spill and the January 2013 In Amenas Hostage crisis.

6.48   Plaintiff's severe emotional distress cannot be remedied by any other cause of action.

6.49   Defendants' wrongful conduct caused Plaintiff to sustain severe emotional distress and mental anguish.

**Count XIII:     Defamation of Character**

6.50   In BP's own words during a recorded meeting with the Plaintiff in London on 20 January 2013, a high-ranking BP "Security" advisor stated that what the Plaintiff did "was

144

definitely heroic, you did the right thing, you kept your wits about you…"  In stark contrast to this statement and in the face of the undeniable evidence supporting the Plaintiff's experience, BP has dishonestly covered up the truth and defamed the heroic actions of the Plaintiff at the expense of his personal and professional reputation.

## XIV.

### DAMAGES

7.01    Plaintiff re-alleges the facts set out in the preceding paragraphs and incorporates those allegations by reference below as is fully set forth *verbatim* herein.

7.02    As a result of the negligence and gross negligence of Defendants, Plaintiff has been made to suffer and sustain damages within the minimum jurisdictional requirements of this Court.

7.03    Plaintiff would state that the amount of monetary relief sought is within the sole discretion of the fact-finders who will consider the evidence and decide what amount will compensate Plaintiff for the Defendants' negligence and gross negligence.

7.04    Elements of damages for which Plaintiff seeks compensation include the following:

a.    physical pain and disability sustained from the date of injury to the time of trial;

b.    future physical pain and disability reasonably anticipated to be sustained in the future;

c.    mental anguish and suffering sustained from the date of injury to time of trial;

d.    mental anguish and suffering which is reasonably anticipated to be suffered in the future;

e.    loss or earnings sustained from the date of injury to time of trial;

f.    loss of earnings and earning capacity reasonably anticipated to be suffered in the future;

g.    reasonable and necessary medical expenses incurred in treatment of injuries from the date of injury to time of trial; and

h.  reasonable and necessary medical expenses reasonably anticipated to be sustained in the future for treatment of Plaintiff's injuries.

7.05  Plaintiff is entitled to punitive damages in an amount to punish Defendants for their grossly negligent actions, civil conspiracy, fraud, intentional infliction of emotional distress, and defamation of character.

7.06  Further, Plaintiff seeks a claim for prejudgment interest for all elements allowed them.

7.07  Plaintiff further pleads for attorneys' fees, costs of court and any other relief to which he may be entitled.

7.08  The BP Defendants have demanded "Full Confidentiality" in a nine-page non-disclosure agreement that includes a waiver of any and all liability attached to any settlement offer compensating the Plaintiff for above referenced damages. The BP Defendants cite the importance of maintaining BP's business "reputation" but refuse to account for the Plaintiff's reputation, which dollar for dollar, is arguably much more important than BP's with a current market cap of over $126 billion. The Plaintiff has a minimum of 30 years left in his career, which is valued at over $12 million if he continues to only earn what he is currently earning. Given BP's shameful and dishonest conduct in representing the facts in this case to date, Plaintiff risks his entire future earnings potential if he signs off on the conditions of BP's settlement offer and is further defamed by BP and blackballed from the oil industry. The Plaintiff seeks jury trial and fair compensation for the above damages that would not require any non-disclosure agreement or waiver of right to take future legal action against any additional defamation by BP or their surrogates that further negatively affect his career.

## XV.

## JURY TRIAL

8.01    Plaintiff demands a jury trial.

## XVI.

### CONDITION PRECEDENT

9.01    All conditions precedent to Plaintiff's right to recover and to Defendants' liability have been performed or have occurred.

## XVII.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that the Defendants be cited to appear and answer herein as the law directs, and that upon final hearing, Plaintiff have and recover judgment of and from the Defendants pursuant to the above and foregoing allegations in such amounts as hereinabove set out and as the evidence may show proper at the time of trial; together with interest thereon at the legal rate and costs of Court.  Plaintiff further pleads for his reasonable and necessary attorney's fees and costs and any other relief, at law and in equity, to which he may be entitled.

Respectfully submitted,

BRAD MCDANIEL

Bradley Lane McDaniel
Texas Board of Professional Engineers EIT #36030
3803 St. Andrews Ct.
Midland, TX  79707
Telephone (432) 214-7915

**PLAINTIFF   "Pro Se"**

147

**Attachment 7 - Civil Cover Sheet & Instructions**

JS 44  (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

### DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff  *Midland, Texas*
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  *Salt Lake, Utah*
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
*Pro Se: Bradley Lane McDaniel*
*3803 St. Andrews Ct., Midland, TX  432-219-7928*

Attorneys (If Known)  *Unknown*

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☒ 3 | Foreign Nation | ☐ 6 | ☒ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☒ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN   (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
*RICO, Civil damages under Section 806 SOX, 18 USC 1514A, other*

Brief description of cause:
*BP Defendants conspired to retaliate against plaintiff Gulf Oil Spill*

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23     DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE  *Robert Schaffer*   DOCKET NUMBER  *2014-54027*

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

**Rev. Ed. April 21, 2009**

43